# TAB 6

TRAK SILAPADURIYANG                                        August 10, 2017

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   ESTATE OF PIERRE LOURY,         )
     Deceased, by TAMBRASHA          )
 5   HUDSON, Administrator,          )
                                     )
 6            Plaintiff,             ) No. 16 C 04452
                                     )
 7       -vs-                        )
                                     )
 8   CITY OF CHICAGO, CHICAGO        )
     POLICE OFFICERS SEAN HITZ       )
 9   (Star No. 6272) and JEFF J.     )
     RIORDAN (Star No. 7716),        )
10                                   )
              Defendants.            )
11
     _____
12

13            The deposition of TRAK SILAPADURIYANG, called

14   by the Plaintiff for examination, pursuant to notice

15   and pursuant to the Federal Rules of Civil Procedure

16   for the United States District Courts pertaining to

17   the taking of depositions, taken before Christine

18   Bechtold, Certified Shorthand Reporter within and for

19   the County of Cook and State of Illinois, at 191 North

20   Wacker Drive, Chicago, Illinois, commencing at the

21   hour of 10:00 o'clock on the 10th day of August, A.D.,

22   2017.

23

24
```

TRAK SILAPADURIYANG August 10, 2017

Page 5

1  (Witness sworn.)
2  TRAK SILAPADURIYANG,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5  DIRECT EXAMINATION
6  BY MR. ODIM:
7  Q. Good morning, Officer Trak.
8  A. Good morning, sir.
9  Q. We're here today for your 30(b)6 deposition.
10 I'm going to show you what we'll mark as Plaintiff's
11 Exhibit 1.
12  (Whereupon, Silapaduriyang
13  Exhibit 1 was marked for
14  identification.)
15 BY MR. ODIM:
16  Q. On the first page beside your name it
17 includes the following, "Paragraph 8 not including
18 subpart." That references Page 4 of the document.
19  You're here to testify, am I correct, about
20 the policies, practices, and/or customs with respect
21 to the training of police officers about discharging
22 firearms at civilians from 2010 to 2016?
23  A. Yes, sir.
24  Q. You're not testifying about Subpart A in

TRAK SILAPADURIYANG                                           August 10, 2017

Page 7

1    A.    First of all is the one in front of me right
2    here.
3    Q.    Okay.
4    A.    Okay.  And the one prior to that is the
5    30(b)6 that I did before on the Lane case.
6    Q.    Okay.  And do you recall that -- you said it
7    was the transcript of that deposition for the Lane
8    case?
9    A.    Yes, sir.
10   Q.    Or the Notice?
11   A.    The transcript, I believe, or is it --
12   Q.    The transcript being the record of the
13   questions and answers.
14   A.    Correct.
15   Q.    Okay.  And those were the only two documents
16   you reviewed, the transcript of the Lane 30(b)6
17   deposition that you gave and the 30(b)6 Notice in this
18   case?
19   A.    Yes, sir.
20   Q.    What's your present position with the City of
21   Chicago police force?
22   A.    I'm assigned as a senior instructor at the
23   Chicago Education and Training Academy, sir.
24   Q.    And the Chicago Education Training Academy is

Page 8

1  a branch of or department of the Chicago police force,
2  correct?
3            MR. SCHOOP:  I'll just object to the form of
4  the question.  But, please, answer the question.
5            THE WITNESS:  It's under the Bureau of
6  Organization Development within the Chicago Police
7  Department.
8  BY MR. ODIM:
9       Q.   Okay.  And how long have you been a senior
10 instructor at that institution?
11      A.   Since 2009, sir.
12      Q.   And do you have any duty -- from 2009 to the
13 present, do you have any duties other than duties
14 associated with the -- your being a senior instructor
15 at that institution?
16      A.   Outside of Chicago Police Department?
17      Q.   No, with the Chicago Police Department.
18      A.   With the Chicago Police Department, assigned
19 to the academy, again, as a senior instructor, teach
20 classes including police recruits, continuing service
21 of the veteran police officers, and curriculum
22 development.
23      Q.   So all your responsibilities from 2009 to the
24 present are responsibilities that are not in the

TRAK SILAPADURIYANG                                August 10, 2017

Page 9

