# TAB 9

JOSHUA HUNT                                    August 11, 2017

                                                        Page 1
1          IN THE DISTRICT COURT OF THE UNITED STATES
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3
      ESTATE OF PIERRE LOURY,          )
4     Deceased, by Tambrasha           )
      Hudson, Administrator,           )
5                                      )
                         Plaintiff,    )
6                                      )
                 -vs-                  ) No. 16 C 04452
7                                      )
      CITY OF CHICAGO, Chicago         )
8     Police Officers SEAN HITZ        )
      (Star No. 6272) and JEFF J.      )
9     RIORDAN (Star No. 7716),         )
                                       )
10                       Defendants.   )

11

12              Videotape deposition of JOSHUA HUNT, taken

13    before NANCY DECOLA EATINGER, C.S.R., and Notary

14    Public, pursuant to the Federal Rules of Civil

15    Procedure for the United States Courts pertaining to

16    the taking of depositions for the purpose of

17    discovery, at Suite 2300, 191 North Wacker Drive,

18    Chicago, Illinois, commencing at 10:03 o'clock a.m.,

19    taken on August 11, 2017.

20

21

22

23

24

JOSHUA HUNT                                         August 11, 2017

Page 2

1              There were present at the taking of this

2     deposition the following counsel:

3

4         ACTION INJURY LAW GROUP, LLC
          By MR. ANDREW M. STROTH,
          191 North Wacker Drive
5         Suite 2300
          Chicago, Illinois  60606
6         (312) 771-2444
          astroth@actioninjurylawgroup.com
7
                and
8
          ODIM LAW OFFICES
9         By MR. CARLTON ODIM
          225 West Washington Street
10        Suite 2200
          Chicago, Illinois  60606
11        (312) 578-9390
          carlton@odimlawoffices.com
12
                appeared on behalf of the Plaintiff;
13
          CITY OF CHICAGO - DEPARTMENT OF LAW
14        By MR. JONATHAN CLARK GREEN,
              Senior Counsel,
15        30 North LaSalle Street
          Suite 900
16        Chicago, Illinois  60602
          (312) 744-0226
17        jonathan.green@cityofchicago.org

18              appeared on behalf of the City of Chicago;

19        CITY OF CHICAGO - DEPARTMENT OF LAW
          By MS. LIZA M. FRANKLIN,
20            Deputy Corporation Counsel,
          30 North LaSalle Street
21        Suite 900
          Chicago, Illinois  60602
22        (312) 742-0170
          liza.franklin@cityofchicago.org
23
                appeared on behalf of the
24              Individual Defendants;

JOSHUA HUNT                                    August 11, 2017

```
                                                     Page 3
1

2           INDEPENDENT POLICE REVIEW AUTHORITY
            By MR. BRANDON CRASE,
3           1615 West Chicago Avenue
            Fifth Floor
4           Chicago, Illinois  60622
            (312) 746-3609
5           brandoncrase@chicagocopa.org

6               appeared on behalf of the
                Independent Police Review Authority and
7               the Deponent, Joshua Hunt.

8
        ALSO PRESENT:  SCOTT JOHNSON, Legal Videographer.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

```
 1        THE VIDEOGRAPHER:  This is the videotape

 2   deposition of Joshua Hunt being taken in the matter

 3   of Loury, et al., versus City of Chicago, et al.,

 4   case number 16 C 04452.

 5             This deposition is taking place at 191 North

 6   Wacker Drive, Chicago, Illinois.  Today's date is

 7   August 11, 2017.  The time is 10:03 a.m.

 8             My name is Scott Johnson, and I'm the

 9   videographer with US Legal Support located at 200

10   West Jackson Boulevard, Chicago, Illinois.  The court

11   reporter today is Nancy Eatinger.

12             Video and audio recording will be taking

13   place unless all parties agree to go off the record.

14             Will counsel please state your names for the

15   record.

16      MR. ODIM:  Carlton Odim for the plaintiff.

17      MR. STROTH:  Andrew Stroth for the plaintiff.

18      MS. FRANKLIN:  Liza Franklin on behalf of the

19   individual defendants.

