IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF PIERRE LOURY, | ) | |
| Deceased, by Tambrasha Hudson, | ) | Case No. 16 C 4452 |
| Administrator, | ) | |
|                     Plaintiff, | ) | |
| v. | ) | Judge St. Eve |
| | ) | |
| CITY OF CHICAGO and Chicago Police | ) | Magistrate Judge Gilbert |
| Officer SEAN HITZ (Star# 6272), | ) | |
| | ) | |
|                     Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO BAR/STRIKE THE OPINION TESTIMONY OF PLAINTIFF'S RETAINED EXPERT ROGER A. CLARK**

Defendant City of Chicago ("the City"), by and through its counsel, Edward N. Siskel, Corporation Counsel for the City of Chicago, moves this Honorable Court to enter an order barring/striking the opinion testimony of Plaintiff's retained *Monell* expert Roger A. Clark. The City moves to bar Plaintiff, pursuant to Federal Rule of Evidence 702, from using any of Clark's opinions, in opposition to Defendant's Motion for Summary Judgment and/or at trial, because (1) Clark does not have the qualifications to serve as a *Monell* expert in this case; (2) his opinions with respect to bolstering Plaintiff's other expert Ronald Scott's use of force opinions, are outside the scope of Clark's retention because by Clark's own admission "[his] opinions are regarding *Monell*" and do "not address the issue of whether Loury had the gun or not" (*See* Clark Dep. at p. 36, lines 6-24); and, (3) his opinions are not the result of reliable methodology necessary to create a requisite factual foundation for Clark's opinions about any of CPD's allegedly unlawful policies, customs and practices espoused in Clark's Report, and should therefore be barred.

1

## I. FACTS

Plaintiff retained Roger A. Clark ("Clark") as an expert to provide opinions to establish the factual bases for Plaintiff's *Monell* claim against the City of Chicago in Count 2 of Plaintiff's Amended Complaint. Clark authored a seventeen-page report ("the Report"), which is attached hereto as **Exhibit A**. In addition to the Report, Clark gave a December 27, 2017 deposition in this matter which is attached hereto as **Exhibit B**. Clark's cited qualifications to serve as an expert included his twenty-seven years of employment with the Los Angeles County Sheriff's Department, attending numerous law enforcement trainings, and receiving several law enforcement certifications. (*See* Clark Dep. at pp. 12-16, **Exhibit B**).

In the Report, Clark offers thirty (30) separate opinions, but classifies them into six categories of similar opinions[1], as follows:

(A) two opinions, by which Clark attempts to bolster the opinions of Plaintiff's use of force expert, Ronald Scott, opining about the circumstances of Loury's April 11, 2016 shooting (*See* Clark Report at pp. 5-7 -- "Plaintiff Expert Ronald Scott's Opinions," **Exhibit A**) ;

(B) six opinions which are the bases for Clark's conclusion that the City has a "policy of impeding investigations of misconduct" (*See Id*. at pp. 8-9);

(C) five opinions which are the bases for Clark's conclusion that the City has a widespread policy, custom or practice of "fail[ing] to investigate" allegations of police misconduct" (*Id.* at pp. 9-10);

---

[1] Mr. Clark, in fact, admitted in his December 27, 2017 deposition that many of these opinions listed within these specific categories were merely redundant of each other. See **Exhibit B**, p.159, lines 14-24; pp. 180, line 24, to p.181, line 15; p. 187, line 16, to p.188, line 14; p. 198, line 20, to p.199, line 6; and, p. 213, line 22, to p. 214, line 13.

(D) eight opinions which are the bases for Clark's ultimate conclusion that the City has "a *de facto* policy or widespread custom or practice of failing to effectively discipline police misconduct" (*Id*. at pp. 10-11);

(E) four opinions which are the bases for Clark's ultimate conclusion that the City has a "*de facto* policy or widespread custom or practice of failing to train officers in the proper use of force" (*Id.* at p. 11); and

(F) six opinions which are the bases for Clark's ultimate conclusion that the City has a "*de facto* policy or widespread practice of ignoring, denying or covering up bad actions of a colleague or colleagues, *i.e.*, a Code of Silence." (*Id.* pp. 11-12).

## II. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*.[2] *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004), *citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). The purpose of the *Daubert* inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012).

