# EXHIBIT

# A

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

November 13, 2017

Andrew M. Stroth Esq.
Carlton Odim, Esq.
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606

*Regarding:*   ***Estate of Pierre Loury v. City of Chicago, et al.***
***(USDC Case No. 1:16-C-04452)***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the April 11, 2016 shooting to death of Pierre Loury by Chicago Police Department (CPD) Officer Sean Hitz in the vicinity of the 3400 Block of West Grenshaw Street in Chicago.

Pursuant to the requirements of Rule 26, I have studied the reports, video recordings, interview transcripts, media reports, CPD reports, deposition testimony and other material (as listed below) provided to me thus far regarding this case. Please be advised that if/when any additional information is submitted, it is likely that a supplemental report refining my opinions will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by Officer Hitz, Officer Riordan, and others, versus the testimony proffered by the Plaintiffs, civilian witnesses and/or others, I do not opine for the trier of fact regarding who are the more believable witnesses. Since the credibility of the parties is within the purview of the jury, the opinions I offer are premised on the truthfulness of the plaintiff's allegations as determined by the fact finder.

<u>Materials Reviewed Thus Far:</u>

1.    Plaintiff's Amended Complaint.

2.    Plaintiff's Answers to Defendants' Interrogatories.

3.    Plaintiff's Answers to Defendants' Requests for Production.

4.    Plaintiff's Rule 26 Disclosures.

5.    Defendants' Answers to the Amended complaint.

6.    Defendants' Rule 26 Disclosures.

7.    Defendants' Answers to Plaintiff's Interrogatories.

8.    Defendants' Answers to Plaintiff's Requests for Production.

9.    CPD written policies.

10.   WTTW interview with Sharon Fairley on January 4, 2016.

11.   WTTW interview with Sharon Fairley on October 18, 2016.

12.   WTTW interview with Mayor Emanuel on December 8, 2015.

13.   Mayor Emanuel's City Council Speech on December 9, 2015.

14.   "Investigation of the Chicago Police Department United States
      Department of Justice Civil Rights Division And United States
      Attorney's Office Northern District of Illinois," January 13, 2017.

15.   Agreement in Principle Between The United States Department of
      Justice and the City of Chicago Regarding the Chicago Police
      Department (January 17, 2017).

16.   Police Accountability Task Force Report, April, 2016.

17.   McGuire Woods Audit of IPRA Shooting Investigations (March 2, 2017).

18.   Response of Sharon Fairley, Chief Administrator of IPRA, to
      McGuire Woods Audit (April 12, 2017).

19.  (Safer Report) Preventing and Disciplining Police Misconduct
     (December 2014).

20.  Advisory letter from Sharon Fairley, May 12, 2016.

21.  Jury verdict in *Obrycka v. Chicago*, No. 07 CV 2372.

22.  July 2016 Report issued by the Office of the Inspector General of the
     City of Chicago, Advisory Concerning The Independent Police Review
     Authority's Reporting Of Use-Of-Force Incidents.

23.  July 28, 2016 City of Chicago's Response Advisory Regarding Use-
     of-Force-Reporting.

24.  July 28, 2016 IPRA's Response Advisory Regarding Use-of-Force-
     Reporting.

25.  2016 testimony of Deputy Superintendent Williams to the PATF.

26.  Crime, Corruption and Cover-ups in the Chicago Police Department,
     Anti-Corruption Report Number 7, January 17, 2013.

27.  Daley's July 19, 2017 statement to City Council.

28.  Publicly released Police Complaint Register information on the internet
     at the Citizens Police Data Project's website: www.cpdb.com.

29.  Macareg, Sarah and Flowers, Alison, Amid Shootings, Chicago    Police
     Department Upholds Culture of Impunity, Truthout, October 22, 2014,
     http://www.truth- out.org/news/item/27486-investigation-uncovers-
     culture-of-impunity-for-chicago-police-department.

30.  Konkol, Mark. SPECIAL REPORT: Rule 14's Slow Road to Justice
     for Police Who Lie, DNAinfo.com, December 20, 2013.

31.  Konkol, Mark. SPECIAL REPORT: Not All 'Career Killer' Rule 14
     violations End with Firing, DNAinfo.com, December 21, 2013.

32.  Data: Black Chicagoans at higher risk of being shot by police, Chicago
     Reporter, December 31, 2014.

33.  Caputo, Angela, Data: Black Chicagoans at higher risk of being shot
     by police, Chicago Reporter, January 23, 2014.