```
 1   field.  You have mainly an education function?
 2       A.  Correct, sir.
 3       Q.  Okay.  Education including all components of
 4   that training, recruiting, that sort of thing?
 5       A.  Correct, sir.
 6       Q.  Okay.  Prior to 2009 did you hold a position
 7   with the Chicago Police Department?
 8       A.  Yes, sir.
 9       Q.  Immediately prior to becoming a senior
10   instructor, what was your position with the CPD?
11       A.  I was a patrol officer assigned to
12   14th District, Shakespeare.
13       Q.  And how long were you a patrol officer?
14       A.  I came on the job in 2002, and then after the
15   academy training I -- 2003 through 2009, sir.
16       Q.  Okay.  So your first employment with the
17   Chicago Police Department was 2002?
18       A.  Yes, sir.
19       Q.  Okay.  Prior to 2002 what were you engaged in
20   doing?
21       A.  I was an axillary police officer for Village
22   of Rosemont for two years.
23       Q.  That would be from 1999 to 2002, roughly?
24       A.  Approximately 2000 to 2002, yes, sir.
```

TRAK SILAPADURIYANG                                    August 10, 2017

Page 10

1    Q.    And prior to that what were you engaged in
2    for employment purposes?
3    A.    I was a customer service manager for
4    Schaumburg Chrysler, that's an automotive dealership,
5    car dealership.
6    Q.    Do I have this right, you were at the academy
7    2002 through 2003?
8    A.    As a police recruit.
9    Q.    As a police recruit.
10    A.    Yes, sir.
11    Q.    You do do consulting with entities other
12    than, that is outside, the Chicago Police Department,
13    correct?
14    A.    Yes, sir.
15    Q.    In the last five years can you tell me the
16    consultancies that you have engaged in?
17    A.    I was selected by the U.S. Department of
18    State representing Chicago Police Academy, Chicago
19    Police Department, went overseas to consult with the
20    Thai police, the Thai National Police, and the
21    Vietnamese National Police.
22    Q.    And this was approximately -- this was in the
23    last five years.  Approximately what year?
24    A.    Started in 2011, sir.

Page 11

 1    Q.   Okay.
 2    A.   And it's currently still ongoing, yes.
 3    Q.   Okay.  And have you had any other
 4  consultancies within the past five years?
 5    A.   No, sir.
 6    Q.   Have you provided expert testimony in any
 7  legal case during your tenure at the Chicago Police
 8  Department?
 9    A.   Recently I have in terms of deposition, yes.
10    Q.   And the -- do you recall the case in which
11  you provided expert testimony?
12    A.   The Lane case I did.
13         MR. SCHOOP:  I just need clarification on
14  this.  Are you asking about expert testimony per
15  2-618, or are we talking about the 30(b)(6) because I
16  don't think the witness is --
17         MR. ODIM:  Good point.
18  BY MR. ODIM:
19    Q.   I'm making a distinction between giving
20  30(b)6 testimony --
21    A.   Okay.
22    Q.   -- and giving testimony as someone who has
23  been formally qualified as an expert witness.
24    A.   Okay.  I see the distinction right there.

Page 14