20      MR. SCOTT:  Brandon Crase on behalf of IPRA.

21      MR. GREEN:  And Jonathan Green on behalf of the

22   City of Chicago and deponent.

23      THE VIDEOGRAPHER:  Will the court reporter please

24   swear in the witness.
```

JOSHUA HUNT                                        August 11, 2017

Page 6

1                     (Witness sworn)

2                     JOSHUA HUNT,

3    called as a witness herein, having been first duly

4    sworn, was examined upon oral interrogatories and

5    testified as follows:

6                     EXAMINATION

7                     By Mr. Odim:

8    Q    Good Morning, Mr. Hunt.

9    A    Good morning, Mr. Odim.

10   Q    You've done this before?

11   A    Yes, sir.

12   MR. ODIM:  I'm going to show you what we'll mark

13   as Plaintiff's Exhibit 1.

14           (Whereupon, Plaintiff's Exhibit 1 was marked

15            for identification.)

16   MR. ODIM:  Q    You are the second listed deponent

17   designee in Plaintiff's Exhibit No. 1, correct?

18   A    That is correct.

19   Q    And there are to the right of your name

20   several paragraph indicators that refer to a rider

21   which is attached.

22           I just want you to confirm that the

23   paragraphs indicated are the paragraphs for which you

24   are prepared to testify about today; that is,

JOSHUA HUNT                                    August 11, 2017

Page 7

1    Paragraph 2, including subpart (a); Paragraph 3,

2    including subpart (a); Paragraph 4, including subpart

3    (a); and Paragraph 6 including subpart (a)?

4         MR. GREEN:  I would just object to the extent

5    that you're asking him beyond CPD, that it includes

6    CPD in some of these where he's a representative of

7    IPRA.

8         MR. ODIM:  Yes, and the designee parens after his

9    name says as IPRA only.

10        MR. GREEN:  Okay, just to clarify.

11        MR. ODIM:  Q   Okay.

12        A    Yeah, okay, yes.

13        Q    Okay, very good.

14             What is your current position with the City

15   of Chicago, Mr. Hunt?

16        A    I'm a deputy chief administrator at the

17   Independent Police Review Authority as it transitions

18   into the Civilian Office of Police Accountability.

19        Q    Is your employer actually the City of

20   Chicago?

21        A    Yes, sir.

22        MR. ODIM:  Okay.  I'm going to show you what

23   we'll mark as Plaintiff's Exhibit 3.

24

JOSHUA HUNT                                    August 11, 2017

Page 12

1    of the City of Chicago?

2        A    That is my understanding.

3        MR. ODIM:  Okay.  So would you go back to the,

4    Court Reporter, the last question that was put to

5    which the objection was made?

6            (From the record above, the reporter read

7            the following:

8            "Q   Does the City of Chicago have an

9            understanding of what a complete

10           investigation of a police shooting of a

11           civilian ought to encompass?")

12       MR. GREEN:  And I would just direct you not to

13   answer for anything beyond IPRA as you are presented

14   here as a 30(b)(6) witness on behalf of the City for

15   IPRA.  You can proceed.

16       THE WITNESS:  Thank you.  To quantify what would

17   make an investigation complete is a difficult task

18   because no two of these are the same.

19           There are certain steps, there's certainly

20   some core concepts that have to be achieved, and

21   there's key information that has to be collected, but

22   each incident is different, so in order to have a

23   standard checklist that we could adhere to would be

24   difficult.

JOSHUA HUNT                                             August 11, 2017

Page 13

1      MR. ODIM:  Q   Okay.  I want to focus on the core

2   components that would be applicable generally in

3   every case.

4      A   Certainly.

5      Q   And so if you could give us those core

6   components, list them for me, and then let's take

7   them one by one.

8      MR. GREEN:  I would just object to the form and

9   vagueness, but go on.

10      THE WITNESS:  Certainly.  So it's rather daunting