In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the Court is to "scrutinize proposed expert witness testimony to determine if it has 'the same level of

---
[2] 509 U.S. 579 (1993).

intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Id.* at 805. The decision to admit or bar expert testimony rests within the sound discretion of the district court. *See General Electric v. Joiner*, 522 U.S. 136, 142 (1992); *Lapsley*, 689 F.3d at 705; *also* Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; (d) the expert had reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011). Rule 702 requires a conjunctive test and thus expert testimony must meet all four requirements to be admissible; failure on any prong is fatal to admissibility. "Each requirement has been thoroughly explored in the case law and each requires a separate analysis, although the last two – reliability of principles and methods and reliable application – are closely related." *Cage v. City of Chicago*, 979 F. Supp.2d 787, 799 (N.D. Ill. 2013).

As a practical matter, district courts apply the *Daubert* framework using a three-part analysis. The Court must determine if: (1) the proposed witness is qualified as an expert by knowledge, skill, experience, training or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the witness' proposed testimony will assist

4

the trier of fact in understanding the evidence or to determine a factual issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The test for reliability is necessarily flexible and courts enjoy broad discretion in making this evaluation. *Kumho*, 526 U.S. at 141-42. That said, the admissibility inquiry "must be tied to the facts of a particular case," *id*. at 150, and must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. "A witness who invokes *'my expertise' rather than analytic strategies widely used by specialists* is not an expert as Rule 702 defines the term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (emphasis added). Finally, expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson. *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires valid scientific connection to the pertinent inquiry as a precondition to admissibility.")

### III. ARGUMENT

**A. Clark should be disqualified as a *Monell* expert because he lacks the foundation to be considered an expert for these purposes.**

Although Mr. Clark cited his twenty-seven years of employment with the Los Angeles County Sheriff's Department, attending numerous law enforcement trainings, and receiving several law enforcement certifications as his qualifications (*see* Clark Dep. at pp. 12-16, **Exhibit B**), Mr. Clark has not served as a sworn law enforcement officer since 1993. *See* **Exhibit B** at p. 72, lines 3-5. He has never ranked higher than lieutenant. *See* Clark CV, attached as **Exhibit C**. Clark has never worked in Internal Affairs. **Exhibit B** at pp. 83.23-84.1. Clark has handled only two on-duty shootings. *Id*. at p. 46. Clark has never written any peer-review articles, or articles at all, on disciplining officers. *Id*. at pp. 87-88. In fact, his last education or training on

5

how to train officers in the use of firearms was in the 1970's. *Id*. at p. 89.

Therefore, Mr. Clark has not been personally involved in law enforcement as a sworn officer for 25 years. He therefore cannot speak as to what is going on with the profession currently after a quarter-century of change. Also, according to his CV, much of his past law enforcement experience had to do with a unit to arrest career criminals, working in jails and juvenile correctional facilities, and supervising reserve officers. None of that experience is relevant to the case at bar. His prior involvement was never at a management level higher than lieutenant. He does not have a public policy background. He therefore does not possess the experience to opine about what policymakers within a police department, let alone the final policymaker for a municipality, must contend with or how they should act. He has not done any independent study of policing in general or the Chicago police department.

Because of his lack of qualifications to discuss officer-involved shootings, investigations into such shootings, the code of silence, or any of the other areas of Plaintiff's *Monell* claims, Clark should be barred.

**B. Clark's opinions bolstering Plaintiff's use of force expert Ronald Scott should be barred because by Clark's own admission, those opinions are outside the scope of Clark's specified area of retention and invade the function of the trier of fact by making impermissible credibility determinations about disputed facts.**

All portions of Clark's report labeled "Plaintiff Expert Ronald Scott's Opinions" (*see* Clark Report at pp. 5-7) should be barred in their entirety. By his own admission, Clark's intended "opinions are regarding the *Monell* [claim]" and do "not address the issue of whether Loury had the gun or not whether [Loury] was pointing the gun or not . . . that's not in any of the five . . . categories of opinions and the 28 specific opinions." (*See* Clark Deposition at p. 36, lines 6-24)