34. Chicago does little to control police misconduct – or its costs. Chicago Reporter, June 22, 2016.

35. Depositions of Plaintiff.

36. Deposition of Officer Sean Hitz and recorded IPRA Statement of Hitz.

37. Recorded IPRA statement of Jeff Riordan.

38. Depositions of:

    a. Robert Klimas (30(b)(6))
    b. Joshua Hunt (30(b)(6))
    c. Kevin Duffin (30(b)(6))
    d. Karen Conway (30(b)(6))
    e. Andrea Hyfantis (30(b)(6))
    f. Trak Silapaduriyang (30(b)(6)

39. Plaintiff Expert Report Ronald Scott

40. CPD Investigative file.

41. IPRA Investigative file.

42. OEMC video, audio, and dash cam video.

### The Basic Rules Regarding the Use of Deadly Force:

Peace officers are trained at a national standard that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life. Firing a firearm at a human being is different from all other police uses of force. While there are other police tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the officer's firearm. Accordingly, peace officers are trained that they can only use firearms under the most extreme circumstances. These situations are very rare. In fact, studies indicate that only a few police officers in the United States ever fire their weapons in the field during their entire careers.

### Brief Overview of Events and Commentary:

On April 11, 2016, at approximately 7:40 p.m., Pierre Loury was in an automobile being operated in the vicinity of the 3400 block of Roosevelt Road, Chicago. The automobile was pulled over by Officers Sean Hitz and Officer Jeff Riordan. Pierre Loury exited from the

passenger side of the automobile and through an alley towards the rear of 3431 Grenshaw Street. Officer Hitz gave chase on foot, while Officer Riordan approached the driver of the automobile.

As Loury approached the rear yard of 3431 Grenshaw, he was confronted with a wrought iron fence, approximately six feet tall (Recorded IPRA Statement of Riordan), which he attempted to climb over. As Loury was on the fence, Officer Hitz fired two shots at him. One of the shots struck Loury in the chest.

When he heard two gun shots, Officer Riordan left his position with the driver of the automobile from which Loury exited. Riordan ran in the direction of the two shots, and found Hitz, gun trained on Loury, who was now on the ground on the other side of the fence.

**Plaintiff Expert Ronald Scott's Opinions**

### *Loury was Shot Atop the Wrought Iron Fence*

The conclusion of Plaintiff's expert Ronald Scott is that "Pierre Loury was shot by Officer Hitz when Loury was atop the wrought iron fence..." (Report of Plaintiff Expert Ronald Scott at 21).

This directly contradicts Hitz's version of the shooting, which is that Loury made it over the wrought iron fence, dove belly first onto a gun that had fallen out of his hand, and while on the ground pointed the gun at Hitz, who responded by shooting Loury while he was on the ground.

### *The Second Bullet Shot by Hitz Was Shot Upward*

There is no dispute that Hitz fired two shots. One shot struck Loury in the chest, subsequently killing him. The other shot – the bullet of which is unaccounted for. "is consistent with being slightly upward and striking the window orthogonally from a location" (*Id.*) where Hitz was standing, at a distance and below the bullet entry-hole in the window.

### The CPD and IPRA Investigation Did Not Reconcile Obvious Discrepancies

There is nothing in the CPD investigation of the IPRA investigation that even remotely suggests that the investigators made any inquiries into the discrepancies or inconsistencies in Hitz's and Riordan version of events.

*Failure to Look for the Second Bullet.* There is no evidence that the CPD or IPRA followed through on an inquiry on the trajectory or location of the second bullet. A second bullet "upward" and into the window contradicts Hitz's version that he shot downward at Loury while he was on the ground.

*A Five Foot Seven Inch Person Straddling a Six Foot Fence.* Hitz says that when he saw Loury "the first time, *he was straddled the fence, one leg on each side, facing me* (Emphasis added). As I approached, he was getting one leg down to the ground and the other leg appeared to still be up

on top of the fence, and he was still kind of facing me but more side like now, trying to pull his leg down which means- when I was trying to tell him "Stop, let me see your hands." And he was still pulling his leg and then that's when he started fidgeting around his waistband, pulled out the weapon, and when I saw it and knew what it was, that's when I said again "Show me your fucking hands." (Hitz IPRA Recorded Statement ; City 002386; Hitz Deposition 13:37:56 – 13:40:58, 13:52:59 -13:58:25)

Riordan, who is six feet five inches (Hitz deposition 14:26:59- 14-27:01) had to be assisted over the same fence by two officers (Riordan Recorded IPRA statement 33; Hitz deposition 14:26:35 - 14-27:01):

> MG: Sure. How did they assist you over the fence?
> JR: It was a fairly high fence, about 6 foot. I got part way up provided a boost, someone else pushed me in the back.