```
 1      A.   I believe a couple months ago.
 2      Q.   Okay.
 3      A.   I'm sorry.  Maybe going back to spring.  I'm
 4   not sure.  Time just flew by.
 5      Q.   Actually, that's the zone I was putting down.
 6   Okay.  Thank you.
 7           Okay.  The current City of Chicago Deadly
 8   Force Policy is contained in General Order GO3-02-03;
 9   is that correct?
10      A.   Yes.
11      Q.   I'm going to show you what we'll mark as
12   Plaintiff's Exhibit 2.
13                      (Whereupon, Silapaduriyang
14                       Exhibit 2 was marked for
15                       identification.)
16   BY MR. ODIM:
17      Q.   Will you take a brief look at that, and I
18   just have a few questions about it.
19      A.   If I may get my reading glasses?
20      Q.   Oh, sure.  Are you set?
21      A.   Yes, sir.
22      Q.   The document, Exhibit 2, you have in front of
23   you is the current policy; is that correct?
24      A.   Yes, sir.
```

Page 15

1    Q.   Now, in the header of that, the first page,
2    it says, "Rescinds: 1 October 2002 Version."
3    A.   Correct.
4    Q.   Okay. Am I correct in saying that there was
5    no substantive difference between Exhibit 2 and the 1
6    October 2002 version that it rescinded?
7         MR. SCHOOP: Objection, foundation.
8         THE WITNESS: I don't understand the
9    question.
10   BY MR. ODIM:
11   Q.   Okay. Is there a difference between
12   Exhibit 2 and the 1 October 2002 version that was
13   rescinded by Exhibit 2?
14        MR. SCHOOP: Same objection as to the
15   foundation of the question.
16   BY MR. ODIM:
17   Q.   Do you understand the question?
18   A.   Yes, sir.
19   Q.   Okay.
20   A.   Yes, there is a difference.
21   Q.   Can you tell me what that difference is?
22   A.   Specifically, I'd have to do compare and
23   contrast. However, when -- this is, like, an updated.
24   So, you know --

Page 19

1   A.

2       A.   Okay.  If you can repeat the question.

3       Q.   Let me ask it in a shorter way.

4            What are the practical applications of the
5   use of deadly force against a fleeing suspect?

6       A.   Okay.  The application practice or practices
7   is we do not shoot at a fleeing subject.  We do not
8   use deadly force at a fleeing subject.

9       Q.   Are there circumstances in which the City of
10  Chicago believes that deadly force should be used
11  against a fleeing suspect?

12      A.   Yes.

13      Q.   And what are those situations?

14      A.   The circumstance will be where the officer
15  has reasonable belief that fleeing subject pose an
16  immediate threat, of course with weapons, to himself,
17  to his or her partner, or other civilians.

18      Q.   So that if a fleeing suspect is in possession
19  of a gun but doesn't point the gun at the officer,
20  would the City of Chicago agree that the use of deadly
21  force against that fleeing suspect would not be
22  appropriate?

23           MR. SCHOOP:  I'm just going to object to the
24  extent that that question arguably is an incomplete

Page 20

1  hypothetical question.  But, please, answer the
2  question.
3          THE WITNESS:  Correct, sir.  No.
4  BY MR. ODIM:
5     Q.   And clearly a fleeing suspect who has no gun
6  on him is not an appropriate target for discharge of
7  an officer's weapon?
8     A.   Correct.
9     Q.   Would it be appropriate for an officer to
10 discharge his weapon at a fleeing suspect who merely
11 reaches for a gun but doesn't pull it out and point it
12 at the officer?
13         MR. SCHOOP:  Again, I'm going to object to
14 the extent the question arguably poses an incomplete
15 hypothetical question.  But, please, answer the
16 question.
17         THE WITNESS:  What we look at, there's three
18 components, sir, on deadly force situations.
19 BY MR. ODIM:
20    Q.   Okay.
21    A.   Okay.  One, the weapon system, which could be
22 a pistol, firearms, knife, bat, anything that could
23 cause death or great bodily harm.
24         Number two is the delivery system.  Delivery

Page 22

1      MR. SCHOOP: I'll just object to the form of
2  the question. But, please, answer the question.
3      THE WITNESS: Correct, sir.
4  BY MR. ODIM:
5      Q.  Okay. And what -- how do you -- how does the
6  City of Chicago train officers to determine or analyze
7  a situation in order to arrive at some reasonable
8  belief about the intent of a fleeing suspect?
9      A.  Couple things. Pre-attack indicators is what
10 we call.
11     Q.  And what are those pre-intent indicators?
12     A.  Pre-attack.
13     Q.  Oh, I'm sorry. Pre-attack?
14     A.  Correct.
15     Q.  Okay, sorry.
16     A.  Indicators.
17     Q.  What are those pre-attack indicators?
18     A.  Bodily language.
19     Q.  Okay.
20     A.  Not necessary it has to be deadly force
21 encounter, like clench fist, boxing stand, 1,000 yards
22 looks, stares, okay.
23     Q.  In connection with a fleeing suspect who is
24 at a distance from the officer, what would be

Page 29

1           What is post discharge training?
2      A.   What that means is in training we have
3   simulators pistol.  So post discharge just means post
4   discharge after a trainee discharge his or her pistol.
5      Q.   Is post discharge training a concept that is
6   used by the City of Chicago after a police officer has
7   discharged his weapon in the field?
8           MR. SCHOOP:  Object to the form of the
9   question.
10  BY MR. ODIM:
11     Q.   Do you understand the question?
12     A.   Post discharge training, okay.  If you're
13  referring to the officer discharged his weapon, yes,
14  there's an eight hours training that the officer has
15  mandatory to come in for training.
16     Q.   And what's the purpose of that?
17     A.   There's several purposes.  One, we want the
18  officer to speak out about the events that occurred,
19  anything that he or she -- about the traumatic
20  incident.
21     Q.   And is there any other purpose?
22     A.   Yes.
23     Q.   And what are the other purposes?
24     A.   There's a review of the law, and there is a

Page 30

1   firearms training again.  We will have the chaplain's
2   office that come out and speak to he or she, employee
3   assistance program.  It is a traumatic incident.
4        Q.   Let me ask you about the difference between
5   written policies and unwritten policies.
6             We've talked about the written policy
7   embodied in General Order GO3-02-03.
8             Are there any unwritten -- are there any
9   practical applications of unwritten policies regarding
10  discharged of an officer's fire arm at a fleeing
11  suspect?
12            MR. SCHOOP:  I'm just going to object to the
13  form and the foundation of the question.  But, please,
14  if you understand the question, answer it.
15            THE WITNESS:  You mean unwritten that's not
16  documented?
17  BY MR. ODIM:
18       Q.   Right.
19       A.   No, sir, absolutely not.
20       Q.   Another definitional question.  What is force
21  mitigation?
22       A.   Force mitigation is techniques to assist
23  officer knowing how to deescalate the situation,
24  especially to the mentally ill individuals.