11   to spell everything out, and I'm -- I don't know that

12   I would hit every single point.

13      MR. ODIM:  Q   Okay, yeah, this is not an exam or

14   a test.

15      A   Certainly, yes.

16      Q   I just want to get the framework as best as

17   you can.

18      A   Sure.  So -- and I'll try to do them in some

19   sort of order.

20         All of the relevant 911 calls, the radio

21   calls or OEMC transmissions, the preliminary reports,

22   the arrest reports, the supplemental reports, the

23   tactical response reports, the officer battery

24   reports, medical records, the ambulance report, the

JOSHUA HUNT                                      August 11, 2017

Page 14

1    medical examiner's records if it's a fatality,

2    photographs and video of the scene, diagrams of the

3    scene, plats of the scene, comprehensive inventory

4    sheets of all the evidence that was collected.

5             And then shifting from the documentary

6    evidence, collection of any and all available video

7    evidence to include dash cams if they are applicable,

8    body-worn cameras, third-party video, police

9    observation device or pod video, red light video,

10   banks, gas stations, ATM, any potential video that

11   could be connected to the event itself or events that

12   surround the event.

13            And then the collection of statements from

14   all of the witnesses that will agree to speak to us

15   and all of the officers who have relevant information

16   to provide about the event to include the witnesses,

17   officers and the involved officers.

18            Ancillary to that is a whole bucket of items

19   that should be collected or completed, but they would

20   sort of be on a case-by-case basis dependent upon the

21   event itself.

22       Q    Okay.  Of the items that you have listed,

23   you've testified, --

24       A    Yes, sir.

JOSHUA HUNT                                          August 11, 2017

Page 16

1       A    They do not.

2       Q    IPRA doesn't take photos of the scene or

3   generate any photos?

4       A    IPRA may, but not photos of the initial

5   scene.  IPRA may return to do additional

6   investigation or photography after the fact, but the

7   initial crime scene, incident scene photos are taken

8   by the CPD's evidence technician.

9       Q    It's also fair to say that IPRA would also --

10  IPRA may also create diagrams and plats?

11      A    IPRA may, that is correct.

12      Q    And the CPD may also do the same?

13      A    That is correct.

14      Q    Okay.  And it's also fair to say that IPRA

15  does not generate or create any inventory sheets?

16      A    That is correct.

17      Q    Okay.  Neither does IPRA generate or create

18  dash cam videos?

19      A    Correct.

20      Q    IPRA does not generate or create third-party

21  videos?

22      A    Correct.

23      Q    And IPRA does not generate or create pod

24  videos?

JOSHUA HUNT                                    August 11, 2017

1      A    Correct.

2      Q    Regarding statements of the witnesses, IPRA

3   does conduct interviews from which it --

4      A    That is correct.

5      Q    -- takes or reduces the statements either to

6   audio or written form?

7      A    Captures the statement audio recorded in some

8   instances from 2010 to 2016, especially later, like

9   2015, 2016, some of those interviews are videotaped

10  at the area.

11     Q    Okay.

12     A    Handwritten statements are generally not

13  taken by IPRA, and in terms of reducing the

14  statements, the statements we collect are only

15  reduced in summary form in a final report, so there

16  is no unrecorded interview that occurs and then is

17  reduced to a smaller form that's documented later.

18     Q    Okay.  Now, an IPRA investigator, let's talk

19  about IPRA investigators --

20     A    Yes, sir.

21     Q    -- for a second.

22          Does IPRA have a method for determining

23  which investigator to assign to which investigation?

24     A    In terms of shootings from 2010 to 2016?

JOSHUA HUNT                                            August 11, 2017

Page 18