6

However, Clark's testimony is contradicted by his Report where he directly opines about the circumstances of Loury's death. Clark relates his opinions about the underlying shooting based on his interpretation of what he *perceives* to be inconsistencies between the officers' respective accounts of the shooting, and ultimately concludes: (1) "*Loury was shot atop the wrought iron fence*"; and (2) "*the second bullet shot by Hitz was shot upward*." (Clark Report at p. 5) Clark is not an occurrence witness, saw no portion of the underlying event, and admits that he was not retained to opine about such matters. Nor, of course, could he be retained for such a purpose because, as a matter of law, experts are not "allowed to sort out possible conflicting testimony or to argue the implication of those inconsistencies. That is the role of the lawyer, and it is for the jury to draw its own conclusions from the testimony that it hears." *Davis v. Duran*, 277 F.R.D. 362, 369 (N.D. Ill. 2011); *Sommerfield v. City of Chicago*, 253 F.R.D. 317, 321 (N.D. Ill. 2008) ("an expert cannot determine credibility; that is for the trier of fact"); *Richman v. Sheahan*, 415 F.Supp.2d 929, 943-44 (N.D. Ill. 2006) (same).

Thus, Clark cannot express his opinions about such matters which are credibility determinations wrapped in the whole cloth of a report labeled as his "expert" opinion. For these reasons, Clark's opinions set forth on pages 5 through 7 concerning the underlying April 11, 2016 shooting should be barred from any consideration, either at the summary judgment or trial phases of this matter.

### C. Clark's remaining opinions are inadmissible for lack of a reliable methodology to create a foundation for his opinions about any of CPD's allegedly unlawful policies, customs and practices identified in Clark's Report.

In *Obrycka v. City of Chicago,* 792 F. Supp.2d 1013, 1023-25 (N.D. Ill. 2011)(St. Eve, J.), this Court, on the basis of Fed. R. Evid. 702, barred "social scientist" Dr. Peter Manning from relating opinion testimony including, *inter alia*, conclusions that the Chicago Police

Department had and maintained a "'closed culture,' a 'code of silence,' and 'systematic failures in discipline,' which — absent supervision, discipline and evaluation — give rise to 'unwritten policies and practices' that 'tend[ ] to [ ] shape' police work and 'produce corruption" within the Chicago Police Department." In barring Dr. Manning's opinions, this Court wrote in relevant part:

> In this case, Plaintiff seeks to admit Dr. Manning's testimony to support her *Monell* claim regarding the 'culture' of the Chicago Police Department. Despite Dr. Manning's extensive academic research on policing in general, however, his knowledge about the CPD is primarily based on a three-day visit to Chicago in 1996, when he brought students and faculty to meet with members of the CPD to learn about the crime mapping approaches of the department. Crime mapping bears no relevance to the issues in this case—it involves a police department's strategy for creating partnerships and working with communities to prevent and combat crime.
>
> * * * *
>
> Other than that three-day visit, Dr. Manning has never conducted any research on the Chicago Police Department. **Beyond reviewing the materials Plaintiff's counsel sent him, Dr. Manning failed to familiarize himself with the culture, structure, and policies of the CPD—the specific subject of his expert testimony. As a result, he was unable to defend his CPD-specific assertions during his deposition** or at his *Daubert* hearing.
>
> * * * *
>
> The Court appreciates Dr. Manning's position that 'I am an expert in policing, and insofar as that is the case, I can speak to the general patterns in the Chicago Police Department, or in the City of London,' [internal citations omitted]. **Plaintiff has not, however, met her burden in demonstrating the foundation for Dr. Manning's specific testimony in this case.** Thus, despite Dr. Manning's impressive credentials and extensive research in many areas of policing, he lacks the requisite foundation for his CPD-specific opinions. Accordingly, he is not qualified to provide his proffered expert opinion in this case. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).
>
> * * * *
>
> As noted above, however, Dr. Manning **did not employ that methodology in preparing his expert report. He did not interview any CPD officers or employees in preparing his report, and he neither devised nor conducted any studies of the structure or the 'culture' of the CPD. Dr. Manning did not conduct any independent research on the Chicago Police Department to prepare his report, and there is no evidence that Dr. Manning investigated the veracity of the materials Plaintiff's counsel provided to him**,