*The Handcuffing of Loury.* Riordan says that after he jumped the fence he "[r]etrieved handcuffs, secured the offender's right hand first because that was nearer to the firearm, and then his left hand." (Riordan IPRA Recorded Statement)

> JL: Okay. So now you've handcuffed the right hand and left hand of Mr. Loury?
> JR: Behind his back, yes.
>
> JL: Okay. And he's still *face down on the ground*? (Emphasis added)
> JR: Correct.
>
> JL: Alright, did you move him in any way other than to do that, to put the cuffs- the handcuffs on?
> JR: Other than his hands, no. I did move his- the firearm with my left foot. Never touched it with my hand. (*Id.*)

Yet Hitz provides an opposite account in his IPRA interview when he says that Riordan flipped Loury to handcuff him:

> JL: Okay so did you see the gun at any time during that period of time when he was being handcuffed?
> SH: I still didn't seen it, no. I didn't see it until after he was in custody.
>
> JL: Was he already removed from the scene when you saw the gun?
> SH: No. He was still on the scene, but we were waiting for the EMS still, so…
>
> JL: Okay. When you saw the gun at that time, where was it?
> SH: It was probably about at his knee and on the right side of his body.
>
> JL: Okay on the right side of his body?

SH: Yes.

JL: Okay and-
SH: Well he was, at the time, *he was turned over to get cuffed* (emphasis added) so it would be his left side but when he was laying on his stomach it was on his right side of his body.

JL: Okay but then, after he is handcuffed, is he-
SH: He gets flipped yeah, *after he's handcuffed he's on his back now* (Emphasis added) –

JL: On his back.
SH: And it's on his left side, approximately at his knee.

JL: Okay on his left side, near his left knee. (Hitz Recorded IPRA Statement; Hitz Deposition 14:29:04 – 14:30:11)

*The IPRA's Inappropriate Questioning Techniques.* For example, IPRA investigator Jim Lukas puts words confirmatory of Hitz' version of events into the following leading questions:

JL: Okay. And then did Officer Hitz, in his description of why he fired at Mr. Loury, did Officer Hitz ever say anything about seeing the gun prior to Mr. Loury pointing the gun at Officer Hitz?
JR: I believe so but I mean I don't want to say too much based on a second-hand account from weeks ago.

JL: Right and that's from Officer Hitz's you're talking about, that second-hand account? Okay. right. did Officer Hitz ever mention whether he saw the gun fall to the ground as Mr. Loury is going over the fence? *Do you remember Officer Hitz saying that?* (Emphasis added)
JR: I believe so.

*The Post-Incident Location of Hitz and Riordan.* The times CPD investigators Tedeschi and Green took their alleged on-the-scene interviews of Hitz (City 0002385) and Riordan (City 0002387) are not contained in the investigative file. A second set of interviews, without explanation, is alleged to have been conducted by the same officers of both Hitz and Riordan at Area Four approximately two hours after the CPD investigators arrived on the scene at 7:50 PM. (City 0002384, 0002389). Tedeschi and Green say that it "should be noted both P.O. Hitz and Riordan were not transported in the same vehicles. Upon arrival in Area Four both officers were placed into separate rooms without speaking to each other." (City 0002389). But there is not record of where Hitz and Riordan were, whether they spoke to each other, and who was present with them during the two hour period before they arrived at Area Four.

**The Department of Justice Investigation:**

The 2017 report of the Department of Justice about its investigation of the Chicago Police Department[1] contains a comprehensive history and analysis of (1) Chicago's broken police accountability systems, (2) Chicago's pattern and practice of failing to properly train and supervise its officers who have authority to discharge of firearms at civilian suspects; (3) Chicago's pattern and practice of failing to properly investigate police misconduct, including the use of excessive force in the shooting of civilians; (4) Chicago's pattern and practice of failing to properly discipline officers who in engage in misconduct, including the use of excessive force in the shooting of civilians, (5) Chicago's pattern and practice of failing to properly monitor officers who in engage in misconduct, including the use of excessive force in the shooting of civilians, (6) Chicago's failure to take sufficient steps to prevent officers from deliberately concealing misconduct (Code of Silence), (7) Chicago's failure to provide sufficient training, supervision, discipline, monitoring of its officers who engage in shootings at civilians, to adequately investigate police shootings at civilians, and to take sufficient steps to prevent a code of silence among officer who shoot at civilians encourages its officers to use excessive and unreasonable force.