```
1       Q    Yes, yes.

2       A    Okay.

3       Q    Yes.

4       A    Great.

5            So yes.

6       Q    And what is that method?

7       A    So from 20 -- in the time period from 2010 to

8  2016 there are two answers to this question, sir.

9       Q    Okay.

10      A    So I don't know how to best address how you'd

11 prefer it to be answered.

12      MR. GREEN:  Well, is it -- just for

13 clarification, does it divide up within that time,

14 six-year time period?

15      THE WITNESS:  Around 2014 there's a change.

16      MR. ODIM:  Well, --

17      MR. GREEN:  Well, --

18      MR. ODIM:  Q   I want the answer, I want the --

19 what it was during the period and what the change

20 was.

21      MR. GREEN:  Right.  If you can give the dates

22 approximately --

23      MR. ODIM:  Yeah.

24      THE WITNESS:  Okay.
```

JOSHUA HUNT                                     August 11, 2017

Page 19

1      MR. GREEN:  -- of the first part and then when it

2   changed, what was the change and what dates did that

3   cover.

4      THE WITNESS:  Absolutely.

5          So in focusing on the time period from 2010

6   to 20 -- late 2014 or maybe even closer to -- my best

7   approximation might be like January 1st of 2015, I

8   think the two time periods we need to discuss to

9   answer this question.

10      MR. ODIM:  Q   Okay.

11      A   So from '10 to let's just call it January

12   1st, 2015, and again, it could be plus or minus 15 to

13   30 days on either side of that.  I couldn't say

14   without having more data in front of me.

15      Q   Yeah, yeah.

16      A   So starting in 2010 through, IPRA had a team

17   of shooting specialists who are investigators that

18   had volunteered for extra duty.

19          At any given time there was approximately

20   six to eight of them.  They had received advanced

21   training both in the classroom and on the job in

22   order to learn how to perform the duties required of

23   a shooting specialist.

24          Those investigators would share call

U.S. Legal Support, Inc.
(312) 236-8352

JOSHUA HUNT                                    August 11, 2017

1    rotation and would respond to the shooting when it

2    happened, so as previously discussed, IPRA had and

3    still has immediate response protocol for the

4    shootings, so our shooting specialists would respond

5    to the scene, and they would conduct the preliminary

6    investigation.

7         Q    Okay.

8         A    They would be responsible for evaluating the

9    scene, making determinations about what needed to be

10   done, conducting canvasses, interfacing with the

11   on-call incident commanders and the commanders of the

12   detective's division, and for in many cases

13   interviewing the witness and sometimes the involved

14   officers and any other witnesses that were available

15   within that first 48-hour-time period.

16              Oftentimes their responsibilities would go

17   beyond that 48-hour-time period if there were --

18   there was time sensitive information that had to be

19   gathered or time sensitive interviews that had to

20   occur.  Again, we're in the 2010 to that 2015 range.

21              After that first few days of a shooting,

22   that investigation would be assigned out to one of

23   our general investigation teams for the finalization

24   of the investigation and for summarization.

JOSHUA HUNT                                                August 11, 2017

Page 21

1           In terms of the workload that was done, it
2      would be hard -- it would be difficult to assign a
3      percentage to how much of the case had been done by
4      the shooting specialist before it was passed to an
5      investigator.  That would vary, but the investigator
6      that would end up being assigned that case would be
7      responsible for completing the investigation.
8           I think that your core question was how were
9      those investigators selected.  We had a coordinator
10     of investigations that had a rotation sheet for all
11     of our investigative teams, and the coordinator would
12     go by the sheet to determine which team was up for
13     the next shooting to be assigned to their team.
14          That shooting would go to that team's
15     supervisor, and then that supervisor would make a
16     determination based upon abilities, talents or
17     workload or rotations themselves which one of their
18     investigators should be assigned that shooting.
19          The responsibility and workload was spread
20     across the office.
21      Q    Does -- okay.  And then the second --
22      A    Sure.
23      Q    Were you finished on that phase?
24      A    Yes, sir.

JOSHUA HUNT                                    August 11, 2017

Page 40

```
 1    fluctuate.

 2         Q    Yeah, okay, got ya.

 3              Fair to say that the City believes that an

 4    IPRA investigator should not conduct an investigation

 5    that is biased towards the officer, the shooting

 6    officer who is being investigated?

 7         A    City agrees.

 8         Q    It's also fair to say that the City agrees

 9    that an IPRA investigator should not interview an

10    officer who is invest -- who is being investigated in

11    a way that suggests answers to the officer?

12         A    The City agrees it should not happen.

13         Q    The City of Chicago also agrees that an IPRA

14    investigator should be objective in conducting an

15    investigation?