8

> or requested additional materials from Plaintiff's counsel to further inform his opinion.
>
> Dr. Manning provides no foundation for his primary conclusions regarding the CPD's 'code of silence' and *de facto* policies. He does not explain how he arrived at those conclusions, or cite material(s) he relied upon, other than the outlines prepared for him in this litigation by Plaintiff's counsel. Furthermore, the Court cannot simply credit Dr. Manning's testimony at his *Daubert* hearing that, as a sociologist, he may infer CPD-specific conclusions from his general knowledge of policing. That is, as the City argues, *ipse dixit*—a Latin phrase meaning, "he himself said it"—in its purest form. Dr. Manning fails to provide any basis upon which the Court may conclude that he can reliably apply his "general" knowledge of policing and "police cultures" to the Chicago Police Department

*Obrycka*, 792 F. Supp.2d at 1023-25 (emphasis added).

All of Clark's remaining opinions should be barred for the same reasons that this Court barred Dr. Manning's opinions: because Clark's opinions lack any factual foundation premised on a reliable methodology to support any of Clark's numerous conclusions. Although Clark purports to opine that the City of Chicago has a "*de facto* policy or widespread custom or practice of ignoring, denying or covering up . . . . in other words, a Code of Silence" (Clark Report at p. 11, **Exhibit A**), Clark admitted in his deposition that the *only* Chicago Police Department policy that he reviewed in preparing his Report was Chicago Police Department Rule 14:

| | |
|---|---|
| Question: | Now, in this list of items on number nine, it says "CPD written policies," which exactly – which policies did you review in preparation of this report from the Chicago Police Department? |
| Answer: | The – policy references the requirement to be truthful and accurate in reports. |
| Question: | Other than that, you have not seen any other City policies? |
| Answer: | Not in relation to this – this issue. |
| Question: | In this report? |
| Answer: | Yes. |
| Question: | So the only rule that you looked at or are familiar with in the Chicago Police |

                Department is Rule 14 about making a false statement report, written or oral?

Answer:     For the purposes of this report that was the policy referenced. As you are aware of, I've had a number of Chicago cases and I've reviewed their policies *in other cases, but the policy for this case is that citation to Rule 14 –*

Question:     So –

Answer:     -- or policy 14.

Question:     So you did not review Rule 21 or Rule 22 or anything regarding spars [Summary Punishment Action Requests] or any other policies/procedures of the Chicago Police Department in coming to your conclusions in this report?

Answer:     **That's correct**.

(*See* Clark Dep. at pp. 22, lines 16-24; 23, lines 1-24; 24, lines 1-9, **Exhibit B**) (emphasis added).

The fact that Clark reviewed only Chicago Police Department Rule 14 did not prevent him from expressing five (5) categories of opinions containing twenty-eight (28) separate opinions about numerous *de facto* policies, customs and practices, on a wide range of topics that exceed the topic of Rule 14 (i.e., whether police officers tell the truth in reports), including, but not limited to, how the Chicago Police Department fails to adequately train officers in the use of force (Clark Report at pp. 11, Exhibit A), and fails to adequately discipline those officers when excessive force is allegedly used (*Id*. at p. 10). Clark confirmed in his deposition testimony that the sole source material and basis for his *Monell* opinions is the U.S. Department of Justice's January 2017 Report concerning its investigation of the Chicago Police Department (*See* Clark Report at pp. 2, 8, **Exhibit A**):

Question:     Have you developed your own methodology for reviewing *Monell* claims?

Answer:     My own methodology? **No, I don't have any particular one other than I don't try to re-plow the ground that's been plowed when it appears valid** and as you know you have a rather renown professor that's been involved in this for years, you have the DOJ, you've got other reports. They have all come to the same conclusion. When you see that, you have

10

> a very substantial support of the conclusions and that's what I tried to express in my report.
>
> Question: **Now, the details you've described earlier like the Christopher Report methodology, what you believe the DOJ did, you personally did none of that in this particular case, did you?**
>
> Objection: Objection. Foundation.
>
> Answer: **I did not do that.**

(Clark Deposition, pp. 65, lines 14-24; 66, lines 1-11, **Exhibit B**) (emphasis added).