**Opinions Thus Far:**

The Monell period in this case is 2010-2016. Based upon the information and analysis set out above, my review of the materials listed above – with particular emphasis on the Department of Justice Report, the Police Accountability Task Force Report and the Safer Report, and my background, experience and training, I conclude that during the Monell period:

*Policy of Impeding Investigations of Misconduct*

1. Chicago has consciously and deliberately created impediments to the process made available for citizens to complain about police misconduct. These impediments include requiring sworn affidavits for complaints, not investigating allegations of misconduct that happened more than five years before the misconduct at issue, and not investigating allegations of misconduct more than five years after a CR number is issued. The maintenance in place of these impediments constitutes a *de facto* policy or widespread custom of failing to properly investigate civilian allegations of police misconduct, including the use of excessive force in the shooting of civilians.

---

1 This is the ultimate report about the failures of the Chicago's Police Department and it's pattern and practice of unconstitutional use of force. It is a report preceded by many studies, interviews, news articles and reports going back decades which echo the DOJ findings, including but not limited to: Police Accountability Task Force Report, April, 2016; McGuire Woods Audit of IPRA Shooting Investigations (March 2, 2017); (Safer Report) Preventing and Disciplining Police Misconduct (December 2014); Crime, Corruption and Cover-ups in the Chicago Police Department, Anti-Corruption Report Number 7, January 17, 2013.

2.      Chicago has failed to take affirmative steps to end or remove these impediments.

3.      The creation of these impediments and the failure to remove them are the result of the deliberate and conscious actions of Chicago and its policy makers, despite the clear consequences of allowing police misconduct to uninvestigated and officer wrongdoers to go without supervision, intervention, or discipline.

4.      These failures impede the conduct of complete, fair, and unbiased investigations of police misconduct and lead to a foreseeable risk of harm to others are things that a reasonable Chicago policy maker would be aware of.

5.      These failures and impediments were the moving force behind the death of Loury, in that they created an environment which gave defendant officers had license to operate with impunity and without fear of punishment.

6.      It was reasonable on August 24, 2014 for defendant officers to believe that no proper investigation of their actions would be instituted and that no such investigation find them culpable of any actions that they might take against Loury, including but not limited to the use of excessive force by shooting and killing him, the failure to intervene to stop the shooting officer from shooting Loury, and the subsequent concealment that misconduct.

### Failure to Investigate

7.      Chicago had a *de facto* policy or widespread custom or practice of failing to investigate allegations of police misconduct, including in the use of excessive force by discharging guns at fleeing civilians.

8.      The Chicago failed to take any affirmative steps end their *de facto* policy of failing to properly investigate allegations of police misconduct, including the use of excessive force by discharging guns at fleeing civilians.

9.      The failure to properly investigate complaints about officer misconduct are the result of the deliberate and conscious actions of Chicago and its policy makers, despite the clear consequences of allowing police misconduct to uninvestigated and officer wrongdoers to go without supervision, intervention, or discipline.

10.     The deliberate and conscious decision to maintain an ineffective and

flawed system by which to investigate police misconduct was the driving force behind the death of Loury.

11.     While it is outside my purview to assess the credibility of the parties, it is easy to see why the defendant officers may feel they it is to their benefit to simply deny plaintiff's allegations and take their chances with a flawed investigative and disciplinary process to sort out the truth.

### *Failure to Discipline*

12.     The City of Chicago had a *de facto* policy or widespread custom or practice of failing to effectively discipline police misconduct, including in the use of excessive force by discharging guns at fleeing civilians.

13.     The low percentage of complaints which result in a sustained finding, the absence of any meaningful disciplinary action, the frequency in which discipline is lowered or reversed, and the absence of any real consequence for wrongdoing caused the defendant officers in this case to have every reason to believe, before they were involved in the incident on April 11, 2016 resulting in the death of Loury, that they would never be effectively investigated or meaningfully disciplined for any misconduct towards Loury.

14.     The failures in the process of disciplining officer's who engage in misconduct are the result of the deliberate and conscious actions of Chicago and its policy makers, despite the clear consequences of allowing a finding of police misconduct to be subject to the fair, consistent, and meaningful application of discipline in order that wrongdoers were not left with the belief that their bad behavior would effectively go unpunished.

15.     At the time of this incident the City had failed to take any meaningful steps to curb or otherwise correct these failures in the disciplinary process.

16.     The failure of Chicago to maintain an effective disciplinary system which prevented police misconduct and protected against a culture that gives officers the belief that their bad behavior would effectively go unpunished amounted to a *de facto* policy of failing to supervise officers, including in the proper use of force when confronted with the decision to discharge a firearm against a civilian.