16         A    The City absolutely agrees.

17         Q    Fair to say that the City of Chicago agrees

18    that an IPRA investigator should use methods during

19    the investigation that ensure objectivity of that

20    investigation?

21         MR. GREEN:  Just object to vagueness in this

22    context, but go on.

23         THE WITNESS:  The City would agree.

24         MR. ODIM:  Q    Okay.  The City of Chicago agrees
```

JOSHUA HUNT                                    August 11, 2017

Page 55

1    investigator would not want to collect that statement

2    right away because other evidence may be pouring in

3    that is important to have before the statement is

4    taken.

5         Q    Okay.

6         A    So that's an easier scenario to sort of

7    define.

8         Q    That -- in order to lock in a story, do you

9    understand what that means?

10        A    I do.

11        Q    And is that in part what you may be referring

12   to here?

13        MR. GREEN:  I would just object to vagueness of

14   this line of questioning.

15        THE WITNESS:  Again, we're kind of in a

16   hypothetical, but there are some instances where

17   locking in a statement early on may be the best

18   course of action in consideration of what your

19   investigative strategy is.

20        MR. ODIM:  Q    Okay.

21        A    There are other instances where there are --

22   there could be witness statements or body cameras or

23   dash cam or third-party camera that we need to obtain

24   and analyze before statements are taken.

JOSHUA HUNT                                    August 11, 2017

Page 56

1      Q    Okay, okay.

2      A    There's also many times -- not many times.

3   There are, there are times when there are potential

4   considerations for potential prosecution of an event

5   that we would purposely wait on collecting the

6   officer's statement as it's a compelled statement.

7   We wouldn't want to affect a criminal investigation.

8          So those are -- these are concepts that have

9   to be analyzed and evaluated as the event is sort of

10  unfolding.

11     Q    Are all officer-involved shootings subject to

12  a criminal investigation?

13     MR. GREEN:  Just object to vagueness as to

14  "subject to".

15     THE WITNESS:  Yeah, I can, I can answer that

16  question --

17     MR. ODIM:  Q   Yes.

18     A    -- with that objection in mind, so, and maybe

19  more simply, in the City of Chicago, all

20  officer-involved shootings are forwarded for the

21  State's Attorneys Office, the Cook County State's

22  Attorney's Office for their consideration.

23     Q    And is that why when a statement is given by

24  an officer it's always compelled?

JOSHUA HUNT                                    August 11, 2017

Page 57

1          MR. GREEN:  I just --

2          MR. ODIM:  Q   A shooting, in a shooting

3     incident?

4          MR. GREEN:  I would just object to evidence not

5     in the record, vagueness, incomplete hypothetical,

6     but go on.

7          THE WITNESS:  The officer statement being

8     compelled has nothing to do with our -- with the fact

9     that we also forward the investigation to the State's

10    Attorney's Office.  The officer's statement is

11    compelled because we are also conducting an

12    administrative investigation, and they have to answer

13    our questions about the shooting.

14         MR. ODIM:  Q   Okay.

15         A    So that's why, that's why it's compelled,

16    but.

17         Q    Okay.

18         A    But the fact that it's compelled --

19         Q    So there no connection, there's no

20    connection, like you said, there's no connection

21    between the forwarding of the criminal and the

22    compulsion that the officer is under?

23              Put it differently, the compulsion is a

24    function of his obligation to his job, he's required

JOSHUA HUNT                                    August 11, 2017

Page 58

1    to give a statement or he may lose his job, right?

2       A    That, that part is true, yes.

3       Q    Yes.  And it's not necessarily connected with

4    the fact that the file may be forwarded to the

5    State's Attorney after it's complete -- or at some

6    point, not after it's complete, at some point?

7       A    Well, to say it's not connected is not

8    entirely true.  There is a connection there.  It's a

9    consideration.  The fact that there's a compelled

10   statement has to be considered in the review of the

11   case for potential criminal prosecution as well, so.

12      Q    Okay.