Clark further admitted that he has conducted no independent review of the DOJ's conclusions and/or the data (if any) that supports those conclusions:

> Question: Now, you also relied on the seven conclusions you've listed here of the DOJ Report, did you – is that correct?
>
> Answer: There were five broad categories and they – I listed them in this paragraph.
>
> Question: All right. But you didn't look at any data yourself that the DOJ looked at in coming to these conclusions, did you?
>
> Objection: Objection. Form.
>
> Answer: I did not review any independent data other than what they cited and what was cited in any other reports I listed in the footnote.
>
> Question: So you didn't look [into] any specific facts cited or any specific instances that they were discussing, yourself independently?
>
> Answer: I did not. I was not an independent investigator of the – of the cases cited.
>
> Question: Did you talk to anyone at the DOJ of how they came about with their conclusions?
>
> Answer: **No**.

(Clark Deposition, pp. 58, lines 23-24; 59, lines 1-20, Exhibit B) (emphasis added).

Mr. Clark confirmed this again later in his deposition:

Q. So what are the reports or analyses that you personally did in Chicago?

A. None.

**Exhibit B** at p. 192, lines 21-23.

In short, Clark does not: (1) have his own methodology for determining whether a municipality (here, the City of Chicago) has deliberately and consciously maintained widespread policies, customs or practices that unlawfully violate citizens' civil rights; (2) know how the DOJ investigation was conducted and/or what, if any, methodology was used utilized or data considered by the DOJ to formulate the conclusions contained in the DOJ Report; and (3) know whether the conclusions in the DOJ Report are reliable because he conducted no independent investigation to confirm the reliability of the anecdotal accounts related in the DOJ Report, nor interviewed anyone from the DOJ who could relate those factual bases to Clark. As this Court noted in *Obrycka*:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Obrycka*, 792 F. Supp.2d at 1025.

Simply put, Clark had no methodology to formulate his opinions, and cut-and-pasted conclusions from the DOJ Report to summarily conclude that the Chicago Police Department has widespread policies, customs and practices of committing various constitutional deprivations on the sole basis that Clark says so. Clark takes this position despite having no knowledge about what, if any, methodology the DOJ utilized in forming its opinions, because Clark conducted no independent investigation to assess the reliability of the DOJ Report, including, but not limited

to, reviewing the DOJ's original source material and/or interviewing source witnesses. To permit his opinions under these circumstances would defeat the very gate-keeping function mandated by *Daubert* and Rule 702 and be in contravention of this Court's decision in *Obrycka*.

## IV. CONCLUSION

For the reasons set forth above, and pursuant to Fed. R. Evid. 702, the City of Chicago respectfully requests that this Honorable Court bar Clark's opinions contained in the portions of Clark's report labeled "Plaintiff Expert Ronald Scott's Opinions," as well as all of Clark's *Monell* opinions contained in pages 8 through 12 of Clark's Report, including all opinions and conclusions contained in the following topic headings:

(1) "Policy of impeding investigations of misconduct" (including paragraph nos. 1 through 6);

(2) "Failure to Investigate" (including paragraph nos. 7 through 11);

(3) "Failure to Discipline" (including paragraph nos. 12-19);

(4) "Failure to Train" (including paragraph nos. 20-23); and,

(5) "Code of Silence" (including paragraph nos. 23 through 28).

Dated: April 13, 2018                                   Respectfully submitted,

                                                        EDWARD N. SISKEL
                                                        Corporation Counsel for the City of Chicago

                                                        By: */s/ Devlin J. Schoop*
                                                        Devlin J. Schoop
                                                        Assistant Corporation Counsel Supervisor
                                                        Attorney No. 06243835

Devlin J. Schoop, Assistant Corporation Counsel Supervisor
Jonathan Clark Green, Assistant Corporation Counsel Supervisor
Dortricia Penn, Assistant Corporation Counsel
Raoul V. Mowatt, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
30 N. LaSalle St., Suite 900
Chicago, Illinois 60602
(312) 742-7042 (Schoop)
devlin.schoop@cityofchicago.org

## CERTIFICATE OF SERVICE

I, Devlin J. Schoop, an attorney, certify that on April 13, 2018, I served a copy of this upon the Plaintiff by filing the same before the Court via the ECF system to all counsel of record.

*/s/ Devlin J. Schoop*
Devlin J. Schoop