17.     These *de facto* policies of a failure to discipline and supervise were the moving force behind each of Loury's death.

18.     Chicago had a *de facto* policy or widespread custom of sustaining and
        disciplining officers less often for misconduct against African-American
        civilians.

19.     The Chicago has failed to take any steps to curb this disproportionality.

**Failure to Train**

20.     Chicago had a *de facto* policy or widespread custom or practice of failing
        to train officers in the proper use of force generally and with respect to the
        discharge of firearms against civilians and fleeing suspects in particular,
        and in failing to train officers in the proper use of intervention in another
        officer's use of force generally and with respect to the discharge of
        firearms against civilians and fleeing suspects in particular

21.     Chicago failed to take affirmative steps ameliorate this custom or practice
        of failing to train officers in the proper use of force generally and with
        respect to the discharge of firearms against civilians and fleeing suspects
        in particular.

22.     The failure of Chicago to maintain an effective training system which
        prevented police misconduct and protected against a culture that gives
        officers the belief that their bad behavior would effectively go unpunished
        amounted to a *de facto* policy of failing to train officers, including in
        the proper use of force when confronted with the decision to discharge a
        firearm against a civilian.

23.     The City of Chicago and CPD's failure to train officers in the proper use
        of force with respect to the discharge of firearms against civilians and
        fleeing suspects in particular was the moving force behind Loury's
        death.

**Code of Silence**

23.     Chicago had a *de facto* policy or widespread custom or practice of
        ignoring, denying or covering up the bad actions of a colleague or
        colleagues or, in other words, a Code of Silence.

24.     The failure to ameliorate the Code of Silence despite being placed on
        notice and acknowledging its existence is the result of the deliberate and
        conscious actions of Chicago and its policy makers.

25.     Chicago created an environment that nurtured a Code of Silence and that
        made defendant officers believe they had license to operate with impunity

and without fear of punishment.

26. Chicago's deliberate and conscious choice to nurture a Code of Silence and their failure to ameliorate it was the moving force behind the death of Loury.

27. In this case, the inadequate CPD and IPRA investigations, the lack of a finding of misconduct, including for false and misleading statements, and the failure of defendant officers to intervene and report the misconduct of others, and the failure to discipline the officers involved are hallmarks of a Code of Silence.

28. Any reasonable officer in the CPD during 2010 – 2016 would have been aware of the systemic flaws in Chicago's investigative process and the discipline system. Those officers who, like the defendants, chose to engage in misconduct did so with the reasonable belief that their actions would not be subject to any thorough and meaningful investigation and would not be subject to meaningful application of discipline, so that their bad behavior would effectively go unpunished.

**Supplemental opinions:**

If I am asked to review additional documents, including the IPRA – now COPA, investigative file of the reopened Loury investigation, I will provide supplemental opinions to this report.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved

patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.
As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide,

robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1550 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas,

Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los
Angeles Police Department Board of Rights and the Los Angeles County Civil Service
Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland
Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho,
Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State
Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the
National Police Accountability Project held at Loyola Law School, Los Angeles, California. I
was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish
Police Officer' Standard of Care" at the National Police Accountability Project, National
Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to
present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics,
Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."
On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013
Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the
Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community
Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of
Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project
and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border
Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court
issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral,
New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption
of a model policy for inquiring into a person's immigration status, which has been adopted
nationwide and has also been presented to the United States Senate, the Secretary of Homeland
Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of
Redwood City*, 737 F.Supp2nd.1047. I have been recognized, and my expert report was quoted
by, the United States Court of Appeals for the Ninth Circuit as an expert in Police
Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th
Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case
involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d
1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and
returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*
(USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training,
discipline and supervision, and which resulted in significant policy changes within the MPD. My
opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751
F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding
credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir.
2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit
also drew from my expert reports regarding Jail Administration and Administrative
Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from
my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a

suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al*, Originating Case No. 1:13-cv-00124 regarding the use of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certification as an expert in the general use and deployment of the TASER weapon occurred in San Francisco, California on January 29, 2015 in *Andre Little, an Individual, v. City of Richmond, et al.*, Case No: CV-1302067-JSC. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is a listing of matters in which I have testified in the last four years as an expert.

My fees are as follows: Travel time at the rate of $50.00 per hour; (Travel via automobile to and from San Diego to Los Angeles 8 hours $400.00) All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour. All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed November 13, 2017, at Santee, CA.

Roger A. Clark