13      A    That's a very difficult and delicate maze for

14   us to navigate sometimes, but it's all -- it is

15   connected to it.

16      Q    Okay, okay.

17      A    It's just not a derivative thereof.

18      MR. ODIM:  Okay.  Let's take a five-minute break.

19      THE VIDEOGRAPHER:  Off the record at 11:14 a.m.

20          (Brief recess taken.)

21      THE VIDEOGRAPHER:  Back on the record, 11:22 a.m.

22      MR. ODIM:  Q   Mr. Hunt, what is, what is a

23   disciplinary matrix?

24      MR. GREEN:  I'll just object to vagueness, but

JOSHUA HUNT                                      August 11, 2017

Page 60

1      A    Yeah, okay.

2      MR. GREEN:   2016 generally.

3      THE WITNESS:   2016.

4      MR. ODIM:   Q   I like using "ish".

5      A    Yeah, in 2016ish, I think it was a little

6  more formalized.  You know, if the discipline matrix

7  is a person, it is a toddler right now, but it's --

8  so to tell you its exact birthday, I can't say, but I

9  know that from 2010 to 2015ish it wasn't, and there's

10 a caveat to your question.

11     Q    Okay.

12     A    It wouldn't be used by the investigators, it

13 would be the chief administrator who is ultimately

14 the one that determines recommendations for

15 discipline.

16     Q    So do I understand that the investigator

17 would not make a recommendation based upon the

18 disciplinary matrix, but the supervisor would make a

19 decision based upon the disciplinary matrix?

20     MR. GREEN:   I would object to vagueness,

21 mischaracterizes his testimony, vague.

22     THE WITNESS:   So many components to that that

23 have to sort of be unpacked.

24          From 2010 to 2015ish, the investigator and

JOSHUA HUNT                                          August 11, 2017

Page 61

1   the supervisor on the case may have a discussion with

2   the chief administrator about what discipline would

3   be appropriate, but the chief administrator would

4   decide.

5        MR. ODIM:  Q   Okay.

6        A    So they wouldn't -- and it wouldn't be formal

7   -- I don't -- it wouldn't be formalized, it would be

8   a discussion upon a case review of a sustained case.

9        Q    Okay.

10       A    Late -- or 2015 until present, the same

11  discussions may occur between an investigator and a

12  supervisor and the chief administrator, but the chief

13  administrator would make the determination, and in

14  that late 2015, 2016 range, the chief administrator

15  could rely upon the disciplinary matrix.

16       Q    Okay.  I want to go back quickly to

17  investigations and the concept of closing an

18  investigation.

19       A    Yes, sir.

20       Q    What is the protocol for closing an IPRA

21  investigation?

22       A    2010 to 2016 shootings?

23       Q    That's correct.

24       A    So I'm trying to determine if there is a

JOSHUA HUNT                                    August 11, 2017

Page 62

1    phase one, phase two issue here.  I don't believe

2    that there is.

3            So 2010 to 2016, once the investigator has

4    finished their investigation, they would summarize it

5    and write it up and provide it to the supervisor.

6    The supervising investigator would go through that

7    report and look for several things.

8            One, is the report well written and legible,

9    typos.  Two, is it reflective of all the evidence

10   that's been gathered thus far in the file itself.

11   And three, is the investigation itself complete or

12   are there investigative steps that are not in the

13   file and not in the report that need to be conducted

14   before the case can be closed.

15           If any of those prongs are met where the

16   supervisor believes there's a -- it's not complete

17   yet or it needs to be re -- like there are edits, it

18   goes back to the investigator, but let's say for the

19   purposes of answering this question that the

20   supervisor has agreed that it's well written, it's

21   reflective of what's there and it's -- reflects a

22   complete investigation, then that would -- that --

23   the file and the report itself gets pushed to one of

24   the deputy chiefs who would do the same analysis of

JOSHUA HUNT                                        August 11, 2017

Page 63

```
 1    the case, and once that's conducted, it would go to

 2    the chief administrator or the first deputy when we

 3    had one to do the same thing.

 4            So you got three and sometimes four layers

 5    of review of an investigation to determine whether or

 6    not it was accurate, complete, factual and that the

 7    findings were appropriate or correct.

 8       Q   Does the City of Chicago believe that all

 9    closed -- all IPRA investigations closed during the

10    2010, 2016 period were complete?

11       MR. GREEN:  Just object to the extent you're

12    seeking speculation, incomplete hypothetical, but go

13    on.

14       THE WITNESS:  I don't know that the City of

15    Chicago could categorically agree or disagree with

16    that statement.  I think that hindsight is 20/20, and

17    I also believe that hindsight from the perspective of

18    self improvement is enhanced.

19            So the way things, the way things were done

20    in a certain time period at the time may -- that,

21    maybe that's how we define what completeness was.

22            As we've moved into a new era and we have

23    sought to improve the way we do things, we wouldn't

24    be improving if we had always done it perfectly, so I
```

JOSHUA HUNT                                          August 11, 2017

Page 64

 1    think to look back and evaluate old cases to see
 2    where you could have improved is a healthy practice.
 3           So the City of Chicago agrees that some
 4    things maybe could have been done differently or
 5    better, and I think that's why they created IPRA in
 6    the first place and then COPA later, to broaden the
 7    way these are handled.
 8    MR. ODIM:   Q   The -- taking out of the question
 9    I'm going to ask you now the question of applying
10    present standards retroactively --
11        A    Yes, sir.
12        Q    -- either for investigative purposes or for
13    review purposes, take that out of the mix here, does
14    the City of Chicago agree that not all cases closed
15    -- rather that all cases closed between 2010 and 2016
16    were not complete?
17    MR. GREEN:   I would just object again to
18    vagueness, renew my objections to this question,
19    incomplete hypothetical.
20    THE WITNESS:   And the City of Chicago would not
21    agree.  If you asked the City of Chicago in 2013 or
22    2014 if shootings closed that year were complete, the
23    answer then would be yes.
24           It's only applying this higher standard --

JOSHUA HUNT                                    August 11, 2017

Page 65

1    today's higher standard retroactively that we realize

2    that there are things that maybe could have been

3    done, but at the time there was never a case that

4    would just be closed with glaring missteps or

5    incompleteness at no time in the agency's history

6    that I'm aware of, and especially from -- within 2010

7    to 2016 were cases allowed to be closed if there was

8    investigative steps that should be conducted.

9         MR. ODIM:  Q    Okay.

10        A    Again, in applying this higher standard today

11   and looking backwards, we see things that we're doing

12   now that we didn't do then, and -- but that's -- at

13   the time.

14        Q    Right, okay, all right.  Does the City of

15   Chicago have an understanding what -- of what witness

16   collusion is?

17        MR. GREEN:  I'll object to vagueness.

18        THE WITNESS:  Does the City of Chicago understand

19   the concept of witness collusion?

20        MR. ODIM:  Q    Yes.

21        A    Yes.

22        Q    And the City of Chicago agrees that proper

23   investigation conducted by IPRA would look for --

24   would investigate if appropriate witness collusion?

JOSHUA HUNT                                            August 11, 2017

Page 66

1        MR. GREEN:  Just object to speculation,

2   incomplete hypothetical, vagueness, but go ahead.

3        THE WITNESS:  The City of Chicago would agree

4   that its best practice in any investigation, to be

5   wary of and to look for and to be able to reconcile

6   any instances of collusion on the part of anybody

7   that's involved in the investigation.

8        MR. ODIM:  Q   After IPRA has con -- taken a

9   compelled statement from an officer, can IPRA compel

10  a second statement?

11       A    From the same officer?

12       Q    From the same officer.

13       A    Yes.

14       Q    Okay.  Is there a limit to IPRA's authority

15  in repeatedly reviewing -- repeatedly interviewing

16  the officer?

17       MR. GREEN:  Just object to the extent you're

18  seeking a legal conclusion, but as to your practice,

19  go on.

20       MR. ODIM:  Q   I mean a practical limit, you

21  know.

22       MR. GREEN:  Just object to vagueness, but go on.

23       THE WITNESS:  Yeah, so there's two questions,

24  there's two questions, two answers.