# EXHIBIT
# B

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESTATE OF PIERRE LOURY,          )
Deceased, by Tambrasha           )
Hudson, Administrator,           )
                                 )
          Plaintiff,             ) No. 16 C 04452
                                 )
     vs                          )
                                 )
CITY OF CHICAGO, Chicago         )
Police Officers SEAN HITZ        )
(Star No. 6272) and JEFF J.      )
RIORDAN (Star No. 7716),         )
                                 )
          Defendants.            )

     The discovery deposition of ROGER
CLARK, taken in the above-entitled cause before
Steven J. Brickey, CSR, State of Illinois, at 30
North LaSalle Street, Chicago, Illinois, on the
27th day of December, A.D., 2017, commencing at
10:10 o'clock a.m.

Page 2

1  A P P E A R A N C E S:
2    ACTION INJURY LAW GROUP, LLC
       BY:  MR. ANDREW M. STROH
3      191 North Wacker Drive
       Suite 2300
4      Chicago, Illinois 60606
       (844) 878-4529,
5      astroth@actioninjurylawgroup.com
6    ODIM LAW OFFICES
       BY:  MR. CARLTON ODIM
7      225 West Washington Street
       Suite 2200
8      Chicago, Illinois 60606
       (312) 578-9390,
9      carlton@odimlaw.com
10         Appeared on behalf of the Plaintiff;
11   CITY OF CHICAGO
       BY:  MR. JONATHAN CLARK GREEN
12       MR. DEVLIN SCHOOP
         MR. RAOUL MOWATT
13       MS. KATE MCCLELLAN
       30 North LaSalle Street
14     Room 900
       Chicago, Illinois 60602
15     (312) 744-4746,
       jonathan.green@cityofchicago.org
16     devlin.schoop@cityofchicago.org
       raoul.mowatt@cityofchicago.org
17     katemcclellan@cityofchicago.org
18         Appeared on behalf of the Defendant,
           City of Chicago;
19
20
21
22
23
24

Page 3

1   CITY OF CHICAGO
      BY:  MR. SHAWN BARNETT
2     30 North LaSalle Street
      Room 900
3     Chicago, Illinois 60602
      (312) 744-4746,
4     shawn.barnett@cityofchicago.org
5         Appeared on behalf of the Defendants,
          Officer Sean Hitz and Officer Jeff
6         Riordan;
7   THE VIDEOGRAPHER:  MS. BARBARA RUDOLPH
8
    REPORTED BY:
9
      Steven J. Brickey, CSR
10    CSR License No. 084-004675
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1               I N D E X
2   THE WITNESS:  ROGER CLARK
3                   PAGE
4   Direct Examination by Mr. Green........... 7
5   Cross-Examination by Mr. Barnett.......... 219
6   Redirect Examination by Mr. Green......... 233
7
8
9            E X H I B I T S
10
11              Marked for
                Identification
12
13   Exhibit No. 1 ........................     9
14   Exhibit No. 2 ........................    12
15   Exhibit No. 3 ........................    14
16   Exhibit No. 4 ........................    21
17   Exhibit No. 5 .....................     234
18
19
20
21
22
23
24

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 5

1  THE VIDEOGRAPHER: Good morning. We
2  are now on the video record at 10:12 a.m. on
3  December 27th, 2017. Please note that the mics
4  are sensitive and may pick up whispering, private
5  conversation and cellular interference. Please
6  turn off all cellphones or place them away from
7  microphones as they can interview with the
8  deposition audio. Audio and video recording will
9  continue to take place unless all parties agree to
10  go off record.
11  This is media unit one of the
12  video recorded deposition of Roger A. Clark taken
13  by counsel for the defendant in the matter of
14  Hudson versus City of Chicago filed in the United
15  States District Court Northern District of
16  Illinois Eastern Division. Case number 16 C
17  04452.
18  This deposition is being held at
19  the City of Chicago Department of Law located at
20  30 North LaSalle Street in Chicago, Illinois. My
21  name is Barbara Rudolph in association with JR
22  Colby and Associates and I am the videographer. I
23  am not related to any party in this action nor am
24  I financially interested in the outcome.

Page 6

1  Will counsel please state their
2  appearance and affiliation for the record starting
3  with the taking counsel first.
4  MR. GREEN: Jonathan Clark Green on
5  behalf of the City of Chicago.
6  MR. MOWATT: Raoul Mowatt on behalf
7  of the City of Chicago.
8  MR. STROTH: Andrew M. Stroth on
9  behalf of the plaintiff.
10  MR. ODIM: Carlton Odim on behalf of
11  the plaintiff.
12  MR. GREEN: Also for the record we
13  have Kate McClellan.
14  MS. MCCLELLAN: Kate McClellan on
15  behalf of the City.
16  MR. GREEN: Also we may have Devlin
17  Schoop joining us during the deposition as well as
18  Shawn Barnett on behalf of the individual
19  defendants.
20  THE VIDEOGRAPHER: Thank you. The
21  reporter is Steven Brickey in association with LA
22  Reporting. Will the reporter please swear the
23  witness.
24

Page 7

1  WHEREUPON:
2  ROGER CLARK
3  called as a witness herein, having been first duly
4  sworn, deposeth and saith as follows:
5  D I R E C T    E X A M I N A T I O N
6  BY MR. GREEN:
7  Q.  Okay. Let the record reflect as
8  stated this is the videotaped deposition of Roger
9  A. Clark taken pursuant to agreement of the
10  parties and notice in the Federal Rules of Civil
11  Procedure in the case of Hudson versus City of
12  Chicago, et al 16 C 4452 presently pending in the
13  United States District Court for the Northern
14  District of Illinois Eastern Division.
15  Now, Mr. Clark, are you here
16  with counsel today?
17  A.  I am.
18  Q.  And who is your counsel who will be
19  defending you?
20  A.  Mr. Odim as I understand.
21  Q.  Okay. And you understand you're
22  under oath?
23  A.  I do.
24  Q.  Okay. And are you presently under

Page 8

1  the influence of any medication, drugs or alcohol
2  that may affect your testimony today?
3  A.  I am not.
4  Q.  And how many depositions have you
5  taken approximately?
6  A.  In depositions, probably 800.
7  Q.  Okay. So you know the ground rules,
8  correct?
9  A.  I believe I do.
10  Q.  Okay. And if you have any questions
11  while I'm taking this deposition, if there is
12  anything you don't understand, of course feel free
13  to stop me at any time and ask for clarification,
14  do you understand that?
15  A.  Yes.
16  Q.  Okay. And if you don't indicate
17  that you don't understand the question, it will be
18  assumed that you understood the question, do you
19  understand that?
20  A.  Yes.
21  Q.  Okay. Also, if you need to take a
22  break, of course please indicate so you'd be
23  allowed to take such a break unless a question is
24  pending, at which time you can take a break as

2 (Pages 5 to 8)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 9

1    soon as the question is answered, you understand
2    that, correct?
3         A.    Yes, and probably every hour if it's
4    okay with you.
5         Q.    I understand.  Your counsel informed
6    me that you may want to take a break, we as well.
7    So we'll work that out as we go along here.
8              Now, you've been engaged by
9    plaintiff's counsel to give opinions in this
10   matter, correct?
11        A.    Yes.
12        Q.    Okay.  And let's go first to just
13   get the exhibits out of the way.  If we could mark
14   here Exhibit 1 the notice of videotaped
15   deposition.
16             MR. GREEN:  Do you have Exhibit --
17             (Document marked as Clark
18             Exhibit No. 1 for
19             identification.)
20   BY MR. GREEN:
21        Q.    You have Exhibit 1 before you, have
22   you seen this before?
23        A.    Yes.
24        Q.    Now, on the backside or the second

Page 10

1    page of the exhibit, it states that all materials
2    to bring with you or make available to defendants'
3    counsel in advance, all materials upon which you
4    relied or relies to formulate and support all
5    opinions contained in this report, all materials
6    reviewed or consulted in this matter, but not
7    relied upon by drafting -- before drafting his
8    expert report including treatises, all notes,
9    notations, comments or other recordkeeping created
10   while reviewing materials to formulate his opinion
11   and/or to memorialize facts or thoughts, copies of
12   all statements, bills, paid or unpaid, copies of
13   all recordkeeping or for billable hours, a list of
14   all matters in which you gave deposition or trial
15   testimony providing the case name, number, court
16   and party for whom the testimony was given, have
17   you provided all those to defendants' counsel?
18        A.    Yes.
19        Q.    All right.  Have you brought
20   anything in addition other than what was sent to
21   you by -- from your counsel to us directly, have
22   you brought anything with you today?
23        A.    I brought nothing further except to
24   let you know that yesterday I did a site visit

Page 11

1    with Mr. Odim.
2         Q.    And where --
3         A.    And that was after I landed and went
4    to the location.
5         Q.    And so that was the site of the
6    underlying incident in this case?
7         A.    Yes.
8         Q.    And how long did you spend there
9    approximately?
10        A.    Probably around -- well, we drove
11   the area starting from where the incident started
12   and then wound up in the alley and got out and I
13   went to the yard, et cetera, and that was probably
14   20 minutes, 30 minutes.  It was cold.
15        Q.    And what time of day was it?  Was it
16   light out, dark out?
17        A.    It was -- it was right around
18   3:00 -- 3:00 to 3:30 p.m.
19        Q.    So it was still light out a bit?
20        A.    Yes, it was.
21        Q.    And did you speak with anybody at
22   the location?
23        A.    No.
24        Q.    Was anybody other than your counsel

Page 12

1    and you there with you?
2         A.    There was a white Lexus with the
3    engine running and somebody in it parked right at
4    the location.  We did not approach or talk to that
5    individual, but there was someone there.
6    Otherwise, I saw no one else.
7         Q.    So you don't know if that was an
8    Uber or somebody just from the neighborhood?
9         A.    Correct, I do not know.
10        Q.    Okay.  If we can mark Exhibit 2 for
11   the record, which is essentially your CV, that was
12   attached as Exhibit A to your report in this
13   matter.
14             (Document marked as Clark
15             Exhibit No. 2 for
16             identification.)
17   BY MR. GREEN:
18        Q.    Can you take a look at this, please.
19   Is this what you recognize as your six-page CV
20   that was attached as Exhibit A to your report of
21   November 13th, 2017, in this matter?
22        A.    Yes.
23        Q.    Have there been any changes since
24   you submitted this?

3 (Pages 9 to 12)

Electronically signed by Steven Brickey (501-307-281-8473)                          954cbfef-baad-48a4-9690-8c9024c19f87

Page 13

```
1          A.    I just noted as I looked that it
2     said that I -- on the first paragraph, I have
3     consulted in approximately 1,500 cases.  That
4     should read 1,700.  Other than that -- and I went
5     ahead and wrote that in by -- 1,700.
6          Q.    By hand on the exhibit?
7          A.    By hand.  So I hope that's okay and
8     that would be a correction.
9          Q.    Okay.  And between the 1,500 and
10    1,700, when did that occur?
11         A.    Well, I -- I -- apparently, I drew
12    this -- the 1,700 would be a couple of years ago.
13    So it would be a year-and-a-half ago, 18 months
14    ago that this was produced.
15         Q.    So you've consulted in 200 more
16    cases within the last two years?
17         A.    I believe so, yes.
18         Q.    Okay.
19         A.    I've not kept track, but it's
20    something like that.  A hundred cases a year.
21         Q.    All right.  We'll return to that in
22    a minute.  Let's just do Exhibit 3 here.  This is
23    the prior testimony for the last four years
24    attached as Exhibit B to the report of November
```

Page 14

```
1     13th, 2017, in this matter.  If you take a look at
2     this just to verify.
3                 (Document marked as Clark
4                 Exhibit No. 3 for
5                 identification.)
6     BY MR. GREEN:
7          Q.    Okay.  Mr. Clark, if you can take a
8     look at that.  Is that a fair and accurate copy of
9     your prior testimony for the last four years as
10    submitted on Exhibit B to your report of November
11    13th, 2017, in this matter?
12         A.    Yes.
13         Q.    Have there been any changes since
14    then?
15         A.    There have been additions since
16    October 9th.
17         Q.    And which additions are those?
18         A.    I have to refer to -- this is a
19    precise list.  So starting from October 9th I'll
20    give you the additional cases -- do you want the
21    additional cases?
22         Q.    Sure.  Yes, please.
23         A.    You want me to, um, just give you
24    the dates or do you want the citations as well?
```

Page 15

```
1          Q.    Citations, too, just as if it was
2     added to this list, that way we're full up-to-date
3     and whether it's trial or deposition.
4          A.    All right.  October -- okay.  So
5     here is what I'll do.  I will say what it is,
6     trial or deposition, and then the date and the
7     citation.
8          Q.    Perfect.
9          A.    I did something wrong here.  It's a
10    busy month.  Okay.  Deposition, October 12th,
11    Evangelica -- Evangelina, E-V-A-N-G-E-L-I-N-A,
12    Gonzalez versus the County of Los Angeles, case
13    I'll have to -- one second.  I think I listed a
14    number.  It's a federal case.  2:16-cv-07018.
15    Next, deposition, October 13th and December 15th.
16    There were two days.  Felipe Navarro, F-E-L-I-P-E,
17    versus the State of New Mexico, 20 -- excuse me.
18    26:16-cv-01180 MCA.  Next, trial, October 17th,
19    Mayumi, M-A-Y-U-M-I, Donaldson, D-O-N-A-L-D-S-O-N,
20    versus the City of Englewood, superior court in
21    the County of Los Angeles, case number BC 563203.
22    Next, trial, October 25th, Randy Conan, C-O-N-A-N,
23    versus the City of Fontana, federal case number
24    15:16-cv-01261.  Next.
```

Page 16

```
1     BY MR. GREEN:
2          Q.    I'm sorry.  City of Fontaine?
3          A.    Fontana, F-O-N-T-A-N-A.
4          Q.    Okay.
5          A.    Okay.  Next is a trial, October
6     27th, Estate of Manuel Diaz versus City of
7     Anaheim, case number 12 -- it's a US case 12-01897
8     JVS.
9          Q.    Emanuel.  What was his last name?
10         A.    Diaz, D-I-A-Z.  Next --
11         Q.    What court was that again?
12         A.    It's a federal case.  Central
13    District.
14         Q.    Of California?
15         A.    California.
16         Q.    Okay.
17         A.    Next, a trial, November 7th, William
18    Mears, M-E-A-R-S, versus the City of Los Angeles,
19    cv 15-08441 JAK.  Next, a trial, November 15th.
20    I'm going to murder this name Shellabarger,
21    S-H-E-L-L-A-B-A-R-G-E-R versus Dicharry,
22    D-I-C-H-A-R-R-Y, case number 13-cv-00188 TLN.
23         Q.    And where was that located?
24         A.    Just one second here.  That was in
```

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)     954cbfef-baad-48a4-9690-8c9024c19f87

Page 17

1   San Francisco Eastern District US case -- US
2   Eastern District of California. It was an
3   interesting case. Next is a deposition of
4   November 21st, Heleine, H-E-L-E-I-N-E, I'm going
5   to spell this for you T-C-H-A-Y-O-U versus the
6   City of Los Angeles. It's a federal case
7   16-cv-06073 TJH. Next, a deposition on November
8   27th, Monica Ortiz, O-R-T-I-Z, versus the City of
9   Rialto, R-I-A-L-T-O, and that is a federal case
10  5:16-cv-01384 JGB.
11      Q.  V or B?
12      A.  B as in boy. Okay.
13      Q.  And where was that located, the City
14  of Rialto?
15      A.  Rialto. That's in California.
16      Q.  Central District?
17      A.  Right, that would be Central
18  District Los Angeles County area. So December 1st
19  CR and you put in parenthesis Rucks, R-U-C-K-S,
20  it's a child deceased, versus the City of Antioch,
21  A-N-T-I-O-C-H, and that's an Eastern District.
22  It's C 16-03742 JST.
23      Q.  I'm sorry. Could you say that one
24  more time?

Page 18

1       A.  Sure. C 16-03742 JST. Next is a
2   trial on December 8th.
3       Q.  I'm sorry. That December 1st one
4   Rucks, was that a trial or a deposition?
5       A.  It's a deposition. I'm sorry.
6       Q.  And the next one is a trial?
7       A.  Next is a trial. December 8th.
8   Sammy Sanchez, S-A-N-C-H-E-Z, versus the City of
9   Tucson, New Mexico.
10      MR. MOWATT:  Might I make a
11  suggestion. Mr. Clark, you're reading this off of
12  a Word file or some such?
13      THE WITNESS:  I am.
14      MR. MOWATT:  Could you possibly
15  e-mail that and I could print copies as a revised
16  exhibit?
17  BY MR. GREEN:
18      Q.  Well, please do. How many more do
19  you have?
20      A.  Not many more, but I was going to
21  suggest that and I'm happy to --
22      Q.  I'd like to hear it first for the
23  deposition.
24      A.  Sure.

Page 19

1       Q.  If you can then forward it to us for
2   our records, that would be great.
3       A.  Okay.
4       Q.  But if you can finish up.
5       A.  I keep it updated and it's precise.
6   So what you'll get is a complete -- the latest
7   edition it won't have this one on it, but it will
8   be up to this date.
9       Q.  Okay.
10      A.  Is that satisfactory?
11      Q.  Sounds good. We have trial --
12      A.  So where we are -- December what?
13      Q.  On December 8th. Sammy Sanchez
14  versus City of Tucson?
15      A.  That's a US case 72-1576857. Next
16  is a deposition of which the City is involved.
17  That was December 11th. The Estate of Roshad
18  McIntosh, M-C-I-N-T-O-S-H, versus City of Chicago.
19  That is case number 1:15-cv-01920.
20      Q.  And that's otherwise known as Lane,
21  the Estate of Lane, or the Estate of McIntosh,
22  Lane is the plaintiff, correct?
23      A.  Correct. Then two more to go. Next
24  is a deposition on December 14th, which is Taylor

Page 20

1   Swift, S-W-I-F-T, versus David Woo, W-O-O, it's a
2   case in San Francisco, it's a US case
3   3:17-cv-00866. And last is a deposition on
4   December 18th. Domingo Davis, Junior versus the
5   City of Santa Clara and that case -- and that's in
6   the Eastern District. It's near San Francisco.
7   5:15-cv-05603 EJD. That's it. And then it will
8   be today.
9       Q.  So since you've provided us with
10  this, you've had 14 depositions or trial
11  testimony, correct?
12      A.  You are correct. That's a precise
13  list.
14      Q.  And of these 14, were any of them
15  Monell cases or have Monell claims that you were
16  testifying in regard to?
17      A.  There were a number that had Monell
18  opinions. In the trials -- in the ones where
19  there were trials, I did not express a Monell
20  opinion.
21      Q.  And --
22      A.  Almost in every one of the reports,
23  there was a Monell commentary.
24      Q.  In each of these?

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 21

1    A.    About two-thirds of them had a
2    Monell commentary.
3    Q.    All right. So along with the
4    additions of these 14 other cases and the list you
5    provided, this is now a fair and accurate copy of
6    your prior testimony of the last four years coming
7    into this deposition?
8    A.    It would be fair, accurate and
9    precise.
10   Q.    All right. Finally, let's do
11   Exhibit 4.
12              (Document marked as Clark
13              Exhibit No. 4 for
14              identification.)
15   BY MR. GREEN:
16   Q.    Okay. Mr. Clark, can you take a
17   look at what's been marked as Exhibit 4 to this
18   deposition.
19              Do you recognize it as your
20   disclosure in this case of November 13th, 2017,
21   without the two attached exhibits which we've
22   marked separately?
23   A.    Yes.
24   Q.    And is it a fair and accurate copy

Page 22

1    of that disclosure?
2    A.    It is fair, accurate and precise.
3    Q.    Okay. In looking at this report on
4    page two to eight, you mark "Materials reviewed
5    thus far for this matter" and there are 42 items
6    listed.
7              Have you reviewed anything since
8    then and, if so, what?
9    A.    It would only be the site visit.
10   Q.    The site visit that you just talked
11   about?
12   A.    Yes.
13   Q.    And was that the one on Grenshaw
14   where the actual shooting took place?
15   A.    Yes.
16   Q.    Now, in this list of items on number
17   nine, it says "CPD written policies," which
18   exactly policies -- which policies did you review
19   in preparation of this report from the Chicago
20   Police Department?
21   A.    The -- the policy references the
22   requirement to be truthful and accurate in
23   reports.
24   Q.    Are --

Page 23

1    A.    And not to make false statements.
2    Q.    Now, your attorney e-mailed us last
3    night that in clarification for this line nine
4    that you had cited Rule 14, which in the Chicago
5    Police Department is the one regarding making a
6    false report, written or oral, is that correct?
7    A.    Correct.
8    Q.    Other than that, you have not seen
9    any other City policies?
10   A.    Not in relation to this -- this
11   issue.
12   Q.    In this report?
13   A.    Yes.
14   Q.    So the only rule that you looked at
15   or are familiar with in the Chicago Police
16   Department is Rule 14 about making a false report,
17   written or oral?
18              MR. ODIM: Objection. Foundation.
19   BY THE WITNESS:
20   A.    For the purposes of this report,
21   that was the policy referenced. As you are aware
22   of, I've had a number of Chicago cases and I've
23   reviewed their policies in other cases, but the
24   policy for this case is that citation Rule 14 --

Page 24

1    BY MR. GREEN:
2    Q.    So --
3    A.    -- or policy 14.
4    Q.    So you did not review Rule 21 or
5    Rule 22 or anything regarding spars or any other
6    policies/procedures of the Chicago Police
7    Department in coming to your conclusions in this
8    report?
9    A.    That's correct.
10   Q.    Now, also, we received a note from
11   your -- I'm sorry. From your -- from your counsel
12   last night that in regard to your reference to the
13   comments by Gene Williams in the Police
14   Accountability Task Force report that it is the
15   quote that Mr. Williams makes or -- at page 70, is
16   that correct?
17   A.    That's right.
18   Q.    There are no other quotes or
19   references in regard to that citation?
20   A.    Correct.
21   Q.    Okay. Also on number 27 you listed
22   Daley's July 19th, 2017, statement to the City
23   Council. Your attorney contacted us last night
24   and said that should not have been on the list.

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 25

1    that it was, in fact, not provided to you,
2    correct?
3        A.   Right. I'm glad he's conveyed that
4    to you. That was a mistake. So that item should
5    be stricken completely.
6        Q.   And it was not considered at all in
7    your conclusions here --
8        A.   That's right.
9        Q.   -- opinions? Finally, your --
10   number 28. It states "Publicly released police
11   complaint registered information on the Internet
12   at the Citizens Police Data Project website
13   www.cpdb.com." We received an e-mail from your
14   counsel last night that said, in fact, that you
15   had conducted no specific search in that database,
16   is that correct?
17       A.   Correct.
18       Q.   Do you know how that database is
19   compiled at all?
20       A.   It is -- it's a civilian project and
21   it has key statistics and what I remember in my
22   reviewing of that database, and very quickly, for
23   example, like 56,000 allegations versus how many
24   are sustained. There is a pie chart indicating

Page 26

1    that. I could bring it up and show it to you.
2    But -- but the purpose of the notation is -- for
3    the report was that the City has had put on --
4    numerous notices of the problem.
5        Q.   Do you know how accurate that actual
6    database is?
7        A.   No.
8        Q.   Do you know who actually put that
9    together?
10       A.   It's a civilian project and I can't
11   remember the individual's name, but he -- it's
12   a --
13       Q.   So you have no idea?
14       A.   It goes back like 15 years of
15   research, but I don't remember.
16       Q.   But you have no personal knowledge
17   of how accurate or who even put that together,
18   correct?
19       A.   Correct, I did not collaborate. I
20   haven't even contacted him. There is one other
21   correction on the list if you're finished. I
22   don't know.
23       Q.   Okay. Well, just going back to Rule
24   14 just to clarify that.

Page 27

1            So the opinions that you are
2    expressing in this case are based solely on your
3    review of Rule 14 in regard to the police policies
4    and procedures?
5            MR. STROTH: Objection again
6    foundation.
7    BY THE WITNESS:
8        A.   That's correct regarding opinions
9    that I have expressed.
10   BY MR. GREEN:
11       Q.   All right. You said there was one
12   other correction on this list, which one is that?
13       A.   Right. It's on the list as number
14   35. It's plural. It's a singular deposition and
15   it's Ms. Hudson's deposition. She's the
16   plaintiff. That's sort of technical, but -- so
17   the list then would be 41 items, not 42.
18       Q.   All right. You list the jury
19   verdict in Obrycka versus Chicago, are you
20   familiar with that verdict at all?
21       A.   Only that it was the -- as I
22   remember, it was the -- putting the City on notice
23   of the Monell.
24       Q.   Do you know which Monell claim, if

Page 28

1    any, were decided in that case?
2        A.   I think there was -- they were given
3    a choice of two views and they -- I don't think it
4    was -- my understanding was it was not clear which
5    of the two views.
6        Q.   So you recognize that it was
7    determined it was an ambiguous verdict?
8        A.   It's an interesting way to put it,
9    but in that way there is an ambiguity. I'm not
10   the lawyer here, but just the important thing was
11   it was a notice of the Monell problems. That's my
12   term for the City.
13       Q.   So you mean that in a generic
14   sense --
15       A.   I do.
16       Q.   -- as for not a specific type of
17   Monell issue?
18       A.   Right, and I wouldn't even know if I
19   would be -- if you can even say there is a
20   difference in types of Monell. It's a custom and
21   practice issue. That's the way I looked at it.
22   It's the City's custom and practice.
23       Q.   So it doesn't matter what type of
24   Monell, it's all the same, is that what you're

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)        954cbfef-baad-48a4-9690-8c9024c19f87

Page 29

```
 1   saying?
 2       A.   I don't understand what you're
 3   asking me.  So if you can be more precise, maybe I
 4   can answer it.  I -- I don't know what you mean.
 5   I think there is a global approach to problems in
 6   a department and it's called Monell, whether it's
 7   a -- I'll wait for the next question.
 8       Q.   So when you divide up your opinions
 9   into five subject matters, it doesn't really
10   matter?  They're all the same, is that what you're
11   saying?
12           MR. STROTH:  Objection.  Form.
13   BY THE WITNESS:
14       A.   Same as what?
15   BY MR. GREEN:
16       Q.   Meaning they don't mean a difference
17   in regard to notice or whether they're
18   deliberately indifferent or anything in regard to
19   a particular area of policy and practice?
20       A.   I think you asked me like three
21   things.  One is there is notice and that's --
22   that's the references of all these different
23   reports, but, in particular, the Department of
24   Justice report which is a global --
```

Page 30

```
 1       Q.   What I'm trying --
 2       A.   If I may.  The second issue is which
 3   is I think the overarching and most authoritative
 4   commentary.  The next is are -- are there written
 5   issues?  Yes.  And are there custom and practices
 6   that are not written?  Yes.  And they're all
 7   included in the five specific areas which are
 8   parsed out in 28 opinions starting at page eight
 9   of my report.
10       Q.   You say the written policies and
11   procedures of the City of Chicago are reasonably
12   sufficient just for written policies?
13       A.   No, I don't think so and I think
14   that's exactly what the Department of Justice says
15   in a number of -- number of areas.
16       Q.   Going to this list you have a report
17   number 26 Crime, Corruption and Coverups in the
18   Chicago Police Department Anticorruption Report
19   No. 7 January 17th, 2013, what type of report is
20   that and where is it from?
21       A.   I can't remember exactly.  I'd have
22   to go to the report.  It's one of the -- just a
23   minute.  It references in a footnote.  It's listed
24   in the footnote of page eight.  And I have to -- I
```

Page 31

```
 1   have to bring it up.
 2       Q.   So you have no independent knowledge
 3   right now of what that report is?
 4       A.   Correct, I don't.  I'd have to look
 5   at it to refresh my memory.  There were -- I'll
 6   wait for a question.
 7       Q.   All right.  On 29, you have Macareg,
 8   Sarah and Flowers, Alison, Amid Shootings, Chicago
 9   Police Department Upholds Culture of Impunity, the
10   Truthout, what is Truthout?  Is that a news blog?
11       A.   Yes, as I remember.
12       Q.   So you're listing this as something
13   you're relying on which is actually a news blog?
14       A.   Yeah, I listed quite a bit of
15   news -- quite a few news articles all of which I
16   think have a collective weight, best way to say
17   it, regarding the opinions I expressed.
18       Q.   Now, when you say --
19       A.   Just let me add this.  There could
20   be -- what I was trying to demonstrate in the
21   report and document is that there could be no
22   claim by the City that's reasonable that they are
23   not aware of these problems that have been ongoing
24   for a length -- a considerable number of years and
```

Page 32

```
 1   that's why these -- that's why they were cited.
 2       Q.   So the news articles which would I
 3   believe, and correct me if I'm wrong, 29, 30, 31,
 4   32, 33 and 34 are basically you're saying that
 5   they go to notice to the City that something --
 6   well, in regard to notice for Monell purposes?
 7       A.   Yes.
 8       Q.   Other than that, there is no --
 9   that's the only reason you're citing them?
10       A.   I'm taking your question as whether
11   or not they're totally truthful or accurate.  I
12   did not assess them in that regard.  Only that
13   they -- the weight of these articles which are --
14   in my opinion, are substantial would take -- would
15   serve as notice to the City and the City response
16   should be in accordance with that kind of notice
17   and has not occurred.
18       Q.   So as I mentioned the 29 through 34,
19   you have no idea how accurate the reporting may
20   have been or how --
21           MR. STROTH:  Objection.  You're
22   mischaracterizing the expert's answers.
23   BY MR. GREEN:
24       Q.   Is it fair to say that you don't
```

8 (Pages 29 to 32)

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 33

1  know how accurate the reports are that you cite in
2  29 through 34?
3      A.   That's not exactly correct. I
4  having been around a while and this looked to me
5  to be good journalism, substantial, I'll use that
6  term, serious, another really good term and
7  collaborative to the -- what I consider to be the
8  crown jewel of all the studies of the City, the
9  DOJ report.
10     Q.   Have you had a journalism
11  background?
12         MR. STROTH: Objection. Foundation.
13         MR. GREEN: I'm just asking.
14  BY THE WITNESS:
15     A.   Not as a journalist, but as a police
16  administrator and then that was one of the issues
17  covered in the Command College course I took.
18  BY MR. GREEN:
19     Q.   And did you talk to any of these
20  groups from 29 through 34 in how they came about
21  and produced their reports that are listed?
22     A.   No.
23     Q.   Okay. You state after you list in
24  this report the things that you reviewed. You

Page 34

1  have a section entitled The Basic Rules Regarding
2  the Use of Deadly Force.
3         Would you agree that the
4  right -- that an officer has the right to use
5  deadly force, including the use of a firearm, if
6  an officer is in fear of death or great bodily
7  harm to himself or others?
8      A.   Well, as part of the calculus, there
9  is more.
10     Q.   So --
11     A.   So I would not agree with that as
12  a -- as a justification in its entirety.
13     Q.   So if he is in fear of great bodily
14  harm to himself or others or death, that he should
15  not use a firearm, is that what you're saying?
16     A.   Well, there are occasions even with
17  that that you would not. The calculus is always
18  with sanctity of life in mind. Only in the direst
19  of circumstances and only absent obvious
20  reasonable alternatives, then if you are in
21  great -- if you are in fear of great bodily harm
22  or death and it's objectively reasonable, you are
23  entitled to use lethal force or you would use
24  lethal force.

Page 35

1      Q.   Now, how much time is required for
2  the alternative mechanisms?
3      A.   That's totally dependent on what we
4  call the totality of the circumstance. There
5  are -- there is training throughout the country
6  regarding putting yourself deliberately in
7  jeopardy and refusing to take a reasonably -- an
8  obvious reasonable alternative to spare a life --
9      Q.   Now --
10     A.   -- to use it as a pretext. So those
11  are -- and there is a lot of training including
12  simulation training given throughout the country
13  regarding those issues.
14     Q.   Would you agree if Pierre Loury in
15  this case pointed a gun at Officer Hitz, he would
16  be justified in shooting?
17         MR. STROTH: Objection. Foundation.
18  BY THE WITNESS:
19     A.   Without knowing any other facts,
20  strictly on that basis, if Officer Hitz is looking
21  down the barrel of a gun in the hands of -- of
22  Loury with the expectation that his life is in
23  danger, then, of course, he could defend himself.
24  BY MR. GREEN:

Page 36

1      Q.   And then your opinions would change
2  in regard to the underlying case here if that was
3  true?
4          MR. STROTH: Same objection.
5  BY THE WITNESS:
6      A.   My opinions are regarding the
7  Monell. Are we talking now about Hitz's practice
8  or --
9  BY MR. GREEN:
10     Q.   I'm saying if Hitz was justified in
11  shooting in this matter, would your opinions not
12  change in regard to this underlying case in regard
13  to any constitutional violation that your Monell
14  would be based on?
15         MR. STROTH: Objection. Same
16  objection. Foundation.
17  BY THE WITNESS:
18     A.   I think I was -- the best way to
19  answer it is I was not -- I did not address the
20  issue of whether Loury had the gun or not or
21  whether he was pointing the gun or not. That's
22  not in any of the five specific opinions and the
23  20 -- I mean, five categories of opinions and the
24  28 specific opinions. So -- but I'm happy to

9  (Pages 33 to 36)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 37

1 answer that kind of question if you can repeat it.
2 I just want to make that aspect clear. My report
3 doesn't talk about that.
4 BY MR. GREEN:
5     Q.    Would you agree that any Monell
6 claim would -- would be based upon -- or the
7 validity of any such Monell claim would be based
8 on the validity of whether there was an underlying
9 constitutional violation in this case or not?
10     A.    No. As I understand your question,
11 the answer is no. It's not -- that issue is not
12 specific to my report.
13     Q.    Now, you mentioned 28 opinions in
14 this case. I just want to see the structure of
15 your opinions here. I actually count 29.
16     A.    You do?
17     Q.    I wanted to have you look at 28 --
18 or I'm sorry -- 23. It appears you have two 23's.
19 One under failure to train and one under code of
20 silence.
21     A.    My bad. So there are 29.
22     Q.    So I will call them for the purposes
23 of this deposition 23A is the failure to train
24 one, the first one, and 23B would be the code of

Page 38

1 silence one, is that fair enough?
2     A.    Yes. Thank you. I don't know how
3 that happened, but it happens.
4     Q.    And now these five topic areas as
5 you mentioned are -- as you have in your report is
6 one policy of impending investigations -- of
7 impeding investigations of misconduct, that's your
8 opinions one through six, correct?
9     A.    Yes.
10     Q.    The next one is failure to
11 investigate, your opinion seven through 11?
12     A.    Correct.
13     Q.    And your third area is failure to
14 discipline, your opinions 12 through 17.
15     MR. STROTH: You mean 19?
16     MR. GREEN: I'm sorry. Nineteen.
17 You're correct.
18 BY MR. GREEN:
19     Q.    And your fourth is failure to train,
20 opinions 20 through now 23A?
21     A.    Failure to train goes from 20 to
22 23A.
23     Q.    Okay. And your code of silence
24 opinions then would be opinions 23B through 28,

Page 39

1 correct?
2     A.    Correct.
3     Q.    And these are all the opinions that
4 you are providing in this matter, these 29
5 opinions?
6     A.    Yes.
7     Q.    All right. On pages five to seven,
8 you also state "The CPD and IPRA investigation did
9 not reconcile obvious discrepancies." Citing
10 "One, failure to look for the second bullet; two,
11 a 5'7" person straddling a six foot fence; three,
12 the handcuffing of Loury; four, the IPRA's
13 inappropriate questioning techniques and; five,
14 the post-incident location of Hitz and Riordan.
15     Now, these are not your
16 opinions, Mr. Clark, are they not?
17     A.    These are not the expressed
18 opinions. These are citations of the event and
19 examples of problems.
20     Q.    So this is what you believe to be
21 the facts in the record of this case, correct?
22     A.    As relating to what I said in the
23 paragraphs, yes, I consider them to be the facts.
24     Q.    And you use these facts as further

Page 40

1 bases for your 29 opinions you cited, correct?
2     MR. STROTH: Objection. Foundation.
3 BY THE WITNESS:
4     A.    As typical examples of -- that would
5 fit into the opinions, correct.
6 BY MR. GREEN:
7     Q.    And how would these five facts
8 concerning the post-shooting investigation change
9 the underlying issue of whether the underlying
10 shooting was justified or not?
11     MR. STROTH: Objection. Foundation.
12 BY THE WITNESS:
13     A.    Well, I think we discussed where
14 that fit -- the underlying justification of the
15 shooting fits into my opinions, but, having said
16 that, they are in the report to exemplify
17 these failures as, for example, in particular the
18 investigative procedures, the training procedures,
19 the code of silence. Those things.
20 BY MR. GREEN:
21     Q.    So they would not go to whether the
22 underlying shooting was justified or not. per se?
23 It was only on the procedural aspects of Monell?
24     MR. STROTH: Objection. Same

10 (Pages 37 to 40)

Electronically signed by Steven Brickey (501-307-281-8473)            954cbfef-baad-48a4-9690-8c9024c19f87

Page 41

1    objection. Foundation.
2    BY THE WITNESS:
3        A.   I think they can't be -- those two
4    issues can't be separated because clearly -- but I
5    took them to -- as examples of the five
6    categories -- five main categories of how they fit
7    in, but you're correct in that if the proper --
8    for example, just as an example, the proper
9    investigative procedure at the scene, i.e. let's
10   take the second -- the bullet hole in the window
11   as commented on in Scott's report, then it
12   certainly may -- would have yielded I think more
13   intensive inquiry and likely a different account
14   of the shooting.
15   BY MR. GREEN:
16       Q.   Well, why can't the post-shooting
17   investigation be separated from what actually
18   happened out there?
19       MR. STROTH:   Foundation.  Objection.
20   BY THE WITNESS:
21       A.   Well, the term is hand in glove.
22   They're part of -- they're different.  There is
23   the glove in the hand, but they're not separable
24   in that regard because they fit together.  I think

Page 42

1    that's a good metaphor.  If -- I'll say quite
2    bluntly, the City investigator says to Hitz "Okay.
3    What happened?"  Hitz gives his account.  "I shot
4    him while I was down."  "So both your bullets went
5    while he was down, correct?"  "Correct."  "You
6    were three feet away, right?"  "Right."  Something
7    like three feet.  "Well, we got a bullet hole in
8    the window up there.  How does that happen?"  "Not
9    mine."  "Okay.  Nothing further.  Must not have
10   been his bullet," not even looking at it, not
11   examining it, doesn't work.  I'm just putting it
12   bluntly.  So it is connected.
13       Q.   Now, on pages 12 to 17, you have a
14   rather lengthy section up through page 17 of --
15   you state "My qualifications to review this case."
16           Now, is this still a fair and
17   accurate description of what you believe your
18   qualifications to review this case are or has
19   anything changed?
20       A.   Not in regard to this case.  There
21   have been a couple of -- I think there is one more
22   9th Circuit opinion that I don't think relates to
23   the Monell issue and there has been an acceptance
24   of my expertise last month as on the taser weapon

Page 43

1    in particular.
2        Q.   I noticed you cited a large section
3    here, paragraph, about tasers, what does that have
4    to do with this case?
5        A.   Well, it's boilerplate.  I put it in
6    my report and it doesn't change.  It is -- I
7    don't -- in other words, I don't adjust it to the
8    specifics of a case.  It's all my qualifications
9    and it goes with the resume.
10       Q.   Also just while we're at it here,
11   I'll go through your CV as well, but I noticed you
12   mentioned you did a thesis in your POST Command
13   College graduation, I take it.  It required a
14   thesis.  Did you, indeed, complete a thesis for
15   that?
16       A.   I did.
17       Q.   And what was the subject matter of
18   that thesis?
19       A.   Community expectations for police
20   services.
21       Q.   So it was on general administration
22   of police services across the board?
23       A.   No, it was about the community
24   expectations for police CV and it focused on

Page 44

1    changing values, attitudes and beliefs in a police
2    agency to meet the community expectations, hence
3    better serve the community.
4        Q.   And I see you went to -- associate,
5    you got your associate degree for two years?
6        A.   Yes.
7        Q.   And then you went to this two-year
8    college, correct?
9        A.   No, the associate -- the AS degree
10   is a two-year degree in police science from
11   Chaffey College.  That was the end of the
12   institutional college degree and then the Command
13   College is a diploma given by the state -- the
14   California State Department of Justice.  They
15   keep -- they don't -- they keep that to
16   themselves.  They don't want to have any other
17   adjustments in the curriculum.
18       Q.   So it's essentially not an
19   accredited university program --
20       MR. STROTH:   Objection.
21   BY MR. GREEN:
22       Q.   -- it's a separate form?
23       MR. STROTH:   Objection.  Foundation.
24

11  (Pages 41 to 44)

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 45

1   BY MR. GREEN:
2       Q.   I'm just asking.
3       A.   Yes, you're correct.  It's not a
4   university degree.
5       Q.   And you are not a lawyer, correct?
6       A.   I am not a lawyer.
7       Q.   And you are not a judge?
8       A.   No, I'm not a judge.
9       Q.   And on page 13, you talk about your
10  station detective work.  That regarded juvenile
11  work, right, in the 1970's, I believe?
12      A.   I was a station -- in the '70's, I
13  was a station detective.  That would be like a
14  precinct detective.  I understand Chicago also has
15  headquarter units for detectives.  But it would be
16  like a precinct detective and back in those days I
17  handled juveniles as well as felony cases that
18  came on that would be assigned to the station.
19      Q.   So you were assigned to juveniles
20  for that?
21      A.   Yes, when I had a little guy who was
22  arrested that night, I took care of him, him or
23  her.
24      Q.   You mentioned that you responded,

Page 46

1   investigative report on use of force in officer
2   involved shootings as a watch commander and
3   lieutenant, how many times did you actually do
4   that?
5       A.   As a watch commander, there were
6   two -- I had two on-duty shootings.
7       Q.   Two off-duty shootings?
8       A.   On-duty.
9       Q.   On-duty.  And could you -- that was
10  when you were as a sergeant and lieutenant?  I'm
11  sorry.  As a watch commander and as a lieutenant,
12  what were the -- you did those two on-duty
13  shootings you reviewed, what was that?
14      A.   Well, that references -- that
15  paragraph references -- that statement references
16  two times -- not -- two ways I was involved.  One
17  is a watch commander.  I had one of my deputies
18  involved in a fatal shooting and then as a
19  lieutenant the process back in those days was
20  there would be a shooting review and that would be
21  an ad hoc assignment for the purpose of looking at
22  that particular event and I was on three of those.
23  The -- of course if there was an officer involved
24  shooting where I was not in command, but yet on

Page 47

1   duty, I would respond to assist with those.
2       Q.   All right.  I'm a little unclear
3   here.  So essentially your citation on this page
4   13 to that work you had one person under your
5   watch who had an on-duty shooting and the rest you
6   said up to three were through this departmental
7   review committee you were participating in?
8       A.   Right, and then I need to add there
9   were three more when I was a commander in NORSAT.
10  For the first three months, I had three shooting
11  events and then from then on no further shooting
12  events.
13      Q.   You didn't actually do the
14  investigations of the shootings, you were on the
15  review committee, correct?
16      A.   Correct.
17      Q.   So you didn't direct the
18  investigation in any way?
19      A.   Only in the one -- I could be more
20  precise about it.  When I was a watch commander at
21  Crescenta Valley Station, I did quite a bit of
22  direction, but I was not the lead investigator.
23      Q.   So you gave suggestions when it was
24  the person under your command of what should be

Page 48

1   looked into?
2       A.   The investigator was never under my
3   command, the lead investigator that would be the
4   homicide detective, but I was the -- probably the
5   second on scene and I took command and secured the
6   scene until that investigator arrived.
7       Q.   So there was a separate person doing
8   the investigation there?
9       A.   Correct.
10      Q.   You state on page 13 you lectured at
11  the Reserve Academy on the POST syllabus.
12           Now, again, the POST for
13  purposes of the deposition is the Peace Officers
14  Standards and Training, correct?
15      A.   Correct.
16      Q.   Okay.  And you said you lectured the
17  Reserve Academy on POST syllabus, the legal and
18  moral use of force and firearms.
19           What else did you actually teach
20  yourself?
21      A.   I taught -- there are 42 learning
22  domains for POST and I think as I say in the
23  statement I taught every one of the 42 one way or
24  another during my career, but that refers to the

12  (Pages 45 to 48)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 49

1    time I worked for on a three-year project with
2    California POST to reconfigure the curriculum for
3    reserves. We had a thousand in our department.
4    There are quite a few in California and the
5    legislature had changed the requirements for their
6    training and that incidentally is still in place,
7    that curriculum and that method. So I'm pretty
8    proud of the work. What they -- I also lectured
9    at the regular academy and, in particular, at the
10   regular academy four topics; use of force,
11   tactics, ethics and demographics.
12        Q.    And The Legal and Moral Use of Force
13   and Firearms, what exactly was lectured in that --
14   was it a one-time lecture?
15        A.    No, every time we had a class, I
16   would keep myself reserved for that class in
17   particular. It was an important issue for me and
18   for them. That syllabus now is called Use of
19   Force. It's learning domain number 20 in our
20   curriculum.
21             THE WITNESS: And I think we're
22   close to an hour --
23             MR. STROTH: Take a break?
24             THE WITNESS: -- if it would be

Page 50

1    possible.
2             MR. MOWATT: Sure.
3             MR. GREEN: We can take -- how long
4    of breaks do you want to take?
5             MR. STROTH: Just a few minutes.
6    Five minutes.
7             MR. GREEN: Few minutes. Okay.
8             THE WITNESS: Just to stretch my
9    legs.
10            MR. GREEN: In a few minutes, we'll
11   be back.
12            THE WITNESS: Check my heart rate.
13            THE VIDEOGRAPHER: We're going off
14   the video record at 11:16 a.m. and this is the end
15   of media unit one.
16            (Whereupon, a break was taken
17            after which the following
18            proceedings were had.)
19            THE VIDEOGRAPHER: We are back on
20   video record at 11:31 a.m. and this is the
21   beginning of video media two.
22   BY MR. GREEN:
23        Q.    Just reviewing further your section
24   on your qualifications for reviewing this case.

Page 51

1    You also make reference on page 14 about you were
2    frequently deployed at the request of
3    investigative units such as narcotics, which
4    provided the initial investigative leads for your
5    operations. That was when you were at NORSAT,
6    correct?
7         A.    Yes.
8         Q.    And so essentially they did the
9    investigations already prior to forwarding them to
10   you, correct?
11        A.    No, that's not correct.
12        Q.    But they had the initial
13   investigative leads for you?
14        A.    They would have an investigative
15   lead that based on their preliminary work required
16   some resources they didn't have or extent of
17   investigative power they did not have and so they
18   would -- they would handle -- they would give us a
19   case in one of two ways.
20             One, they would temporarily
21   attach to NORSAT and become the lead investigator.
22   We called them the case ace, A-C-E, or they would
23   give us the information and we would take it from
24   there and then report back to them. So it was

Page 52

1    done those two ways.
2         Q.    Did you personally handle any of
3    those investigations?
4         A.    No, I was the commander. So I would
5    review and make sure that everything was on track
6    and done correctly.
7         Q.    Now, you mentioned here about the
8    three months of your command. You had three
9    justifiable shooting incidents and then over the
10   next five years your command established as you
11   call it a remarkable record that there was not a
12   single shot fired by your officers or the
13   suspects.
14             What about other officers
15   involved in those arrests, were there any other
16   shootings?
17        A.    No. None.
18        Q.    And do you know why other than what
19   you stated here that could have been the case?
20        A.    It is because of the -- our method
21   of operation and, in particular, the cultural
22   aspects of the units itself.
23        Q.    Could it have been perhaps that
24   during that three-year period no one was actually

13 (Pages 49 to 52)

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 53

1  put in fear of their life or great bodily harm of
2  themselves or others?
3      MR. STROTH: Objection. Foundation.
4      MR. GREEN: I'm getting the
5  foundation.
6  BY THE WITNESS:
7      A.  Let me explain it to you this way
8  because there was a comparable unit to NORSAT
9  which was an LAPD unit called SIS and I followed
10  their track record during the time I had command
11  in NORSAT. The only difference between the two
12  units were SIS was entirely LAPD personnel.
13  NORSAT was sheriff's department, five federal
14  officers, plus up to five participating
15  departments in the county police officers. Their
16  arrest rate SIS would be 300 a year. My arrest
17  rate was 500 a year. SIS would shoot and kill six
18  a year, shoot and wound a couple dozen a year.
19  BY MR. GREEN:
20      Q.  Now, did SIS operate in the city?
21      A.  Let -- may I finish?
22      Q.  Mm-hmm.
23      A.  NORSAT never fired a shot, had a 97
24  percent conviction rate at the time of arrest, not

Page 54

1  time of filing. So I would simply lay that at
2  your feet that there was absolutely no difference
3  between the type of operation or the suspect
4  apprehended or -- in fact, I think NORSAT had far
5  more dangerous clients than SIS because at least
6  85 percent of our arrests were homicide suspects.
7      Q.  Geographically did you work in
8  different areas?
9      A.  No, we had full range of the county.
10  In fact, the state because we were federal
11  officers. SIS was typically embedded in the city,
12  but also had full range because their
13  investigations would take them out. And, in fact,
14  on one occasion, we worked together as a combined
15  unit which was the one and only time I attempted
16  to do anything like that.
17      Q.  Now, you mentioned that you were
18  involved in authoring the Field Operations
19  Directive 89-3 Tactical Operations Involving
20  Detective Personnel and you said that remained in
21  force for 20 years until 2009, why did it change?
22      A.  It changed because the department
23  was reorganized and it changed because the orders
24  or the compilation of the orders was formatted

Page 55

1  differently. That's the only change that was
2  made.
3      Q.  Now, on page 15, you list a number
4  of lectures or visiting comments you made in
5  various locations. Were any of these peer
6  reviewed presentations?
7      A.  Well, the -- they were attended by
8  different agencies and so forth.
9      Q.  But they were not reviewed by
10  anybody?
11      A.  No.
12      Q.  And you mentioned your work with
13  several projects in the Paso Del Norte Civil
14  Rights and Texas Civil Rights, that one involved
15  immigration issues?
16      A.  Yes.
17      Q.  And you mentioned two commendations
18  here. Something about possession of child
19  pornography. That has nothing to do with this
20  particular Monell case, does it?
21      A.  No, that was an award by the
22  Attorney General of the United States.
23      Q.  And that in no way affected your
24  decision-making in this case, correct?

Page 56

1      A.  No.
2      Q.  Or your opinions?
3      A.  Correct.
4      Q.  Now, you make reference to that you
5  were requested by the Cleveland District Attorney
6  to present your opinions to the Cleveland Grand
7  Jury in the Tamir Rice case in Cleveland?
8      A.  Yes.
9      Q.  Who actually retained you in that
10  case?
11      A.  The mother -- the family -- Tamir's
12  mother, in particular, with the law firm. I wrote
13  a report and the district attorney contacted me
14  and had me comment to the Grand Jury.
15      Q.  So, in fact, you first were
16  initiated through the plaintiff, correct?
17      A.  Correct.
18      Q.  Or hired?
19      A.  Yes.
20      Q.  And you continued to be retained by
21  them?
22      A.  I did until it concluded.
23      Q.  Going back to the section entitled
24  the Department of Justice Investigation, are you

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)            954cbfef-baad-48a4-9690-8c9024c19f87

Page 57

```
 1    aware of the standard of proof that they used in
 2    coming to any conclusions?
 3          MR. STROTH:  Objection.  Foundation.
 4    BY THE WITNESS:
 5          A.    Page --
 6    BY MR. GREEN:
 7          Q.    I'm getting the foundation.
 8          A.    What page were you on?  I think it's
 9    page eight.
10          Q.    Page eight of 17.
11          A.    I'm aware generally because I've --
12    I've reviewed a number of these with other
13    agencies.
14          Q.    And what is it?
15          A.    It's extremely vigorous and precise
16    in my estimation.
17          Q.    So is it more than a preponderance
18    of the evidence?
19          A.    That's a lawyers type term, but I
20    would -- based on what I understand is the term,
21    it's -- it's a very high-degree of certainty
22    because, first and foremost, it carries the name
23    of the Department of Justice and when you read the
24    report you see it's well-cited, well-documented
```

Page 58

```
 1    and it's supported as I stated it the footnote by
 2    a number of other companion studies that resonate
 3    with their findings.
 4          Q.    Other than --
 5          A.    And it -- it involved a very deep
 6    review statistically in the very -- in various
 7    cases and -- and a number of those are commented
 8    on in the report.
 9          Q.    What is the actual name of the
10    standard that they use?
11          MR. STROTH:  Objection.  Foundation.
12    BY THE WITNESS:
13          A.    I don't remember.
14    BY MR. GREEN:
15          Q.    So you don't know?
16          A.    I did know and I do not know the
17    term they used as I sit here today.
18          Q.    But right now other than it's
19    entitled by the Department of Justice, you don't
20    know what the standard is that they used?
21          A.    I do not recall I think is the best
22    way to answer it and I do not contest it.
23          Q.    Now, you also relied on the seven
24    conclusions you've listed here of the DOJ report.
```

Page 59

```
 1    did you -- is that correct?
 2          A.    There were five broad categories and
 3    they -- I listed them out in that paragraph.
 4          Q.    All right.  But you didn't look at
 5    any data yourself that the DOJ looked at in coming
 6    to these conclusions, did you?
 7          MR. STROTH:  Objection.  Form.
 8    BY THE WITNESS:
 9          A.    I did not review any independent
10    data other than what they cited and what was cited
11    in the other reports I listed in the footnote.
12    BY MR. GREEN:
13          Q.    So you didn't look in any specific
14    facts cited or any specific instances that they
15    were discussing, yourself independently?
16          A.    I did not.  I was not an independent
17    investigator of the -- of the cases cited.
18          Q.    Did you talk to anyone at the DOJ of
19    how they came about with their conclusions?
20          A.    No.
21          Q.    Would you acknowledge that the
22    Department of Justice, also the report, did
23    recognize that the Chicago Police Department were
24    making attempts at reform historically?
```

Page 60

```
 1          A.    I noted that.
 2          Q.    Including body cameras by 2016, is
 3    that correct?
 4          A.    I noted that that's already occurred
 5    last time I was here for the other deposition that
 6    was announced.
 7          Q.    Is there any basis to question that
 8    the DOJ's findings that there were indeed reform
 9    attempts underway by the Chicago Police
10    Department?
11          A.    Well, I saw that they cited -- that
12    the City has stated their desire, but that stated
13    desire is there and also I took it as an
14    acknowledgement by the City of this exact thing,
15    this Monell issue, that it did exist and does --
16    and does exist and I took it as -- you know, I did
17    not take the statement that it was being
18    eliminated.  I certainly based on the two cases
19    that I've had here with the McIntosh and this that
20    span a year and the problems are there.
21          Q.    Now, if you were to do an
22    independent investigation into what you cite here
23    through the Department of Justice investigation,
24    which -- what data would you look at?
```

15 (Pages 57 to 60)

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 61

```
 1          MR. STROTH:  Objection.  Foundation.
 2   BY THE WITNESS:
 3       A.   I think I would -- first, you're
 4   talking about my approach?
 5   BY MR. GREEN:
 6       Q.   If --
 7       A.   If I were going to do a statistical
 8   review?  I think that's been done to the -- to
 9   the -- I mean, that's been looked at over and over
10   and over again, at least five times as I've cited
11   in different reports, all with the same
12   conclusion.  That's why the report is written as
13   it is.  It's there.  The City has been on notice.
14   The problem has existed.  It continues to exist.
15   It certainly continued to exist to this issue and
16   that's why the report is formatted this way.
17       Q.   So it's fair to say you wholly rely
18   on these seven conclusions of the Department of
19   Justice report?
20          MR. STROTH:  Objection.  That
21   mischaracterizes the expert's testimony thus far.
22   BY THE WITNESS:
23       A.   I do not rely wholly, but I
24   certainly can find no problem with those seven at
```

Page 62

```
 1   all in any way.  There is no outreach on any of
 2   those seven.
 3   BY MR. GREEN:
 4       Q.   Now, on page seven I'll ask -- I'll
 5   ask it again.
 6          If you were to do an independent
 7   investigation and not just rely on these
 8   conclusions of the Department of Justice, what
 9   would you do?
10          MR. STROTH:  Objection.  It's a
11   hypothetical.
12          MR. SCHOOP:  Yes, it is a
13   hypothetical.  You're tendering this man as an
14   expert.  Experts can and should be expected to
15   answer hypotheticals, counsel.  Please answer the
16   question, if you can, sir.
17          MR. STROTH:  Same objection.
18   Foundation.  You can answer the question if you
19   can, if you understand it.
20   BY THE WITNESS:
21       A.   Sure.  Chicago is a big department.
22   It would require most likely and which has been
23   done as I understand it by a number of researchers
24   including a staff of the Department of Justice
```

Page 63

```
 1   assigned to this project I would probably do it
 2   much the same way as the DOJ described their
 3   approach because for two reasons.
 4          One is they have done this many
 5   times throughout the country and it works.  In
 6   particular, I was very close to the LAPD
 7   Department of Justice review and the Inglewood
 8   Department of Justice review.  So I think it's --
 9   I'll use the term bulletproof in terms of fairness
10   and completeness.  So I would follow those --
11   those protocols.  Now -- and it would have to
12   be -- it would have to occur with the deficiencies
13   acknowledged in the system itself because the
14   data -- I'll wait for -- are you ready?
15   BY MR. GREEN:
16       Q.   Mm-hmm.
17       A.   The data is -- source is the
18   department itself.  One of the problems as stated
19   in this report is if I do not want the question --
20   if I do not want the answer, I will not ask the
21   question and if I do not want to memorialize the
22   problem, I will not keep the data and those are --
23   that's -- those are two hurtles that have to occur
24   which I saw significantly occurred with these
```

Page 64

```
 1   reports.  So I'll wait for the question, next
 2   question.
 3       Q.   Well, what specifically would you do
 4   to come to these conclusions in the way of
 5   investigating the data that the Department of
 6   Justice had?
 7       A.   I --
 8       Q.   What protocols are there that you
 9   are referring to?
10       A.   Well, I would be -- first, you
11   identify who your sources are, how much of them
12   exist, if at all, what you would need.  You would
13   get experts on statistics.  You would have workers
14   that would develop a database.  Hopefully you
15   would use computers.  You would tap into what
16   exists if it exists at all what's called an EWS,
17   early warning system.
18          I would reference you to the
19   Kolts Commission and the Christopher Commission
20   study, which is extensive.  Rodney King riot, my
21   last riot, I had a platoon under my command in
22   that riot and the Christopher Commission Report is
23   very good because it -- what he did was able to
24   delve into the personnel files.  So it would be --
```

16  (Pages 61 to 64)

Electronically signed by Steven Brickey (501-307-281-8473)                                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 65

1   there were 7,000 personnel files by the way in the
2   LAPD.
3           They sorted through every one of
4   them and all of the complaints that existed in the
5   record and identified a certain group of officers
6   that were responsible for the majority of the
7   complaints and they statistically weighed them and
8   then he identified recommendations that this is a
9   springboard for EWS. So I think that approach was
10  good. I think that's typically what -- how the
11  DOJ report starts out, but it's very significant
12  min -- -- delving into everything available that can
13  be reviewed and placed in a database.
14      Q.   Have you developed your own
15  methodology for reviewing Monell claims?
16          MR. STROTH: Ob- -- that's fine.
17  BY THE WITNESS:
18      A.   My own methodology? No, I don't
19  have any particular one other than I don't try to
20  re-plow the ground that's been plowed when it
21  appears valid and as you know you have a rather
22  renown professor that's been involved in this for
23  years, you have the DOJ, you've got other reports.
24  They have all come to the same conclusion. When

Page 66

1   you see that, then you have a very substantial
2   support of the conclusions and that's what I tried
3   to express in my report.
4   BY MR. GREEN:
5       Q.   Now, the details you've described
6   earlier like the Christopher Report methodology,
7   what you believe the DOJ did, you personally did
8   none of that in this particular case, did you?
9           MR. STROTH: Objection. Foundation.
10  BY THE WITNESS:
11      A.   I did not do that.
12  BY MR. GREEN:
13      Q.   Now, on page 17, you also talk about
14  your fees?
15      A.   Page 17?
16      Q.   Yes, 17 at the end. You have travel
17  time at the rate of $50 an hour; travel via
18  automobile to/from San Diego to Los Angeles eight
19  hours $400; all case review consulting and writing
20  of expert opinions, such as Rule 26 reports, at
21  $250 per hour; all testimony, either trial or
22  deposition, $350 an hour with a two-hour minimum
23  required, is that a fair and accurate description
24  of your billing rates in this case?

Page 67

1       A.   It's not accurate in terms of the
2   billing rate for this case. I capped the billing
3   for the case up to today at $3,500.
4       Q.   Is that a flat fee?
5       A.   Well, it certainly has exceeded at
6   the rate of $250 an hour, the $3,500, but I capped
7   it at that pending if there is a trial and then
8   I'll charge the $350 and, of course, the travel
9   expenses and so forth will be charged and will be
10  charged during trial time as well.
11      Q.   So how many hours and how much have
12  you charged in this case so far to date?
13      A.   Well, I've charged $3,500 and
14  nothing further up to today, plus the airfare,
15  which is right at something like $1,100 and hotel
16  has been provided, meals have been provided. So
17  just travel back to the airport. That will be it
18  until and if there is a trial, then there will be
19  travel again and $350 for the time on the stand
20  and, of course, the deposition time here typically
21  under the Federal Rules would fall on the City,
22  but I understand they're taking care of it. So it
23  would be the $350 for the hours here.
24      Q.   Now, if there is a result in favor

Page 68

1   of plaintiff at the trial, do you expect to charge
2   for all those extra hours that you were not paid
3   for yet?
4       A.   No, it's -- I would be -- regardless
5   of the outcome, my time on the stand I will charge
6   for. Other than that, no.
7       Q.   So have you been paid the $3,500?
8       A.   Yes.
9       Q.   And just curious, what percentage of
10  your income presently is derived from your expert
11  witness work?
12      A.   It would be right at two-thirds of
13  my income and the other third is my retirement.
14      Q.   That's your pension from the
15  sheriff's office?
16      A.   Yes.
17      Q.   And, Mr. Clark, did you actually
18  write each portion of this report that has been
19  marked Exhibit 4 or were there certain portions
20  that were prewritten that you reviewed and
21  approved?
22      A.   There were some that were prewritten
23  that I approved.
24      Q.   And, if so, which -- which portions

17 (Pages 65 to 68)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 69

1  were prewritten and by whom?
2      A.    Oh, my goodness.  Well, they -- I
3  think the best way to say this, collaborative with
4  Mr. Odim.  Nothing from Mr. Stroth.
5      Q.    Mr. Odim, you're talking about your
6  counsel with you today?
7      A.    Yeah.  Well, he's my client.  He is
8  not representing me, but he is representing the
9  plaintiff.  Plaintiff's counsel.  So let me see.
10 I vetted with him the listing of material
11 reviewed, the overview of events.  Actually, I
12 took out of statements you see there is heavy in
13 quotes.  Mr. Odim pointed me to IPRA statements,
14 which I plugged in.  And then it was -- you see
15 some similarities with McIntosh on opinions and
16 then -- and then my qualifications, as I said,
17 always appears in my reports.
18     Q.    Now, when you say similarities,
19 they're, in fact, virtually identical to the Lane
20 opinions, the last list of opinions in that case,
21 is that correct?
22          MR. ODIM:  Objection.
23 BY THE WITNESS:
24     A.    They're -- they're not exact and

Page 70

1  they're not -- but I think the paragraph, the
2  Department of Justice investigation is I think
3  almost word for word because it's accurate.
4  BY MR. GREEN:
5      Q.    And they -- they were drafted by
6  Mr. Odim for you?
7      A.    No.
8          MR. STROTH:  Objection.
9  BY THE WITNESS:
10     A.    No, it was collaborative.  And we --
11 we worked together on it.  He made suggestions and
12 then the opinions was closely collaborative.  The
13 footnote is his that he provided to me.
14 BY MR. GREEN:
15     Q.    Now, is this -- that's -- one last
16 note on this -- on the bottom here.
17          MR. STROTH:  Of what page?
18          MR. GREEN:  Of page eight of 17.
19          MR. STROTH:  Mm-hmm.
20 BY MR. GREEN:
21     Q.    This is the ultimate report about
22 failures of the Chicago Police Department's
23 pattern and practice, what -- what footnote --
24 where is that referring to?

Page 71

1      A.    Well, that's at -- and so when I put
2  it into the report, I forgot the little one, but
3  it's meant to be after -- it's a comment on the
4  Department of Justice investigation.
5      Q.    So this is just a comment on the
6  paragraph concerning the Department of Justice --
7      A.    Right.
8      Q.    -- investigation?
9      A.    Right, and the formatting is my
10 fault.  That's -- that's the source of the
11 information.
12     Q.    And just for the record the Lane
13 case or McIntosh case that we've been referring to
14 that's 15 C 1920, the deposition you provided a
15 couple of weeks ago on December 11th, 2017?
16     A.    Yes.  Yes.
17     Q.    All right.  Let's just go back to
18 your CV itself Exhibit 2.  If we can take a quick
19 look.  It states that you were a police procedures
20 consultant self-employed since April 1st of 1993,
21 correct?
22     A.    Correct.
23     Q.    And you made that change that you've
24 had 1,700 cases thus far in your retirement that

Page 72

1  you've worked on, correct?
2      A.    Yes.
3      Q.    All right.  And you've had no law
4  enforcement work since 1993, isn't that correct?
5      A.    Not as a sworn officer, correct.
6      Q.    In fact, the only thing here you
7  have listed as your work at the Juvenile
8  Corrections Center for one year, seven months,
9  correct?
10     A.    Right.  I was appointed by the
11 governor to be one of twelve to establish the
12 agency.
13     Q.    Okay.  Going to your history in law
14 enforcement from 1993 and going back from there
15 you mentioned your command of a special unit, the
16 NORSAT unit.  Where was that located?  What was
17 the jurisdiction?
18     A.    Well, it was --
19     Q.    It says northern region of Los
20 Angeles County, is that the north suburbs?
21     A.    Well, the location that was -- the
22 physical headquarters was the City of Duarte
23 provided the building for us.  It was an
24 undercover location with an undercover fleet.  So

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 73

1  with that in mind, but we -- and we were
2  assigned -- in the sheriff's department there are
3  three regions and the unit had to be attached to
4  one of those regions and it was Region North and
5  that's the way we were assigned under -- because
6  we had to fall under an area commander and a
7  division chief. So we were in Region North.
8      Q.  And that's the northern suburbs of
9  Los Angeles City, county?
10     A.  Right, the northern region is, but
11 we're not restricted to that. You know, we
12 went -- there were a number of times we went quite
13 a bit out of -- out of the county itself depending
14 on the investigation.
15     Q.  And the size of that unit that you
16 were in from '87 to '93, you have 25 officers, 25
17 reserves and three civilians. So at one time
18 there were 50 or less in that unit?
19     A.  Yes.
20     Q.  In fact, at 25 reserves, did they
21 work part-time? You mentioned that in a couple of
22 places here. How does that work?
23     A.  Reserves in our department were --
24 had full-time jobs. They were not paid hourly

Page 74

1  rate. They were highly trained, I'll use the
2  term, individuals male and female that were given
3  police powers after they received their POST
4  certification and worked with us.
5      Q.  And --
6      A.  And they were specific. I mean,
7  they were vetted and specific to the unit.
8      Q.  So you have your 42 months before
9  that Executive Offices Reserve Forces Bureau, in
10 fact, that was an administrative position, was it
11 not?
12     A.  Well, that's -- it's actually split
13 into two parts, but it belonged to the Emergency
14 Operations Bureau and that was a unit that I
15 helped -- I was assigned to establish -- in
16 California, the sheriff is the assigned director
17 of operations for emergency -- for natural
18 disasters and civil disorders. So that unit
19 tended to that. And while I was there, I
20 connected with the -- did a lot of work with the
21 Department of Justice, discovered that we could
22 tap into their excess property legally and that
23 program is still ongoing. It's about a million
24 dollars a month in property that the agency gets.

Page 75

1      Q.  So you didn't do any sworn peace
2  officer operations individually?
3      A.  Only -- only on when there was
4  callouts for the unit to deploy such as plane
5  crashes and fires and earthquakes and civil
6  disorders, et cetera.
7      Q.  On a day-to-day basis, how many
8  people were actually in that unit?
9      A.  There were only -- there were four
10 sergeants and staff and probably around a dozen.
11     Q.  A dozen?
12     A.  Yeah, plus the equipment.
13     Q.  And you have 400 -- excuse me -- 450
14 law enforcement explorer scouts, can you explain
15 what those are that you had contact with?
16     A.  What are we looking at here?
17     Q.  On the top of page three of your CV.
18     A.  You know, I was talking about as a
19 sergeant the Reserve Forces Bureau -- forgive me.
20 Item number two, Reserves Forces Bureau for the 42
21 months. That was a project, special assignment to
22 work with POST for the POST curriculum and I had
23 collateral assignments for the chaplaincy, the
24 reserves on our department, about a thousand of

Page 76

1  them. The civilian volunteers, the posse, so
2  forth. So that's a reference. The department had
3  explorers through the Boy Scouts of America. They
4  had personnel assigned to each station, a sergeant
5  typically that took care of them. They were like
6  intern wannabe hopeful to -- once they graduated,
7  to become police officers eventually and they
8  were -- there were 450 of them and that was an
9  adventure because it's like 450 cats that you're
10 watching.
11     Q.  All right. So when you were
12 referring before about being called out for
13 emergencies and things, is that at the Executive
14 Offices Reserve Forces Bureau or was --
15     A.  No.
16     Q.  -- that something else you're
17 referring to?
18     A.  No, that -- that is going to be in
19 item -- I jumped ahead. That's going to be item
20 number five and six.
21     Q.  Okay. So essentially item number
22 two, the Executive Offices Reserve Forces Bureau,
23 was an administrative position, correct?
24     A.  Right, it was administrative. It

19 (Pages 73 to 76)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 77

1    was the POST project and got me connected to the
2    Department of Justice and I became one of the
3    department experts on POST.
4        Q.    Your Field Operations Region One
5    Crescenta Valley Station, number three, for 49
6    months back in 1980 to '84 it said a police
7    facility of a hundred personnel, was that at any
8    one time there were a hundred people there?
9        A.    Yeah, that was like a precinct or a
10   division in the department.  That's in the
11   sheriff's department.  In the sheriff's
12   department, I was a lieutenant.
13       Q.    And, in fact --
14       A.    Okay.
15       Q.    Is that -- again, is that in that
16   northern area of LA County?
17       A.    Correct.
18       Q.    Have you ever worked in south LA?
19       A.    Not at a station, so I did a station
20   only on certain projects.
21       Q.    Or east LA?
22       A.    Only on special projects.
23       Q.    So your main area was the northern
24   suburbs of Los Angeles?

Page 78

1        A.    Correct.
2        Q.    I see in that field operations
3    section when you were there you talked about a
4    high school undercover narcotics operation, what
5    did that involve?
6        A.    That was -- the City of La
7    Canada-Flintridge had a high school and we had an
8    undercover narcotics sting operation there.  We
9    put in some youthful looking officers.  They
10   pretended to be high school students.
11       Q.    And took care of the annual station
12   picnic, too?
13       A.    Well, those are some of the things
14   that I was involved in.
15       Q.    Going back further into '78 through
16   '80, you had custody division of the Central Jail.
17   That essentially was a corrections position,
18   correct?
19       A.    Right, that was my first two years
20   as a lieutenant.
21       Q.    And you worked on new fire safety
22   specifications for jail bedding and mattresses?
23       A.    Yes, that's one of the
24   contributions.

Page 79

1        Q.    And then going back before that in
2    '76 through '78 for 27 months you worked in the
3    administrative division federal surplus, that's
4    the one you talked about earlier taking care of
5    the surplus property?
6        A.    Right, that's actually a four-year
7    assignment, same desk I was sitting at and -- but
8    I was -- because of the program they divided me
9    out.  So put me from patrol division into
10   administrative division.  So five and six are
11   essentially the same.
12       Q.    So six was also administrative in
13   nature when you were assigned as the personnel and
14   logistics sergeant?
15       A.    Correct.
16       Q.    And, going back, the patrol division
17   when -- you were a sworn officer at that point in
18   1973, '74?
19       A.    Yes.
20       Q.    And in '72, '73 at San Dimas
21   Station?
22       A.    I was a patrol sergeant there.
23       Q.    And how big is the San Dimas
24   Station?

Page 80

1        A.    Well, geographically, it was the
2    largest of the stations, but there's 18 stations.
3    Population-wise it included -- it was urban and
4    rural, the Angeles National Forest, but it had
5    pieces of Pomona, San Dimas, Arcadia, West Covina,
6    Covina.
7        Q.    How many officers were in San Dimas
8    Station?
9        A.    There were -- it was about the size
10   of Crescenta Valley, so it was about a hundred
11   total in that station.
12       Q.    And you worked 1971 to '72 as a
13   watch commander in the sheriff's department old
14   radio room, is that, again, administrative in
15   nature working in the radio room?
16       A.    Right.  That was a special project
17   as a sergeant, first year as a sergeant and I
18   helped with the department from analog to digital
19   in that project.
20       Q.    And going back again '70 -- 1970,
21   1971 you were a station detective assigned to the
22   evening watch.  I believe you referred to that
23   earlier when you had some juvenile matters come
24   in, criminal complaints, juvenile petitions.  That

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 81

```
 1    was actual detective work you did at that point?
 2         A.    Yeah, it was my last two years as a
 3    deputy rank.
 4         Q.    And that was the last time you
 5    actually were assigned detective work, per se,
 6    correct?
 7         A.    As a detective.  I was a detective
 8    bureau commander and -- after that.
 9         Q.    That's the last time you were
10    whole-heartedly assigned yourself as a detective,
11    correct?
12         A.    Right, I was a deputy.
13         Q.    Okay.  And, again, we have, again,
14    San Dimas you mentioned there was maybe a hundred
15    officers over there and that was in '68 to '70
16    and, again, your first work back in '65 to '66 was
17    in the Central Jail again, correct?
18         A.    Correct.
19         Q.    Okay.  You have degrees and
20    certifications on the bottom.  If you can just
21    explain them.
22              The POST Command College, you
23    mentioned that was a nonaccredited program,
24    correct?
```

Page 82

```
 1         A.    Well, it's accredited by the State
 2    of California, but you're right about it not being
 3    part of the university system.
 4         Q.    Right, as an academic degree.
 5         A.    Correct, the diploma is given by --
 6    there is a diploma and it's given by the
 7    Department of Justice.  So that's in '88.  I
 8    didn't bother with -- I have pages of POST
 9    certification, but I had the management
10    certification in '80.  POST in California
11    certifies at basic, intermediate and advanced.  I
12    just cited the advanced certification when I
13    received it in '75 and then the academic degree
14    with Chaffey College in '71.
15         Q.    And that was a two-year associates
16    degree?
17         A.    Correct.
18         Q.    And what was your area of study back
19    then?
20         A.    It was police science.
21         Q.    Police science, was that like
22    similar to criminal justice?
23         A.    That would be equivalent.
24         Q.    Could you point out in your CV your
```

Page 83

```
 1    specific credentials in regard to administrative
 2    investigations of officer misconduct?
 3         A.    Sure.  It would be the POST Command
 4    College in particular and my work at NORSAT I had
 5    a number of police corruption cases that we worked
 6    and was called on to work, assigned to work by the
 7    administration.
 8         Q.    Did you ever work in Internal
 9    Affairs?
10         A.    I'm not quite finished with the
11    first -- do you want me to stop?
12         Q.    No, go ahead.
13         A.    And then, of course, I've had -- I
14    think this is not unique to any officer.  I had
15    right from the very beginning of my career, in
16    fact, the first day of my assignment I bumped into
17    the code of silence and the cultural aspects of an
18    investigation, in particular, the units that would
19    become infested with -- with misconduct and the
20    department's response or lack of response to it
21    from my own experience.  So that's the answer to
22    the next question, sir.
23         Q.    Well, did you ever work in Internal
24    Affairs?
```

Page 84

```
 1         A.    Not in the Internal Affairs Unit.
 2         Q.    Well, what other ways did you work
 3    in Internal Affairs?  Were you an informant for
 4    them?
 5         A.    No, I was never an informer, as in
 6    undercover.  I certainly wrote a number of -- of
 7    in-house memoranda that got a lot of attention
 8    regarding corruption, in particular a group called
 9    the Vikings for which incidentally the sheriff of
10    Los Angeles County is now awaiting sentencing and
11    the undersheriff is in prison.  So I was never an
12    informer, but would be assigned for -- because of
13    our surveillance abilities to surveil subjects in
14    that regard.
15         Q.    Is this with NORSAT?
16         A.    That would be NORSAT and the last
17    piece of that answer is that at the time that I
18    was in the department the misconduct could be
19    handled at two levels depending on if there were
20    certain qualifiers.  At the station level, it
21    would be referred to Internal Affairs.  More often
22    than not, the station took care of its own
23    problems and did its own stations and I was
24    involved in a number of those as a lieutenant, one
```

21 (Pages 81 to 84)

Electronically signed by Steven Brickey (501-307-281-8473)    954cbfef-baad-48a4-9690-8c9024c19f87

Page 85

1  of which would resulted in discharge, a theft
2  of -- thievery thing out of our evidence locker.
3      Q.   So those were your normal duties as
4  a commanding officer --
5      A.   Yes.
6      Q.   -- to take care of those types of
7  matters?
8      A.   As the commanding officer, correct.
9      Q.   And the -- that was your experience
10 with what you would call the code of silence in
11 Los Angeles County was what you assisted using
12 your NORSAT group --
13     A.   Yes, sir.
14     Q.   -- in an investigation in that
15 regard?
16     A.   Yes, code of silence would be an
17 issue. It's always an issue in misconduct.
18     Q.   How would you define code of silence
19 or how do you define it for purposes of this
20 report?
21     A.   Well, I think I define it the same
22 way in the statement by Superintendent Williams.
23 I think he did a good job, but it's the propensity
24 and the cultural influence of officers to support

Page 86

1  and/or deny misconduct for another officer.
2      Q.   And that's --
3      A.   With results -- I think the
4  definition you asked me -- and the result of
5  poison that leaches into the organization because
6  of it.
7      Q.   You're referring, by the way, to
8  Mr. Williams. Is that page 70 of the Police
9  Accountability Report?
10     A.   Right.
11     Q.   Now, what credentials are -- would
12 you point to in your CV to support your expertise
13 in disciplinary procedures for officer misconduct
14 once it's found?
15     A.   From my training and experience as a
16 sergeant and as a lieutenant, the 9th Circuit case
17 called Blakenhorn cites me by name regarding
18 discipline. I'll leave it at that, but I think I
19 have considerable experience on discipline and the
20 influence of discipline.
21     Q.   Other than your work as -- your
22 normal duties as a commander that you just talked
23 about, have you had any other experience in
24 disciplinary procedures once it's found, once

Page 87

1  misconduct is found?
2      A.   Only as a police administrator. I
3  think what needs to be said here is the root word
4  of discipline is disciple and now we're talking
5  about values, attitudes and beliefs.
6      Q.   I'm talking about procedural aspects
7  of the disciplinary process, what have you done in
8  that regard other than the work you did at your
9  district?
10     A.   Let me put in the record I have not
11 completed, but I'll just take what you asked.
12     Q.   Please do.
13     A.   In addition to what I just commented
14 on, I've had a number of cases regarding --
15 federal cases regarding the lack of discipline,
16 inadequate discipline, I've studied this issue
17 after my retirement from the department
18 continually for the next -- from 1993 on and have
19 testified regarding it and as quoted by the 9th
20 Circuit "Inadequate discipline is tantamount to no
21 discipline." That's a direct quote by me from the
22 9th Circuit.
23     Q.   Have you written any peer reviewed
24 articles on this subject or anything else?

Page 88

1      A.   No.
2      Q.   Have you written any articles on
3  this subject or anything else?
4      A.   No.
5      Q.   And what in your CV do you point to
6  as your experience with statistical analyses?
7      A.   There is nothing referencing
8  statistical analysis in my CV except the thesis
9  required a statistical analysis and my faculty
10 advisor Dr. Ward Jenssen, who incidentally
11 graduated from Chicago a professor assisted me in
12 that work. I commented on in my last deposition
13 in McIntosh, but, other than that, it's just
14 direct from him and as you may know I've done some
15 statistical work regarding Chicago and other
16 incident reports.
17     Q.   So you wouldn't consider yourself a
18 statistical expert, would you?
19     A.   I'm not degreed in statistics. I
20 certainly think and can understand statistical
21 conclusions.
22     Q.   And other than what you have
23 testified to so far, what about any other
24 credentials in regard to training of law

22 (Pages 85 to 88)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 89

1  enforcement and use of force?
2      A.    Yes.  In my fitness reports, I'm
3  cited specifically as renown expert on four topics
4  in an academy lecture and one of them is use of
5  force.  This is a topic that I've testified
6  throughout the country on use of force and been
7  accepted by the courts.
8      Q.    Yet you have written no peer
9  reviewed articles on the matter?
10     A.    No, other than the case reports I
11 write.  Other than that, no.
12     Q.    Have you done any education or
13 training directly on point as to how to train
14 officers in the use of firearms?
15     A.    Yes, and that's -- you'll notice my
16 years at the Emergency Operations Bureau.  That's
17 four years.  As a collateral assignment, as a
18 sergeant, I was part of patrol school faculty and
19 that was a scenario role play on how to use --
20 when it would be appropriate to use firearms.  It
21 included that.
22     Q.    What faculty was that again?
23     A.    That would be in '74 to '78.
24     Q.    Since then have you done anything?

Page 90

1      A.    Training?  I've done no training
2  since I retired out of the department in '93.
3      Q.    And since you left that position in
4  the '70's you just mentioned?
5      A.    Well, I talked about use of lethal
6  force up to '93 and lectured on and was accepted a
7  POST -- it covered the requirements by POST for
8  use of lethal force, but the hands-on training
9  last time was four years during the patrol school
10 times when I'd be assigned ended in '94.
11     Q.    Do you have any --
12     A.    Excuse me.  '78.
13     Q.    In the late '70's, right?
14     A.    Right.
15     Q.    Any training in law, do you have any
16 training in law?
17     A.    I have no degrees.  Just personal
18 study and training in the department.
19     Q.    And other than what you've testified
20 to already, any training in statistics?
21     A.    As I understand your question, no.
22 I did not -- I took some statistical classes as
23 part of the police science and the rest of it with
24 Dr. Jenssen.  He taught me a lot in terms of how

Page 91

1  to crunch trends and analysis.
2      Q.    Any training in public policy in
3  general?
4      A.    Oh, my goodness.  That Command
5  College for two years was intensive on policy.
6      Q.    Any education or training directly
7  on point on how to discipline officers for misuse
8  of firearms?
9      A.    I'm taking that as the application
10 of lethal force and I taught extensively up until
11 '93.
12     Q.    But since '93 you haven't?
13     A.    No, other than my testimony and
14 trials and explaining it to a jury.
15     Q.    Now, going over your own career,
16 have you ever been involved in an officer involved
17 shooting as an officer?
18     A.    Yes.
19     Q.    And what were the circumstances of
20 that case or how many times?
21     A.    One time.
22     Q.    Okay.  And what were the
23 circumstances of that case and when did it happen?
24     A.    I was a detective.  It was in

Page 92

1  December of '72 as I remember.  It was a case
2  involving burglary and identified the subject
3  whose name was Lamont Wells and he was a heroin
4  addict and had -- and was a fugitive in addition
5  to a suspect in our case and had information
6  regarding where he was.  As my partner and I we
7  were in an unmarked unit; I was not in uniform, I
8  was in detective civilian clothing, along with
9  him, and as we pulled up to a bar which we knew he
10 was, he happened to be walking out, spotted us and
11 took off running.
12          Now, in those days, there was no
13 such thing as handheld radios or -- the only radio
14 was in the car and the tactic at that point was if
15 you have a fleeing subject, your target subject,
16 one person would keep him in view while the other
17 used the radio in the car, the only means of
18 communication to announce direction, what was
19 going on and get the area saturated with police
20 officers.  This was in the City of Pomona by the
21 way.
22          So I was shotgun, jumped out,
23 started following him, kept him at a distance and
24 waiting for the Pomona officers to come in to

23  (Pages 89 to 92)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 93

1    establish a perimeter. I made a couple of turns
2    when he made a couple of turns and to my surprise
3    I had turned and left myself in the open where he
4    was standing waiting for me with a gun.
5        Q.   Was he pointing the gun at you?
6        A.   Yeah, I was looking down the barrel
7    of the gun.
8        Q.   And did you have a fear for your
9    life or the life of others at the time?
10       A.   I had a fear for my life.
11       Q.   And did you discharge your weapon?
12       A.   After some things, yes, I did.
13       Q.   What do you mean after some things?
14       A.   Well, he pulled the trigger before
15   anything. Immediately when I came into view, he
16   pulled the trigger. The gun misfired. It was a
17   semiautomatic. We both realized what had happened
18   and I had my gun out. I told him "Drop it. Drop
19   it. Drop it." This was all heard by -- it was an
20   apartment complex. People heard it. His reply to
21   me was "Fuck you" and he brought the gun up to
22   work the slide to eject the bad round at which
23   point I shot him.
24       Q.   So, at that point, again, you had

Page 94

1    the barrel of a gun at you?
2        A.   Actually, he was working the slide
3    to re-chamber and I couldn't get to him in time
4    and so I shot him.
5        Q.   So he wasn't even pointing a gun at
6    you at that point?
7        A.   Not precisely, no. We both knew
8    exactly what was going on.
9        Q.   And you felt you were in fear of
10   your life and the life of others or your --
11       A.   I felt I was in fear of my life.
12       Q.   And you discharged your weapon and
13   you feel you didn't violate any policies at that
14   point?
15       A.   I did not violate any policies.
16       Q.   And in this particular case when
17   Officer Hitz fired his gun, if he had that,
18   indeed, gun pointed in his direction or, in your
19   case, knew what was going to happen, why would
20   that be a violation of policy --
21            MR. STROTH: Objection.
22   BY MR. GREEN:
23       Q.   -- and not yours?
24            MR. STROTH: Objection. Foundation.

Page 95

1    BY THE WITNESS:
2        A.   I never said it was a violation of
3    policy on his case. The set of facts that he
4    recounted, he and his partner, match being in fear
5    for his life.
6    BY MR. GREEN:
7        Q.   So, in fact, no constitutional
8    violation would have occurred?
9            MR. STROTH: Objection. Foundation.
10   BY THE WITNESS:
11       A.   Are you asking me about the veracity
12   of the statement? Because I clearly said in the
13   second paragraph of my report I did not make
14   credibility statements. There is considerable
15   physical evidence that belies the presentation of
16   the facts.
17   BY MR. GREEN:
18       Q.   So how many times were you involved
19   in investigating an officer involved shooting, not
20   your own shooting, but I think you mentioned two
21   or three, right?
22       A.   Well, I was involved in the one I
23   mentioned at Crescenta Valley where I was a watch
24   commander and got up there in short order.

Page 96

1        Q.   That was one of your own people,
2    right?
3        A.   Yes, one of my own deputies. I was
4    with NORSAT physically during one of the -- two of
5    the shootings that NORSAT had one close at hand
6    and because I was the ranking officer I stabilized
7    the location. The others would be as part of the
8    review.
9        Q.   So had any of those officers you
10   just mentioned been found to act
11   unconstitutionally or unjustifiably?
12       A.   No.
13       Q.   So they were all found within
14   policy?
15       A.   No. See, there is a difference
16   between constitutionally and policy.
17       Q.   Were they found within policy?
18       A.   No.
19       Q.   And which one was that?
20       A.   Well, I consider --
21       Q.   All?
22       A.   There were two that come to mind
23   right now. The one when I was a watch commander
24   at Crescenta Valley I think was both within policy

24  (Pages 93 to 96)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 97

1    and constitutional.
2        Q.    That was the one involving your --
3    your officer?
4        A.    Yes.
5        Q.    But the other two you don't think
6    were in policy?
7        A.    There were two that were problematic
8    that I would have considered out of policy.
9        Q.    And what -- was your role in
10   those two?
11       A.    Reviewer.
12       Q.    So after everything was done
13   investigation-wise, you just were a member of a
14   committee reviewing it?
15       A.    Right.
16       Q.    And you made a collective decision?
17       A.    There was a collective decision.
18       Q.    And who decided your own officer's
19   situation when they were found within policy?
20       A.    That would be the independent
21   reviewer of the review team and, of course, I
22   plugged in my opinion as part of the commentary.
23       Q.    What was your opinion?
24       A.    Oh, we're talking about --

Page 98

1        Q.    Your own officer.
2        A.    My own officer absolutely was in
3    policy and constitutional. I said that already.
4        Q.    Did he have a gun pointed at him?
5        A.    No, he didn't. He was -- I can give
6    you the details.
7        Q.    Just briefly.
8        A.    The officer's name was Fieg,
9    F-I-E-G. He had a cadet with him. The Angeles
10   National Forest is dark at night. It's remote.
11   He came across an abandoned -- what appeared to be
12   an abandoned vehicle. They investigated. There
13   was an individual inside, tapped on the window,
14   the person -- and he saw a large butcher knife on
15   the dashboard. The only light was the light from
16   the radio car and his flashlight. The minute he
17   tapped on the door to check on the individual, the
18   person leaped out and attacked Fieg.
19           The cadet was on the other side
20   of the vehicle. Stood there frozen in fear and
21   Fieg backed up and literally had his shirt being
22   torn off his chest. He was under the impression
23   that he was being stabbed, which was reasonable,
24   and he had significant scratch injuries and a torn

Page 99

1    shirt and after he backed out of the light and
2    could see no further he pulled out his gun and
3    shot him once in the chest and he expired at the
4    scene.
5        Q.    So you believe what your officer
6    told you?
7        A.    I did.
8        Q.    And did you do any investigation in
9    regard to anything that occurred there?
10       A.    Yes, I -- when -- I took command
11   because I was the ranking officer. I separated
12   the two. The cadet told exactly the same story
13   having no opportunity to consult with Fieg. Fieg
14   told me the story. He had the physical defects on
15   his uniform.
16       Q.    What -- I'm sorry. Were you there
17   at the car when this happened?
18       A.    No, I arrived on the scene.
19       Q.    So the two were still on scene
20   together, right?
21       A.    Correct.
22       Q.    So they could have talked before
23   they talked to you.
24       A.    They could have talked before.

Page 100

1        Q.    And you didn't consider that in your
2    investigation?
3        A.    Of course I did.
4        Q.    But you just believe they told you
5    the truth?
6        A.    No, I did more than that. It
7    matched the physical evidence, knife, single shot,
8    injury to Fieg, torn uniform, terrified cadet, all
9    of the particulars as sorted out by the
10   investigating officers once they were -- were
11   settled. All the details matched, timing and Fieg
12   himself and it had -- it all spoke to the truth.
13       Q.    And you provided that opinion to the
14   review authorities?
15       A.    I provided the complete account of
16   everything I did and the timing to the time they
17   arrived.
18       Q.    Have you ever been sued as a deputy
19   sheriff --
20       A.    No.
21       Q.    -- or disciplined?
22       A.    No.
23       Q.    Have you ever been involved in
24   Internal Affairs generally other than what you've

25 (Pages 97 to 100)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 101

1  talked about?
2      A.    As a subject?
3      Q.    Yes.
4      A.    As a target, no.
5      Q.    Was there a policy that involved
6  inadequate investigation of officer involved
7  shootings at the Los Angeles Sheriff's Department
8  while you worked there?
9      A.    I believe that there were a number
10 of deficient examples of -- the methods and -- and
11 techniques of a good investigation have not
12 changed for decades and the issue is if I do
13 not -- if you have an investigator that
14 approaches if I do not want an answer, I will not
15 ask the question, then that's where it falls
16 apart. An experienced detective knows what to ask
17 for and what to seek and leaves no stone unturned.
18     Q.    And you never went to detective
19 school, did you?
20     A.    No.
21     Q.    Was there a policy of inadequate
22 discipline of officers while you were at the
23 sheriff's department?
24     A.    There are a number of times I've saw

Page 102

1  that and commented on it whenever I saw it.
2      Q.    But you never had a rank higher than
3  lieutenant when you were a police officer,
4  correct?
5      A.    Correct.
6      Q.    And is it fair to say that your work
7  as a staff jail deputy or a jail watch commander
8  and administrator did not factor into how you
9  evaluated this particular case?
10     A.    Other than the general uniform
11 practices of police administration.
12     Q.    That was within correctional
13 facilities, correct?
14     A.    Well, the sheriff's department ran a
15 very large jail system. I think probably the
16 largest in the nation. But there are a lot of
17 similarities in how to run an organization that
18 has police authority.
19     Q.    Is it fair to say your work as a
20 commanding officer in investigative units did not
21 figure into this particular case either?
22     A.    Of course it does. My experience in
23 all these areas lends its weight to my opinions I
24 think and my experience is a big issue here.

Page 103

1      Q.    You never took a class in Internal
2  Affairs, did you?
3      A.    I never took a formal POST class
4  devoted strictly to Internal Affairs. Only
5  administration -- administrative procedures.
6      Q.    All right. Let's take a look at
7  Exhibit 3.
8      MR. STROTH:  Counsel, can we take a
9  break?
10     MR. GREEN:  I have one more exhibit
11 to go through and then --
12     MR. STROTH:  Just five minutes.
13     THE VIDEOGRAPHER:  We're going off
14 the video record at 12:41 p.m. and this is the end
15 of video media two.
16         (Whereupon, a break was taken
17          after which the following
18          proceedings were had.)
19     THE VIDEOGRAPHER:  We are back on
20 video record at 1:32 p.m. and this is the
21 beginning of media unit three.
22 BY MR. GREEN:
23     Q.    Okay. Mr. Clark, could I turn your
24 attention to Clark Exhibit 3, your prior testimony

Page 104

1  that we discussed previously.
2          How many times have you given
3  testimony at trial as a Monell expert?
4      A.    I think no more than a couple of
5  dozen times.
6      Q.    About 24 or so?
7      A.    Something like that, I think.
8  Estimate.
9      Q.    And what is your understanding of
10 what a Monell claim is?
11     A.    Well, it's -- comes out of New York.
12 It's a Supreme Court case. It relates to the
13 custom and practice, either written custom and
14 practice or an established custom and practice on
15 an issue and the responsibility of the agency
16 which would be a municipality, police department,
17 et cetera, to that custom and practice whether
18 it's constitutional or not.
19     Q.    So you had just said about -- it
20 involves a custom and practice on a particular
21 issue, correct?
22     A.    Yes.
23     Q.    And, therefore, in your own opinions
24 you divided it up into I believe four categories.

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 105

1  correct?
2      A.    Right.
3      Q.    So don't they require a separate
4  analysis of these various areas in regard to
5  custom and practice?
6      A.    I don't see why they would.  I think
7  the -- I envisioned it and I intended it to be the
8  global issue of the Monell, the custom and
9  practice, and the aspects or the foundation of
10  that would be -- could be discussed I think that's
11  the best word or maybe illustrated to make the
12  point in -- for the purpose of the report five
13  specific areas.  As you know, the DOJ report
14  specifies seven.
15     Q.    I'm sorry.  Five areas.  I
16  previously said four.  But five areas.
17     A.    There's five.  And -- and then --
18  but I sequentially kept numbering one through,
19  well, I thought it was 28, now it's 29.
20     Q.    So --
21     A.    But the DOJ report has seven
22  specific categories.
23     Q.    So in your own report, how are you
24  analyzing a failure to train claim compared to a

Page 106

1  code of silence claim in your opinions?
2      A.    Well, it's clear in my -- in my
3  analysis, but the training -- all these are, as I
4  said, are -- they're related.  I don't think they
5  can totally be separated, but failure to train
6  covered -- would cover the conditioned response.
7  I'll give you an example.  Hitz running off solo
8  leaving his partner behind just taking off, not
9  getting on the air, not -- you know, just --
10  that's totally against the professional wisdom
11  and, of course, if that hadn't occurred, there
12  would have been no shooting, et cetera, et cetera.
13  That's just an example.
14            The -- how that relates to code
15  of silence is the -- I think connected with the
16  propensity to ignore training or the professional
17  wisdom with -- with the confidence that there
18  would be no accountability either from the brother
19  officer or sister officer that is with you at the
20  time of the occurrence or those who will come in
21  and scrutinize the incident.
22     Q.    But within those two examples,
23  though, would you not agree that the failure to
24  train involves a lack of training or no knowledge

Page 107

1  of the training versus a code of silence where
2  there would be training. there is knowledge of the
3  training, but they're not following it?
4      A.    Not exactly.
5      Q.    Aren't those different?
6      A.    Yeah, they are -- they're
7  distinctions, but you're right about is there a
8  time when there is no training, therefore, there
9  would be no accountability because there had been
10  no training in that specific aspect.  I agree,
11  but --
12     Q.    So there would be a different
13  analysis depending --
14     A.    Right.
15     Q.    -- on the issue involved?
16     A.    Yes, so we talk about the -- there
17  are some aspects in relation to the Pierre
18  shooting as well as the general findings by the
19  DOJ to the department as a whole.
20     Q.    Well, going back before we go
21  through a bit of these testimonies you said
22  earlier there was -- you had mentioned Monell
23  commentary in some cases versus some Monell
24  opinions you gave in testimony, what is the

Page 108

1  difference?
2      A.    Well, the difference is there were
3  specific cases where the at-issue was the Monell.
4  I had -- for example, I had a Fresno case where
5  the judge specifically ordered at the request of
6  the plaintiff certain data for one of their
7  experts to review, which turned out to be me.
8      Q.    Which case was that?
9      A.    It's the -- it was a case called --
10  that case was called Enrique. the one I'm talking
11  about.
12     Q.    Can you put --
13     A.    As an example.
14     Q.    Can you put it out and point it out
15  here just as an example?
16     A.    I've got to do it this way.  The
17  other aspect -- in answer to your question, is --
18  the question was about the differences when it
19  occurred, that in my review of the facts I could
20  see that there was a ratification by the agency or
21  a pattern and practice that I considered connected
22  to the incident that I reviewed and so I would
23  render an opinion in that regard.
24     Q.    So are you saying that in cases even

27 (Pages 105 to 108)

Electronically signed by Steven Brickey (501-307-281-8473)        954cbfef-baad-48a4-9690-8c9024c19f87

Page 109

1  where there was no Monell claim filed and you were
2  giving opinions on other areas of law enforcement,
3  you would still give opinions of Monell?
4      A.   Yes, I did that.  I would give
5  opinions.
6      Q.   Despite being asked for it or not?
7      A.   Yes.
8      Q.   And that's a regular practice of
9  yours?
10     A.   It's typical.
11     Q.   And you're always critical of the
12  municipality?
13     A.   When I render it, yes.
14     Q.   You said Enrique case, was that in
15  the last four years?
16     A.   Actually, it goes back to 2011.
17     Q.   So it's not on this list?
18     A.   That case occurred in 2011.  Both
19  deposition and trial.
20     Q.   And do you remember what court that
21  was in?
22     A.   Fresno.  US District Court in
23  Fresno, California.
24     Q.   And would you have the cite on your

Page 110

1  other --
2      A.   I can give you the citation, I
3  think.  10-cv-00581 AWI.
4      Q.   Thank you.  And in the last four
5  years on this list, how many times would you give
6  trial testimony as a Monell expert?
7      A.   I would have to carefully go over
8  the list.  I'm sure there is about four to six in
9  here.
10     Q.   Four to six times in the last four
11  years?
12     A.   I would think so.  That would be an
13  estimate.
14     Q.   And can you --
15     A.   I notice --
16     Q.   Can you pull those out?
17     A.   I notice this exhibit has some
18  format issues.  I'll provide a better --
19     Q.   I think everything is on there,
20  though.
21     A.   Yeah.  Okay.  The question?
22     Q.   Can you provide us the list of those
23  Monell cases on here?  This is a rather extensive
24  list if you can't do it right now.

Page 111

1      A.   I won't be able to do it right now.
2           MR. GREEN:  Can counsel forward that
3  to us?
4           MR. ODIM:  Yes.
5  BY MR. GREEN:
6      Q.   And have you ever been barred as an
7  expert in any area where you were ever disclosed
8  as an expert?
9      A.   There are typically motions in
10  limine on certain issues and I'm instructed not to
11  testify.
12     Q.   Right.  So that's happened to you
13  before?
14     A.   Yes.
15     Q.   And how many times and where?
16     A.   Well, it's common because the issues
17  of -- medical issues or engineering issues where
18  I've been instructed not to comment.
19     Q.   So, essentially, you provided expert
20  opinions in areas that you were not recognized as
21  an expert, is that what happened?
22     A.   Sufficient for the case, yes.
23     Q.   So how many times has that happened
24  in the Monell context?

Page 112

1      A.   I don't think it's ever happened --
2  well, there -- the only way I can answer it is in
3  my experience the motions by the defense or other
4  motions exclude out of the case in chief Monell
5  issues and so I'm instructed not to -- to comment.
6      Q.   Were any of those based on your
7  methodology or you were providing an opinion that
8  you were not qualified to give in the Monell
9  context?
10     A.   No, not that I am aware of.
11     Q.   So not in the last four years
12  anyway?
13     A.   Nothing I can remember, no.  But
14  often there will be agreements between parties
15  that Monell will not be pursued in the trial.
16     Q.   And in the four to six times you
17  stated that you had given Monell testimony in the
18  last four years, what areas of Monell were the
19  issues involved were there or what were the
20  issues?
21     A.   They would involve use of force.
22  The case itself would be use of force.  I think
23  all the cases involved shootings and the
24  department response to those.

28  (Pages 109 to 112)

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 113

1    Q.   So there were shootings, use of
2    force and did any of them involve the impending
3    investigations or impeding investigations of
4    misconduct other than this case and perhaps the
5    Lane case that we just discussed?
6    A.   Well, if you -- I've commented on
7    the failure to implement or utilize the EWS
8    properly.
9    Q.   EWS being?
10   A.   Early warning system.
11   Q.   And how about failure to
12   investigate, were any of those Monell cases
13   involving a failure to investigate?
14   A.   Yes, that would include the
15   department response and the investigation thereof.
16   Q.   And how about a failure to
17   discipline?
18   A.   Well, I gave you the Blakenhorn.
19   That's one that pops all the time.
20   Q.   Blakenhorn?
21   A.   Blakenhorn versus City of Orange.
22   Q.   Was that in the last four years?
23   A.   No, I think it's older now, but
24   failure to discipline is commentary often.

Page 114

1    Q.   And how about failure to train?
2    A.   Failure to implement the training as
3    required by POST.  So that would be the -- most of
4    the time that I -- I comment or write about the
5    POST requirements, the POST standards and that
6    failure to either be -- to adhere to them or to be
7    supervised to the extent that they're implemented
8    by the department.
9    Q.   And are you familiar with the POST
10   requirements in Illinois?
11   A.   Yes, I am.
12   Q.   And would you say that the written
13   general orders and training of the Chicago Police
14   Department satisfy those requirements?
15   A.   In terms of the training and
16   certification for POST basic, yes.
17   Q.   And they would be reasonably
18   sufficient for those purposes?
19   A.   Yes, and that certainly would keep
20   Hines from -- Hitz from running solo after Pierre.
21   Q.   And how about any of your Monell
22   cases involve the code of silence other than Lane
23   and this case?
24   A.   Any of my other cases?

Page 115

1    Q.   Right.
2    A.   A number of them have commented on
3    the code of silence.
4    Q.   Now, when you say commented, this
5    was something you had mentioned that it's in a
6    case there wasn't necessarily a Monell claim
7    because you just voluntarily put that into your
8    report?
9    A.   In both -- I've done that both ways.
10   One of the key cases I had early on was Darren
11   Thomas versus the County of Los Angeles and that
12   had a lot to do with the code of silence.
13   Q.   Is that within the last four years?
14   A.   No, that goes back to '93.
15   Q.   How many times have you in your
16   history with this being an expert have you
17   represented -- have you been hired in a criminal
18   case versus a civil case?
19   A.   Criminal cases are fairly rare.
20   I've had probably 15 percent of my cases involve
21   some -- criminal -- criminal case, per se?
22   Q.   Right.
23   A.   I've only had a handful of criminal
24   cases that I've dealt with.

Page 116

1    Q.   And in the civil cases, how many
2    times have you represented plaintiff versus how
3    many times have you represented defendants or
4    meaning you gave opinions for plaintiffs or
5    retained by plaintiffs versus being retained by
6    defendants?
7    A.   Only one time in Houston for the
8    plaintiff.  That would be for the County -- Texas,
9    in Texas, against a police officer.  Other than
10   that, all the others were defendants.  One of them
11   was a police officer defendant, criminal case.
12   Q.   So you've always given reports on
13   behalf of the defendant?
14   A.   We're talking about criminal
15   matters.
16   Q.   All right.  Well, I was talking
17   about civil matters.
18   A.   Oh.  So for civil matters, there is
19   still very few defendant cases.  I have two active
20   right now.
21   Q.   Out of how many?
22   A.   Out of the 1,700 cases consulted on.
23   Q.   So out of 1,700, you only did two
24   for the defendant's side?

29  (Pages 113 to 116)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 117

1    A.    No, I have two active. I have
2  probably somewhere close to a dozen, maybe less,
3  for defendants.
4    Q.    So out of 1,700 cases, you had 12
5  that you represented defendants in in civil
6  matters or you have rendered opinions and been
7  retained for defendants?
8    A.    Yes, cases that I have accepted.
9  You are correct.
10   Q.    And how many of your cases involve
11 the Chicago Police Department?
12   A.    I can go through and tell you how
13 many there are. I didn't bother -- I think
14 there's around a dozen, maybe a little less than a
15 dozen involving Chicago.
16   Q.    And how many in the last four years?
17   A.    Well, it would be listed in the
18 report. I have three that come to mind right now.
19 Maybe there might be a couple more.
20   Q.    All right. Can your defense counsel
21 give us a list of those just to make sure we got
22 them all along with --
23   A.    I can cull them up now if you want.
24 All of them? All the --

Page 118

1    Q.    In the last four years anyway and
2  are any of them, do you know, on behalf of the
3  plaintiff?
4    A.    I know that they're all on behalf of
5  the plaintiff.
6          MR. ODIM:  Can we take a quick break
7  on this?
8          MR. GREEN:  Do you want to take a
9  break?
10         MR. ODIM:  Yeah, I want to figure
11 out how we do this. Two minutes.
12         THE VIDEOGRAPHER:  We are going off
13 the video record at 1:52 p.m.
14         (Whereupon, a break was taken
15          after which the following
16          proceedings were had.)
17         THE VIDEOGRAPHER:  We are back on
18 video record at 1:56 p.m.
19         MR. GREEN:  Okay. I just -- we had
20 talked about this and we're also going to get a
21 list of the City of Chicago cases, correct --
22         MR. ODIM:  That is correct.
23         MR. GREEN:  -- that Mr. Clark was
24 involved in?

Page 119

1  BY MR. GREEN:
2    Q.    Okay. Let's move to your opinions
3  in Exhibit 4. Your first opinion states "Chicago
4  has consciously and deliberately created
5  impediments to the process made available for
6  citizens to complain about misconduct. These
7  impediments include requiring sworn affidavits for
8  complaints, not investigating allegations that
9  have happened more than five years before the
10 misconduct at issue and not investigating
11 allegations of misconduct for more than five years
12 after a CR number is issued.
13         The maintenance in place of
14 these impediments constitutes a de facto policy,
15 widespread practice of failing to properly
16 investigate civilian allegations of police
17 misconduct including the use of excessive force in
18 the shooting of civilians."
19         Mr. Clark, what is the factual
20 basis for saying that the City has consciously and
21 deliberately created such impediments?
22   A.    The factual basis comes from the DOJ
23 report and the other reports as listed and they --
24 and what I did in this opinion was to be more

Page 120

1  specific after the first sentence to give these
2  examples, the five-year limit, et cetera.
3    Q.    So --
4    A.    The requirement for an affidavit to
5  be signed, et cetera.
6    Q.    So the -- you had the seven
7  conclusions of the DOJ report you cited, correct?
8    A.    That's right.
9    Q.    What specific beyond that are you
10 citing in support of this opinion?
11   A.    The other five citations that are in
12 footnote number one, the only footnote, they're
13 also included there that these are clearly
14 impediments to the --
15   Q.    Other than --
16   A.    -- to the ease of citizens to report
17 misconduct.
18   Q.    So other than the general materials
19 found in these reports, you have no other
20 independent factual basis for coming to this
21 conclusion?
22   A.    Well, I have no other -- I have no
23 other resources that I've cited other than the
24 material listed in my report and as you know a

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 121

1  number of the articles and so forth reference this
2  cumbersome, my word, impediment that exists and
3  impairs the ability of citizens to file
4  complaints.
5      Q.    Now, when you're talking about
6  reports, are you talking about those newspaper
7  reports, those articles from 29 through 34?
8      A.    Yes, that includes that.
9      Q.    And what is the factual basis for
10  saying the City even created those impediments?
11      A.    Because they're part of the City
12  process. The City -- I consider the City
13  responsible for that process and they can fix it,
14  my term again, if they really wanted to.
15      Q.    What is your factual basis for the
16  City allegedly not investigating misconduct that
17  happened more than five years after a CR is
18  issued?
19      A.    Because they have a five-year limit
20  and that's contrary to the process of monitoring
21  officers and their conduct.
22      Q.    And when you say --
23      A.    It sets in place an impairment to
24  really understanding and knowing what -- where

Page 122

1  your malignant officers are and what they're
2  doing.
3      Q.    So how often does that actually
4  happen?
5      A.    How would I know? Because you have
6  the five-year limit and, by the way, I do not -- I
7  did not do that study. I'm referencing the fact
8  that they consider it an impairment and I agree it
9  would be an impairment.
10      Q.    So you don't know exactly how many
11  times that's even affected the investigations of
12  misconduct in the City of Chicago, you personally
13  right now do not know, correct?
14      A.    I -- in terms of the raw numbers, I
15  personally did not research that or -- or
16  accumulate those facts.
17      Q.    Were there any other impediments
18  beyond the sworn affidavits and not investigating
19  the five-year old complaints that you're citing?
20      A.    Any other?
21      Q.    Yeah.
22      A.    Yeah, there is the opinions in this
23  category of -- of impeding misconduct go from one
24  to six.

Page 123

1      Q.    So --
2      A.    In terms of opinions.
3      Q.    So other than what's in this one to
4  six, are there any other impediments?
5      A.    Yes, and these are specific to that
6  issue that I felt were -- were necessary to best
7  make that point, but, as I said earlier, and I
8  want to -- I cannot overstate these five
9  categories are related to one another and
10  reflective of one another and influence one
11  another. They are not solos.
12      Q.    You know the sworn affidavit
13  requirement is based on state law, right?
14      A.    Yes, I've been offered that --
15      Q.    So --
16      A.    -- information and I'm aware of it.
17      Q.    So are you suggesting Chicago should
18  ignore the law?
19      A.    No, I'm suggesting and I'm more than
20  suggesting, I'm recommending, that the City of
21  Chicago get it changed.
22      Q.    Well, you agree that Chicago needs
23  to follow the state law, right?
24      A.    Chicago needs to follow the state

Page 124

1  law. You are correct.
2      Q.    And Chicago didn't create that law,
3  it's a state law, right?
4      A.    I'm sure -- I don't know how much
5  stuff was done to get that law passed and make
6  that requirement -- put that requirement into
7  Illinois -- into the Illinois code. I'm not --
8  but I'm confident having been involved in the
9  legislative process, ergo, 311.11 of the Penal
10  Code how these things can be changed with the
11  right effort.
12      Q.    Well, this is a shooting case,
13  right?
14      A.    Pierre Loury is a shooting case.
15      Q.    And do you agree that officer
16  involved shootings in Chicago they're automatic
17  investigations regardless of an affidavit,
18  correct?
19      A.    There are.
20      Q.    So why would that even matter here?
21      A.    It's -- it matters in terms of the
22  influence, A, of the requirement for the affidavit
23  and how it impairs the identification of malignant
24  officers. I'm going to use the term malignant

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 125

1    officers or officers that are troublesome or have
2    a propensity to be out of policy and it is the
3    first level incidentally as stated by Kolts and as
4    stated by the Christopher Commission Report of an
5    indicator of how you can manage the department and
6    keep more serious problems erupting by monitoring
7    their behaviors that are reflective of their
8    propensity to not follow policy.
9         Q.    Now, do you know of any example of a
10   shooting case in Chicago where there was not an
11   investigation done immediately?
12        MR. ODIM:  Objection.  Form of the
13   question.
14   BY MR. GREEN:
15        Q.    A police shooting case.
16        MR. ODIM:  Still objection to the
17   question.
18   BY THE WITNESS:
19        A.    You're saying immediately.  I don't
20   consider the response in Chicago to the police
21   shootings as anything close to immediate.  There
22   are people that come on scene right away, but
23   whether the investigation can be put in the
24   category of immediate, which incidentally is an

Page 126

1    aspect of competence and clarity and determining
2    exactly what happened.  Immediately --
3    BY MR. GREEN:
4         Q.    Do you have an example --
5         A.    Sorry.  I just want to say this to
6    answer your question.
7              So I would be -- I would argue
8    the point of the term immediate response.
9         Q.    Do you have an example of a
10   shooting -- police shooting in Chicago where there
11   was not an investigation done?
12        A.    I know of no shooting where there
13   was not an investigation.
14        Q.    Now, do you know that the police
15   department and IPRA, now known as COPA,
16   investigate such -- they -- not only do they
17   investigate such shootings, but the Cook County
18   State's Attorney investigates every police
19   involved shooting here?
20        A.    That's what I've been informed.
21        Q.    And do you know that the federal
22   authorities also potentially can investigate a
23   shooting here?
24        A.    Yes.

Page 127

1         Q.    And, in fact, they have done?
2         A.    According to the DOJ report, they
3    have.
4         Q.    So any evidence -- do you have any
5    evidence that a single officer involved shooting
6    has not been investigated because of the affidavit
7    requirement?
8         A.    No.
9         Q.    Or not investigated properly?
10        A.    I would say that my review of this
11   case is it was not investigated properly and it's
12   reflective of the lack of due diligence as cited
13   by the DOJ report.
14        Q.    Do you have any evidence that a
15   single officer involved shooting has not been
16   investigated because of the supposed five-year
17   limitation?
18        A.    No.
19        Q.    Now, you recently gave an identical
20   Monell opinion regarding the Chicago Police
21   Department in your December 11th, 2017, Lane
22   deposition in that case 15 C 1920 for the Monell
23   period 2009 to 2015, correct?
24        A.    Yes.

Page 128

1         Q.    And, in fact, why don't we just mark
2    this as Exhibit 5.  Can you take a look at that,
3    please?
4         MR. ODIM:  While he is looking, I'm
5    going to object to, one, relevance, object to,
6    two, foundation.  I'll object to form on the word
7    identical and an objection based upon the
8    privileged nature of part of this report, meaning
9    subject to the protective order.
10   BY MR. GREEN:
11        Q.    Can you take a look at that.
12        A.    Okay.
13        Q.    Is that a fair and accurate copy of
14   the November 3rd, 2017, opinion you wrote
15   regarding Monell in the Lane case?
16        A.    I don't know if I can answer that.
17   This is a protected document as far as I
18   understand it.
19        Q.    In what way is it protected, are you
20   aware?
21        MR. ODIM:  It uses material subject
22   to the protective order.  Should we talk about
23   this off the record?
24        MR. GREEN:  Yeah, let's go off the

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)            954cbfef-baad-48a4-9690-8c9024c19f87

Page 129

1  record.
2  THE VIDEOGRAPHER: We're going off
3  the video record at 2:09 p.m.
4  (Whereupon, a break was taken
5  after which the following
6  proceedings were had.)
7  THE VIDEOGRAPHER: We are back on
8  the video record at 2:12 p.m.
9  BY MR. GREEN:
10  Q.  All right.  By agreement of the
11  parties, I'm going to withdraw this as an exhibit,
12  but you're familiar with the report you gave in
13  Lane as well, right?
14  A.  Yes.
15  Q.  Okay.  And you had a similar Monell
16  listing of opinions in that case, correct?
17  A.  Yes.
18  Q.  Okay.  That's fine.
19  MR. GREEN: I'll take back 5 just to
20  be cautious.
21  MR. ODIM: Okay.
22  BY MR. GREEN:
23  Q.  In the Lane case, in your analysis
24  of the Chicago Police Department and the City and

Page 130

1  Monell purposes, you looked at the 2009 to 2015
2  time period, correct?
3  A.  Correct.
4  Q.  Is there anything in this first
5  opinion, number one, that has changed in any way,
6  this being the 2010 to 2016 time period in regard
7  to your opinion regarding the City of Chicago in
8  your opinion one?
9  A.  No.
10  Q.  Okay.  Let's go to opinion two.  You
11  say "Chicago has failed to take affirmative steps
12  to end or remove these impediments."
13  Again, what is the factual basis
14  in this report to support the claim that the City
15  hasn't taken affirmative steps to end or remove
16  these impediments?
17  A.  That I saw nothing in any of the
18  material that I reviewed that there have been
19  efforts to do that and that was a criticism in the
20  DOJ report.
21  Q.  And, again, the affidavit
22  requirement that you're citing, again, is a state
23  law, is it not?
24  A.  It is.  As I understand it.

Page 131

1  Q.  And whether the City wanted to or
2  not, it was up to the Illinois General Assembly to
3  decide that?
4  A.  If they wanted to change the law.  I
5  don't know if something could be implemented that
6  would satisfy both the law and the need of the
7  department to track its officers properly.  I
8  don't know about that.  But I would agree it would
9  need -- the best fix would be a correction in
10  the -- from my viewpoint, a correction in the
11  code.
12  Q.  Now, what -- what steps, again,
13  would you say that Chicago should have taken
14  during this time period of 2010 through 2016 --
15  MR. ODIM: Objection.
16  BY MR. GREEN:
17  Q.  -- in regard to this?
18  MR. ODIM: Objection.  Foundation.
19  Improper hypothetical.
20  BY THE WITNESS:
21  A.  Well, it's -- as noted by the DOJ
22  report and other reports, there has been no
23  vigorous, my term, effort to get the law passed
24  that would eliminate this impediment.

Page 132

1  BY MR. GREEN:
2  Q.  So you're talking about lobbying
3  efforts?
4  A.  Well, I -- if you want to discuss
5  how it's done, I'm very familiar with it and, yes,
6  it includes lobbying, it includes the -- there is
7  a legislative process obtaining the sponsor for
8  the bill, the support for it, the public outcry
9  I'll use that term, et cetera.
10  Q.  And what is the basis for saying
11  that the City of Chicago -- Strike that.
12  And what is the basis for saying
13  that the City hasn't investigated police involved
14  shootings within five years when it automatically
15  is investigated?
16  A.  Well, if you want to use --
17  investigation and response I think can be two
18  different terms, but I would agree that the City
19  police department responds to every shooting event
20  by an officer of a civilian.
21  Q.  And, again, you have in opinion two
22  in the Lane case as well, that was for the period
23  2009 through 2015, correct?
24  A.  Well, the Lane -- there is a bit of

33 (Pages 129 to 132)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 133

1    a shift in time period. You're correct with Lane.
2        Q.    That's what I'm trying --
3        A.    There was no -- as far as that --
4    the restriction for the Lane case and the time
5    period was not a factor in the difference in time
6    period for this case.
7        Q.    So you're saying there has been no
8    changes shifting to the 2010 to 2016 time period?
9        A.    Right, nothing that would change my
10   opinion. So, ergo, I think if you're allowed to
11   see the two and compare them, they would be the
12   same.
13       Q.    Now, opinion three, you state "The
14   creation of these impediments and the failure to
15   remove them are the result of deliberate and
16   conscious actions of Chicago and its policymakers
17   despite the clear consequences of allowing police
18   misconduct to go, I assume, go uninvestigated and
19   officer wrongdoers to go without supervision,
20   intervention or discipline."
21            What is the factual basis in
22   this report to support your statement that they
23   create -- that they are failing to remove the
24   creation of these impediments -- Strike that.

Page 134

1            What is the factual basis to
2    support your contention that it was a deliberate
3    and conscious action of Chicago and its
4    policymakers?
5        A.    Because it's such an obvious
6    impediment.
7        Q.    And, again, you're just talking
8    about the affidavits and the five-year
9    requirement, correct?
10       A.    Yes, the heartbeat of that opinion
11   are those two main issues. They clearly impair,
12   and I can be more precise, the administration of a
13   well-ordered department.
14       Q.    You say that -- what is the factual
15   basis for your contention that there are clear
16   consequences in allowing misconduct to go
17   uninvestigated, is that not assuming that it's
18   going uninvestigated?
19       A.    Yes, it's -- it's not an assumption.
20   It's an obvious consequence that any reasonably
21   trained police administrator would know. As an
22   example, citizen comes in, typically from one of
23   the more dynamic parts of the city where police
24   misconduct can -- often occurs and walks in and

Page 135

1    says "One of your officers just beat my son near
2    to death and I want to report it." "Sure. Sign
3    here." "What is this?" "This is an affidavit and
4    if we find anything wrong with what you're saying,
5    you're culpable."
6        Q.    Mr. Clark, isn't this a shooting
7    case where there is an automatic investigation?
8        A.    You asked me a question about the
9    impairment against misconduct and there is a
10   linkage between misconduct and officer involved
11   shootings. Clearly, this is well-known ever since
12   Christopher did his work. So I'll wait for the
13   next -- but I gave you the example. I can
14   continue on with it.
15            Therefore, mother walks out of
16   the precinct having not signed anything. They
17   take any allegation of misconduct from an officer
18   they know is malignant, tear it up, throw it away
19   and he goes on his way for something -- for the
20   next episode. That's what happens and everybody
21   knows it.
22       Q.    What is the factual basis to support
23   that officer wrongdoers go without supervision,
24   intervention or discipline?

Page 136

1        A.    That's well-written about in the
2    literature that I cited in the 48 items of
3    material review.
4        Q.    So other than the DOJ report
5    conclusions, are you also including in there those
6    newspaper articles?
7        A.    And the other five reports as
8    listed, yes. There is a substantial foundation
9    for this conclusion and the observation and the
10   conclusion and the antidotal stories that support
11   it as well.
12       Q.    Now, what are your qualifications to
13   opine on the state of mind of the City or its
14   policymakers?
15       A.    Only what they do. Only what's
16   occurred and only the history of the City.
17       Q.    So you don't know the actual state
18   of mind of the City or its policymakers, do you?
19       A.    I do not know their mentality or
20   their heart, correct.
21       Q.    If all shootings are investigated as
22   in this underlying case, why did these supposed
23   impediments even matter?
24       A.    Because they're reflective of the

34  (Pages 133 to 136)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 137

1    investigation itself and whether the officers know
2    or would expect pursuant to their shootings by
3    their experience in the -- and what's occurred in
4    the past in terms of their other brother officers
5    or sister officers that have been involved in
6    shootings.
7        Q.    In fact, the shooting case involving
8    Laquan McDonald occurred before this particular
9    case, did it not?
10       A.    One year before and that's, I think,
11   very important to note that -- no, McDonald, I
12   think, was even before.  What's important to note
13   is there is the history over the years -- I
14   thought you were talking about another case -- but
15   that I am aware of that this spans over a number
16   of years and with no changes.
17       Q.    But wouldn't the officers in this
18   particular case be well-aware of shooting
19   investigations?
20       A.    Of course they're aware that someone
21   is going to come out and take a look, right.
22   That's it.
23       Q.    And how do you reconcile supposed
24   deliberate and conscious impediments with general

Page 138

1    orders or even state law?
2        A.    Because the general orders require
3    an investigation and the investigation doesn't
4    meet the requirement.
5        Q.    And the City of Chicago also has an
6    independent citizen review authority.  They're now
7    called the independence Civilian Office of Police
8    Accountability, correct?
9        A.    Yes.
10       Q.    What about other large cities like
11   New York or Los Angeles, they don't have full-time
12   civilian investigative bodies, do they?
13       A.    They have policies and procedures,
14   some of which are wanting, and others that are
15   good.  I can give you some examples.
16       Q.    But they don't have an independent
17   review authority like Chicago, do they?
18       A.    The City of Los Angeles has a police
19   commission that serves as an independent authority
20   and New York has a very fine policy established by
21   Bratton when he was the commissioner and it's
22   generally well done.
23       Q.    Again, this opinion three in the
24   Lane case, that covered the period 2009 to 2015,

Page 139

1    has there been anything to change your opinion in
2    this case in regard to the time period here from
3    2010 to 2016?
4        A.    No.
5        Q.    Opinion four.  You say "These
6    failures impede the conduct of complete, fair and
7    unbiased investigations of police misconduct and
8    lead to foreseeable risk of harm to others and are
9    things that a reasonable Chicago policymaker would
10   be aware of."
11          What is the factual basis to
12   support that it impedes the conduct of complete,
13   fair and unbiased investigations, these failures?
14       A.    What occurred here in this case, and
15   I cited them, and I could give you a better
16   example I think in particular to this case and --
17       Q.    I'm sorry.  Is that referring to
18   those first four elements you -- you cited
19   regarding the investigation?
20       A.    No, the entirety of the report.  I
21   know we're going through it step-by-step, but the
22   entirety of the report is reflective to that and
23   so it was never intended for these to be totally
24   standalone statements and the -- there was another

Page 140

1    part -- answer to your question.
2          And the impairments as I already
3    stated and I started to give you an example of the
4    mother who comes in to complain about the beating
5    of her son and they require the affidavit are --
6    are known to be clear impairments to any police
7    administrator and how they ever crept their way
8    into Illinois's law I think is -- is interesting,
9    would be an interesting historical review.
10       Q.    That is the law nonetheless?
11       A.    It is the law and I think as stated
12   by the Department of Justice commentary in their
13   report that there are a number of things that
14   somehow become part of the agreement between the
15   police league and the City, et cetera, that now
16   stand in the way of a -- of a good investigative
17   process in police involved shootings.
18       Q.    And you're -- you're referring to
19   the Collective Bargaining Agreement?
20       A.    Yes, I think that probably -- as
21   stated by the Department of Justice that there are
22   some real problems with that and that that
23   authority or that ability to make a policy needs
24   to be restored back into the City.

35  (Pages 137 to 140)

Electronically signed by Steven Brickey (501-307-281-8473)                                954cbfef-baad-48a4-9690-8c9024c19f87

Page 141

1    Q.    So your opinions in this regard are
2    totally based upon what you read in the DOJ
3    report?
4    A.    The DOJ report and the other -- can
5    we agree that when I say DOJ all of the
6    foundational articles and reports that -- that
7    agree one way or another with the findings that I
8    cited in my report?
9    Q.    Your --
10    A.    The collective --
11    Q.    The 48 items and the DOJ report
12    conclusions?
13    A.    Right, which I think are a very
14    excellent recount of what the problems are.
15    Q.    What is your factual basis as they
16    lead to foreseeable risk of harm to others?
17    A.    Because when a person gets the
18    notion that they can act with impunity, then harm
19    follows. Ergo, the differences between the NORSAT
20    and the SIS unit, the LAPD SIS unit is a good
21    example.
22    Q.    Do you have any training in
23    psychology?
24    A.    I'm the father of ten children.

Page 142

1    So --
2    Q.    Other than that.
3    A.    Nine of them daughters, but, no, I
4    am not a certified psychiatrist.
5    Q.    And what is your factual basis that
6    a reasonable Chicago policymaker would be aware of
7    the risk?
8    A.    Because in the profession there
9    is -- there is an acceptance of some basic
10    standards, administrative standards, I'll say it
11    that way, and there -- they're private
12    organizations as well; the International
13    Association Chiefs of Police, CALEA, the
14    Department of Justice, COPS, PERF, P-E-R-F, all
15    caps. So none of these are in contrast with one
16    another in terms of their agreement in how a
17    well-ordered department is run and that's the
18    foundation for this report and I think the DOJ
19    report.
20    Q.    How does it mean anything if all
21    officer involved shootings, such as this
22    underlying case, are investigated?
23    A.    Because what we're putting our
24    finger on is you can go to the scene of a shooting

Page 143

1    and with a wink and a nod and say "It's okay" or
2    you can really look at it to find out what the
3    truth is and that's entirely different. So I'm
4    not at all critical of going to the scene of a
5    shooting, but that does not excuse the department
6    for its response and its investigative competence.
7    Q.    You're assuming that's how they
8    approach all these investigations?
9    A.    Well, certainly in this case and in
10    the other cases I've had, I saw it as very
11    problematic and not only that I see it as with the
12    reports that we're consistently going back to and
13    very simply stated if I were the
14    detective/commander looking over the photographs
15    of the scene of this shooting, I'd say "Wait a
16    second. There is a bullet hole up here. How the
17    hell did that happen and what have you guys done
18    to recover that slug and how -- and match it to
19    Hitz gun?" And if I hear "Well, we haven't done
20    that yet, sir," "Well, get your hips over there
21    and get that slug." That's what you do.
22    Q.    So that's your understanding of what
23    occurred in this case?
24    A.    That did not occur in this case and

Page 144

1    that's what I'm talking about.
2    Q.    What you explained occurred in this
3    case?
4    A.    As an example. There is far more
5    than that, but this is really one of the obvious
6    ones as discussed by Scott in his report.
7    Q.    So you're basing it on Scott's
8    report basically?
9    A.    No, I saw the photograph myself. I
10    know where that window was. I saw the bullet hole
11    in the window. I saw where the little guy fell.
12    It's -- okay. I'm sorry. I get a little excited
13    here.
14    Q.    Again, in Lane, there was a 2009 to
15    2015 timeframe for this opinion.
16    Has anything changed in this
17    opinion for this particular case in the 2010 to
18    2016 time period?
19    A.    No.
20    Q.    Okay. Opinion five. "These
21    failures and impediments were moving force -- were
22    the moving force behind the death of Loury, in
23    that they created an environment which gave
24    defendant officers had license to operate with

36  (Pages 141 to 144)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 145

1    impunity and without fear of punishment."
2         What is the factual basis for
3    the assertion that the failures here were the
4    moving force?
5         A.   Again, the reports, the DOJ report
6    has this is a consequence of incompetence or
7    looking the other way, another good term, when you
8    go out to the scene of a shooting.
9         Q.   Now, what is your understanding of
10   what the term moving force means?
11        A.   That it is the heartbeat of the
12   issue, that it is the -- that it is the central
13   issue of the issue -- of the discussion at hand
14   and that is -- that's the way I meant it to be.
15        Q.   What's the factual basis for the
16   notion that defendant officers had license to
17   operate without impunity and without fear of
18   punishment?
19        A.   Because that is in the -- in the
20   profession, it's known as an opportunity -- it's
21   known to provide the opportunity for officers to
22   do what they do with a feeling of impunity.  That
23   attitude is cultural.  That's the Monell.  Values,
24   attitudes and beliefs.  I know someone is going to

Page 146

1    come out and look at my shooting, but I know I can
2    say anything I want.  They're not going to
3    question it, they're going to accept it and we'll
4    go on and if I recount a story justifying fear for
5    myself, great bodily harm or death, I'll be
6    justified and no one will question it.
7         Q.   As we mentioned, the Laquan McDonald
8    event happened before this shooting, correct?
9         A.   As I remember it, yes.
10        Q.   So --
11        A.   But I was not involved in that
12   investigation.
13        Q.   Wouldn't the officers had to know --
14   well, you're familiar with that generally, are you
15   not?
16        A.   Yes, I am.
17        Q.   And wouldn't the officers had to
18   know that they would be investigated or could be
19   investigated by the City?
20        A.   You know, that's an interesting -- I
21   would -- that would be a logical conclusion for
22   someone who is not so steeply involved in -- that
23   one -- I can still do what I can do because
24   it's -- nothing has changed even though there is a

Page 147

1    brew ha ha about McDonald.
2         In other words, here's the
3    thing.  Has McDonald did a -- done a change in the
4    department to influence its cultural values, what
5    officers do and how they deport themselves, how
6    they tactically deploy, et cetera, which I talk
7    about here, and I think the answer is no and
8    that's what brings me here for this.
9         Q.   They knew they could be investigated
10   by entities outside the City, did they not?
11        A.   I think they -- I don't know what
12   they know and, as I said, I don't know what their
13   thinking process is.  I only know what they did
14   and it's a very logical conclusion that this
15   attitude of impunity is still a driving force and
16   still at this time was a -- was a part of the
17   cultural values of the department.
18        Q.   So, essentially, they also knew they
19   could be charged with a crime and be sued civilly,
20   no?
21        A.   I'm assuming they would know that.
22        Q.   And also you're presuming within
23   this whole review that this shooting was
24   unjustified in the first place, are you not?

Page 148

1         A.   I'm not assuming anything, no.
2    Remember, I said earlier in the deposition very
3    early on my issue is the Monell, not whether or
4    not there was even a gun there.
5         Q.   Well, if Loury pointed a gun at
6    Officer Hitz, he would be justified in shooting
7    Loury, correct?
8         A.   I think you've already asked me that
9    question at least twice, and now this will be the
10   third time, and I said, yes, if Loury -- if Hitz
11   under the circumstance had a reasonable belief
12   that he was in danger now of being shot by Loury,
13   of course he could defend himself.
14        Q.   And if that's the case, would you
15   agree the City policies would not have been the
16   moving force behind Officer Hitz shooting Loury?
17        A.   Well, the City's written policy is
18   if you are reasonably -- and I talk about sanctity
19   of life, obvious reasonable alternatives, dire
20   circumstances and if Hitz is -- per the policy and
21   the training, if you are in reasonable fear of
22   great bodily harm or death, you can defend
23   yourself.
24        Q.   So is that a yes?

37  (Pages 145 to 148)

L.A. Court Reporters, L.L.C.
312-419-9292

Page 149

1    A.    That would be yes.
2    Q.    And. again. in Lane for this
3    opinion, this was 2000- -- in that case was 2009
4    through 2015, is there anything that would change
5    your opinion for this case that was 2010 to 2016
6    in regard to your opinion five?
7          MR. ODIM: I'm just going to again
8    object on the same basis I objected before. I
9    thought it was withdrawn, but --
10         MR. GREEN: You can have a standing
11   objection.
12         MR. ODIM: Yeah, so the standing
13   objection of, you know, foundation, form, let's
14   see, the privilege issue. Okay.
15   BY THE WITNESS:
16         A.    Nothing has changed.
17   BY MR. GREEN:
18         Q.    Nothing has changed. Okay. Opinion
19   six. "It was reasonable on August 24th, 2014, for
20   defendant officers to believe that no proper
21   investigation of their actions would be instituted
22   and no such investigation would find them culpable
23   of any actions that they might take against Loury
24   including, but not limited to, the use of

Page 150

1    excessive force by shooting and killing him, the
2    failure to intervene to stop the shooting officer
3    from shooting Loury and the subsequent concealment
4    of that misconduct."
5          What is your factual basis for
6    the opinion that it was reasonable on August -- in
7    this particular case for the officers to believe
8    no proper investigation of their actions would be
9    instituted? This was a shooting case, was it not?
10         A.    Okay. So you asked me two things.
11   The last answer is, yes, it was a shooting case
12   and I think I've already answered this in a number
13   of ways that if you have the attitude that you can
14   do anything without being held culpable for it,
15   then you do anything and I said it's reasonable
16   for them to believe that there would be no proper
17   investigation and that is -- that sparks or is the
18   driving force to be willing or doing things that
19   are contrary to the law and policy knowing you
20   will not be held accountable.
21         Q.    So, in essence, these are
22   duplicative opinions here, are they not?
23         A.    Well, I was waiting for that one.
24   They are slight -- as you know, I thought that

Page 151

1    maybe they could all be written in one big
2    paragraph, but they are different to some degree
3    and they're -- therefore, are broken into the six
4    sections, but they are in many ways duplicate one
5    another.
6          Q.    What is your factual basis for the
7    opinion that no such investigation would find them
8    culpable of any actions that they might take?
9          A.    I saw in the -- in this
10   investigation that that is apparent because of the
11   obvious differences in what the physical evidence
12   says occurred and what the officers say occurred.
13   Very significant and obvious and the other is that
14   this also appears in the DOJ, et al opinions.
15         Q.    Regarding this particular case?
16         A.    Not regarding this particular case.
17   Regarding the conduct, the policies and procedures
18   and the cultural issues involving the department
19   itself. But regarding this case in particular,
20   I've already mentioned that they're very
21   significant and obvious physical indicators about
22   the way the shooting really occurred.
23         Q.    All right. So your opinion is based
24   on the notion that Defendant Hitz used excessive

Page 152

1    force?
2          A.    It's based on the fact that the
3    physical evidence belies the statement made by
4    both officers.
5          Q.    So perhaps he didn't use excessive
6    force, is that what you're saying?
7          A.    Well, that's curious. Because if --
8    if he didn't -- the question then becomes if he
9    didn't use excessive force, then why would he tell
10   such a different story? So that's a problem. But
11   what I was addressing was we have this story about
12   what happened only from the surviving officer.
13   Loury is dead. So -- but his body speaks
14   certainly and the trajectory of those slugs
15   speaks.
16         Q.    In your opinion, it's based on the
17   notion that Defendant Riordan failed to intervene
18   in this case?
19         A.    He was not present when the shots
20   were fired and that's not what the paragraph says.
21         Q.    It says "The failure to intervene to
22   stop the shooting officer from shooting Loury."
23         A.    Well, that's related to Riordan
24   saying "Get the hell back here. Don't go after

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 153

1    him. Stay with me."
2         Q.   Oh, so that's what you're saying
3    upfront?
4         A.   Yes.
5         Q.   What do you mean by the subsequent
6    concealment of the misconduct? What is the
7    factual basis for that comment?
8         A.   There is no comment about the
9    obvious misconduct.
10        Q.   Your last phrase is the subsequent
11   concealment of misconduct.
12        A.   Right.
13        Q.   That's referring I believe to
14   Defendant Riordan.
15             MR. ODIM: Objection. Foundation
16   and form.
17   BY MR. GREEN:
18        Q.   I'm just asking about your own
19   opinions here.
20        A.   Right. Yeah, the example I cited --
21   that's why I put in the policy tell the truth,
22   make truthful statements.
23        Q.   All right. So, again, in the Lane
24   case was from 2009 to 2015. Is there anything to

Page 154

1    change your opinion in this regard for this
2    particular case from 2010 to 2016?
3         A.   No.
4         Q.   Okay. The second category you have
5    is "Failure to investigate." Opinions seven
6    through 11. Opinion seven "Chicago had a de facto
7    policy or widespread custom or practice of failing
8    to investigate allegations of police misconduct
9    including the use of excessive force by
10   discharging guns at fleeing civilians."
11             Mr. Clark, what is the factual
12   basis for the opinion that Chicago had a de facto
13   policy, a widespread custom or practice in this
14   regard?
15        A.   Okay. So you'll notice there is
16   a -- there is -- the first piece is impairing or
17   impeding the investigation of his conduct and now
18   this centers down to the failure to investigate
19   itself and you'll see that the paragraphs mirror
20   one another because they are linked to one another
21   and --
22        Q.   Are you saying about opinion seven
23   through 11 --
24        A.   Yes.

Page 155

1         Q.   -- that they would be somehow
2    duplicative in nature?
3         A.   Not somehow. That they're directly
4    duplicative of one another.
5         Q.   So would it be fair to say you
6    essentially have five opinions here, but there are
7    subsections of those opinions?
8         A.   Yes. Yeah, I think that's fair.
9         Q.   Okay.
10        A.   That was the intent and I realize
11   you got to be very precise. So we worked on this.
12        Q.   Okay.
13        A.   Okay. I'll wait.
14        Q.   Let's go to that opinion seven. So
15   what is the factual basis for your opinion that
16   there is a de facto policy in this regard for
17   failure to investigate?
18        A.   Well, again, that was a finding of
19   the DOJ, et al, and also apparent in the facts of
20   the shooting of Loury.
21        Q.   Now, can you name every case that
22   you're familiar with since 2010 in this time
23   period that Chicago failed to investigate officer
24   involved shootings?

Page 156

1              MR. ODIM: Objection. Form.
2    BY THE WITNESS:
3         A.   Well, I think you asked me the
4    question. The issue is how they -- if you use the
5    term investigate in terms of responding to and
6    showing up and taking over and assuming the
7    responsibility for it, that's part of an
8    investigation and they do that.
9    BY MR. GREEN:
10        Q.   So, essentially, you admit that they
11   are investigating the shootings, you just have
12   some comments on how they investigate the
13   shootings?
14        A.   Well --
15             MR. ODIM: Objection. Form.
16   BY THE WITNESS:
17        A.   The semantics and you're right. If
18   we simply -- I'm clearly acknowledging the reality
19   that Chicago Police first respond, they take the
20   first handle, then it goes to IPRA for another
21   review, et cetera. The issue is when I say
22   failing to investigate, I'm talking about the
23   process itself, the looking the other way issues,
24   et cetera, as I have given you examples for.

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 157

BY MR. GREEN:

Q. So your basis for saying those investigations were improper or inadequate, or at least in this particular instance is what you cited in the beginning of your report, regarding the inconsistencies that you believe occurred?

A. Yes, and there are more, but I wanted to be succinct in some regard, but also be illustrative of the issue, but there are a lot of deficiencies in the investigation.

Q. And other than the ones that you cited in the front and that you've testified to so far, what else was wrong with the investigation?

A. Well, IPRA has -- well, there are some things in the 28-page -- I think it's like 28-page IPRA report, but let me give you a couple that come to mind. Scott cites some. Let's talk about the gun scene -- found at the scene. The fact that it didn't go through ATF, that the analysis -- raising the serial number didn't occur although it was apparently filed down, there is ways to get that up. The DNA sample taken I think it was from the gun or the clip -- clip, no DNA sample was taken from the officers to see if

Page 158

they -- if it belonged to some of them. I don't consider the workup on the car that fled the scene at all adequate. These are very, very obvious in my opinion. The trajectory analysis at the scene at the time. The preservation of the scene including locating the slug that missed and where it went and recovering it and then bringing it back, making it clear it came from -- from the officer's gun I can -- I can -- if you give me a few more minutes I can think of -- those are examples. I didn't talk about them in my report, but those are things that come up very obviously to a -- to a situation.

Q. And you never went to detective school, did you?

A. No, I did go to -- I ran a detective unit and we were pretty good at it.

Q. And what's your -- what are you saying that -- your basis for saying the investigations you have named are part of a widespread practice?

A. Because that's the finding of the DOJ based on my look at the cases I've had, I find that also to be true. So I embrace that.

Page 159

Q. And when you say the cases you've had, you're talking about that list we'll get of the cases -- the Monell cases that you've reviewed --

A. Right.

Q. -- from the Chicago Police Department in your experience as an expert witness?

A. Yes.

Q. And, again, in Lane, for this opinion it was 2009 to 2015, anything change your opinion in this case for the 2010 to 2016 period?

A. No.

Q. Okay. Opinion eight. "The Chicago Police Department failed to take any affirmative steps ending their de facto policy of failing to properly investigate allegations of police misconduct including the use of excessive force by discharging guns at fleeing civilians."

What is the factual basis for this opinion? Is it merely redundant of the previous one?

A. Well, it's fairly redundant, but it's a little bit of a difference.

Page 160

Q. What is the difference?

A. This has to do with the actions that you would expect Chicago to take which would have been at some level certainly if the quality of this investigation has been turned over to a police administrator, then there would be something close to this is really bad, you guys don't ever do -- and don't you ever do this again and that would change considerably the police response -- or the department's response to this type of an event.

Q. Are you saying that the City did not commission various reports from 2010 to 2016 seeking to improve how it investigates allegations of police misconduct?

A. Clearly there -- there is a -- I think there is a City report I cited. The Police Accountability Task Force Report, which is in April 2016.

Q. So wouldn't that be reflective of an effort to improve in this area?

A. Yeah, it's reflective whether -- here is the issue and I think --

Q. Would you not call it an affirmative

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)

954cbfef-baad-48a4-9690-8c9024c19f87

Page 161

1    step?
2        A.    Yeah.  But, see, we're talking about
3    something that's more deeply embedded than just
4    punching out another report.  There is a plethora
5    of reports.  That's why I considered you have a
6    very well-documented Monell just on the basis of
7    the reports and so you punch out a report and
8    nothing gets done.  That's the issue here.
9        Q.    Well, are you saying that the
10   recommendations contained in these reports don't
11   constitute affirmative steps?
12       A.    Well, they do constitute an
13   acknowledgement.  I guess that's affirmative.  You
14   have to know what the problems are before you can
15   take care of them, but they knew what the problems
16   were long ago, long before 2016.
17       Q.    Now, again, in the Lane case was
18   2005 to 2015, I'm sorry, 2009 to 2015.  Anything
19   to change your opinion eight here in this case
20   from 2010 through 2016?
21       A.    No.
22       Q.    Okay.  Opinion nine.  "The failure
23   to properly investigate complaints about officer
24   misconduct are the result of the deliberate and

Page 162

1    conscious actions of Chicago and its policymakers
2    despite the clear consequences of allowing police
3    misconduct to go uninvestigated and officer
4    wrongdoers to go without supervision, intervention
5    or discipline."
6              Again, what's the factual basis
7    for failure to properly investigate complaints
8    about officer misconduct?  Is it what you
9    testified to in the last two previous sub opinions
10   here?
11       A.    Yes, but this one is directed to the
12   policymakers --
13       Q.    And how is that different?
14       A.    -- and the police administration.
15       Q.    And what is your factual basis to
16   say that they failed to properly investigate?
17       A.    Because they -- A, what happened
18   here in this instance and the report, that had to
19   go through the chain of command for some sort of
20   approval and recognition which are blatantly
21   deficient and, therefore, I consider the chain of
22   command to be culpable for their failure to see
23   what was obvious in terms of the report itself
24   regarding this specific incident and this is

Page 163

1    clearly part of the problem as identified by the
2    DOJ, et al.
3        Q.    What is the factual basis for you
4    saying that the policymakers were deliberate --
5    there were conscious actions of Chicago and its
6    policymakers to not act in that way?
7        A.    Because there is no affirmative
8    document in the entirety of the review of this
9    material regarding Loury's shooting death.  It
10   says "Did this wrong.  Failed to investigate
11   properly.  You're fired or you're being
12   transferred.  I'm going to get somebody who knows
13   how to do this right," et cetera, and that is the
14   responsibility of the department, the chain of
15   command.
16       Q.    So you're assuming, again, that
17   there was an unjustified shooting in this case?
18       A.    I don't know how many times -- I
19   think we're probably in a dozen area.  I'm here to
20   talk -- I'm not talking about the justified
21   shooting.  I'm here to talk about the obvious
22   deficiencies that I think are linked to -- could
23   be linked to an unjustified shooting, but
24   certainly express the Monell aspects of the

Page 164

1    department, its values, its attitudes and beliefs.
2        Q.    So you're inferring -- you're
3    inferring the deliberateness or consciousness of
4    the actions of the policymakers?
5        A.    I don't know how else you can
6    identify such a thing, only what happens and what
7    has happened repeatedly that there would be a
8    responsibility when it happens over and over and
9    over again.
10       Q.    Well, again, this opinion nine in
11   Lane it was from 2009 to 2015, do you have
12   anything to change your opinion for this period
13   2010 through 2016?
14       A.    No.
15       Q.    Okay.  Opinion ten.  "The deliberate
16   and conscious decision to maintain an
17   ineffectively flawed system by which to
18   investigate police misconduct was the driving
19   force behind the death of Loury."
20             Again, what factual basis do you
21   have for the deliberate and conscious decision to
22   maintain this ineffective and flawed system, is it
23   the same as to what you've referred to in opinion
24   nine?

41 (Pages 161 to 164)

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 165

1    A.   Yes.
2    Q.   And the same for the ineffective and
3  flawed system?
4    A.   Right.  Because the investigators
5  operate within the system.
6    Q.   And what, again, is the factual
7  basis for the driving force behind the death of
8  Loury that this would be?
9    A.   Well, one of the things that comes
10  to mind to answer your question is what you posed
11  to me earlier.  You asked me am I saying that --
12  that Hit or -- excuse me -- Hines, H-I-T-Z --
13    Q.   Hitz.
14    A.   -- did not shoot Loury in defense of
15  his life?  Well, I offer to you if he was doing
16  that, why didn't he just say it in the -- the
17  physical evidence belies what he said -- how he
18  says it occurred.  So if you -- if you have a
19  system them embraces what the officer says without
20  question, and in particular when the physical
21  evidence is so obvious, then you have a driving
22  force for misconduct and the answer is yes.
23    Q.   And if Loury did point a gun at
24  Officer Hitz, none of this would apply, correct,

Page 166

1  and if he was in fear of his life?
2    MR. ODIM:  Objection.  Foundation,
3  improper hypothetical and argumentative.
4  BY THE WITNESS:
5    A.   You know, the -- the IPRA report
6  itself says the mere fact that if Loury had a gun
7  and the mere fact of having a gun does not justify
8  shooting him.  It has to be more than that.  There
9  has to be --
10  BY MR. GREEN:
11    Q.   I said pointing a gun.
12    A.   -- a set of facts.
13    Q.   I said pointing a gun.
14    A.   Pardon me?
15    Q.   I said pointing a gun at him.
16    A.   If he was pointing a gun in such a
17  manner that it was objectively reasonable that
18  this was a threat of great bodily injury or death,
19  as I said before, then Hitz could shoot him.
20    Q.   Just like it happened in your own
21  personal situation?
22    MR. ODIM:  Objection.  Foundation.
23  relevance and form.
24

Page 167

1  BY THE WITNESS:
2    A.   To that degree, you are correct.
3  BY MR. GREEN:
4    Q.   Opinion 11.  While it is outside my
5  purview to assess credibility of parties, it is
6  easy to see why defendant officers may feel it is
7  to their benefit to simply deny plaintiff's
8  allegations and take their chances with the flawed
9  investigative and disciplinary process to sort out
10  truth."  Aren't you assessing the credibility of
11  the parties with this opinion?
12    A.   Well, I think that's exactly
13  contrary to what I said in the first line of that.
14    Q.   Despite of putting that clause in
15  there, is this not a credibility assessment of
16  whether they're telling the truth or not?
17    A.   I'm linking as a last opinion in
18  this segment the -- what the consequences would
19  be.  It's easy to see what this consequence would
20  be.  And I'm -- I clearly wanted, and I did put in
21  there, that I'm not making a credibility
22  statement, but there are consequences to this type
23  of a system.
24    Q.   So you're not assuming that the

Page 168

1  officers are lying?
2    A.   I never assumed for the opinions the
3  officers are lying.  That's up to the jury to
4  determine as I have stated in the second paragraph
5  of my -- the first page.
6    Q.   Going to your third main opinion.
7  Failure to discipline.
8    A.   I'd like to take a break.
9    Q.   How about we take a break here.
10    THE VIDEOGRAPHER:  We are going off
11  the video record at 3:01 p.m. and this is the end
12  of video media three.
13    (Whereupon, a break was taken
14    after which the following
15    proceedings were had.)
16    THE VIDEOGRAPHER:  We are back on
17  the video record at 3:08 p.m. and this is the
18  beginning of media unit four.
19  BY MR. GREEN:
20    Q.   All right.  Mr. Clark, you
21  previously talked about the sanctity of life and
22  how it is to be used in that people are trained in
23  it when deciding when to discharge a firearm or
24  not, is that correct?

42  (Pages 165 to 168)

L.A. Court Reporters, L.L.C.
312-419-9292

Page 169

1    A.    Yes.
2         MR. ODIM:  Object -- objection to
3    form.
4    BY MR. GREEN:
5         Q.    Where is this training for sanctity
6    of life, in what curriculum is it?
7         A.    Well, it's -- it's embedded in the
8    California POST and most of the POSTS I've seen.
9    Nevada comes to mind, Arizona, Utah, but I cannot
10   cite you a -- Texas -- the sections on the use of
11   lethal force by a police officer, but I can
12   cite -- I cannot cite that to you in the Illinois
13   POST right now.
14        Q.    And would that sanctity of life
15   analysis also include the sanctity of life of a
16   person who is a law enforcement officer who is
17   placed in fear of their own life?
18        A.    Of course.
19        Q.    So let's move onto the failure to
20   discipline general opinion -- opinions 12 through
21   17.  Opinion 12 you state "The City of Chicago had
22   a taped -- de facto policy or widespread custom or
23   practice of failing to effectively discipline
24   police misconduct including in the use of

Page 170

1    excessive force by discharging guns at fleeing
2    civilians" and what is the factual basis for this
3    opinion that it's a widespread custom or practice
4    of failing to discipline or effectively
5    discipline?
6         A.    Right.  It's connected to the first
7    conduct on the impeding of the investigations of
8    misconduct, the failure to investigate the
9    misconduct and now this section is -- and these
10   opinions 12 through 19 comment on the failure to
11   discipline and, as I said earlier, if you do
12   not -- you know what a true discipline implies and
13   what a -- the results of the failure to discipline
14   adequately or correctly is tantamount to no
15   discipline whatsoever.  So -- and I considered
16   that the discipline that as cited in the DOJ, et
17   al, and in this case was reflective of that.
18        Q.    So --
19        A.    Mostly the DOJ report is reflective
20   of the failure to discipline.
21        Q.    So you're assuming that there were
22   out-of-policy actions in regard to excessive force
23   that were not disciplined?
24        A.    Well, no, not -- that's not the

Page 171

1    right way to say it.  The failure to discipline
2    generates violations of policy clearly.
3         Q.    So this, again, just assumes that
4    there was an effective -- ineffective
5    investigations will create -- Strike that.
6         A.    I thought we were talking about
7    discipline here, not investigations.
8         Q.    Well, you cited it earlier in
9    referring back to your previous opinions that
10   somehow it's your -- in this -- this is assuming
11   that once there has been a violation that it's not
12   being disciplined, correct?
13        A.    Right.
14        Q.    And what is the basis for that other
15   than your general referral to the conclusions of
16   the DOJ report?
17        MR. ODIM:  Objection.  Foundation.
18   Misstates his testimony.
19   BY THE WITNESS:
20        A.    The conclusions for this report come
21   from the DOJ and not from the incident because I
22   don't know how much discipline had ever been
23   applied to either officer.
24

Page 172

1    BY MR. GREEN:
2         Q.    And do you have any other examples
3    of where police misconduct was not disciplined?
4         A.    Other examples?
5         Q.    Individual examples.
6         A.    Well, the reports cite them and I
7    agree with them.  That's what -- why I put this
8    here.
9         Q.    And the reports you're saying are
10   the ones you listed in your 48 things in the -- 48
11   references in the beginning of your report?
12        A.    Right, plus my experience as a
13   police administrator.
14        Q.    And -- but for the Chicago Police
15   Department the prior cases you've been involved
16   in?
17        A.    Right.
18        Q.    Now, again, the Lane case was 2009
19   through 2015.  Anything to change your opinion in
20   this regard for the 2010 to 2016 period?
21        A.    No.
22        Q.    Okay.  Opinion 13.  "The low
23   percentage of complaints which result in a
24   sustained finding, the absence of any meaningful

43 (Pages 169 to 172)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 173

1    disciplinary action, the frequency in which
2    discipline is lowered or reversed and the absence
3    of any real consequence for wrongdoing caused the
4    defendant officers in this case to have every
5    reason to believe before they were involved in the
6    incident on April 11th, 2016, resulting in the
7    death of Loury that they would never be
8    effectively investigated or meaningfully
9    disciplined for any misconduct towards Loury,"
10   what is the factual basis in your report for this
11   allegation or opinion?
12      A.   Well, the low number of sustained is
13   one of the items listed and we talked about that
14   in terms of --
15      Q.   And that's in the DOJ conclusion?
16      A.   Twenty-eight -- item 28. And then
17   the DOJ and this is a well-known consequence of --
18   of failure to discipline or sustain misconduct and
19   this paragraph links those two things into could
20   this or would it be a factored influence, the
21   shooting, and the answer is, yes, that's the way
22   it was intended to be written.
23      Q.   Now, other than the conclusions in
24   the DOJ report that you cite and that other report

Page 174

1    that you mentioned on number 28, what other
2    records did you review to reach such a conclusion?
3      A.   Records?
4      Q.   Yeah, any records.
5      MR. ODIM:  Well, objection to form
6    again.
7      MR. GREEN:  All right.
8    BY MR. GREEN:
9      Q.   What materials or records did you
10   review other than the conclusions of the DOJ and
11   that one report?
12      MR. ODIM:  Again, objection. That
13   misstates his testimony.
14   BY THE WITNESS:
15      A.   This opinion 13 comes from the items
16   I listed in the report. I can go out of that, the
17   confines of those I think 48 to say this is
18   well-known in the profession and there has been a
19   lot written about it, but I can't -- I use this as
20   a basis for this paragraph, those items listed in
21   the 48.
22   BY MR. GREEN:
23      Q.   What was the percentage rate of
24   sustained during this relevant Monell period of

Page 175

1    2010 to 2016?
2      A.   I think it was something like three
3    or four percent.
4      Q.   And what should the percentage rate
5    be for a sustained rate?
6      A.   That's interesting because it would
7    be -- you'd have to factor in having the
8    complaints, the flow of complaints on impaired.
9    Having said that, I -- my understanding is
10   something around eight -- at least eight to ten
11   percent are typical in the nationally.
12      Q.   You're saying that that's a national
13   standard, eight percent?
14      A.   As I remember the literature in that
15   regard.
16      Q.   Now, does that include cities over
17   500,000?
18      A.   I don't think it includes -- there
19   is any differences in any kinds of complaints
20   regardless of the size of the city, although there
21   is probably some, but Chicago is a large
22   department and I think eight percent would be low
23   in terms of sustained.
24      Q.   What agency adheres to that standard

Page 176

1    of three percent or, I'm sorry, eight percent?
2      A.   I don't think that any agency sets a
3    bright line at eight percent, but the issue as
4    identified by the studies typically in particular
5    starting with the Christopher Commission, et
6    cetera. is that the officers generating the
7    complaints have to be attended to, have to be paid
8    attention to.
9      Q.   Going back to this standard you say
10   of eight percent, where is it published, where can
11   I find it?
12      A.   I can't remember where I read it. I
13   think it's in -- it's a DOJ study, but four out of
14   a hundred is very low and I think Futterman
15   comments on that in his study.
16      Q.   Futterman or Fudderman?
17      A.   Futterman.
18      Q.   So are you differentiating at all
19   between the different systems across the country
20   in making that analysis?
21      A.   I'm not -- as you know, I don't -- I
22   don't cite a number here at all. I'm talking
23   about in paragraph 13 that there is a low
24   clearance rate or finding very low and there are a

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 177

1  number of impairments even before you get to this
2  point.
3      Q.  So just to say --
4      A.  Let me --
5      Q.  -- it's low is based on what?
6      A.  The numbers themselves as in the
7  material I've listed.
8      Q.  Would you agree it's impossible to
9  determine with a case by case analysis which
10  outcomes are acceptable in the way of a percentage
11  rate of sustained cases?
12          MR. ODIM:  Objection.  Foundation
13  and objection to form.
14  BY THE WITNESS:
15      A.  I think pegging a number, specific
16  number, would require a specific study which I've
17  not seen.  That's the best way I can answer it.
18  Certainly four out of a hundred is very low.
19  BY MR. GREEN:
20      Q.  Do you know what causes the
21  discipline to be lowered or reversed?
22          MR. ODIM:  Objection.  Foundation.
23  Form.
24

Page 178

1  BY THE WITNESS:
2      A.  I don't know what you mean.  I don't
3  understand your question.
4  BY MR. GREEN:
5      Q.  Well, when you're referring in this
6  "The frequency in which discipline is lowered or
7  reversed," you're saying is not appropriate here,
8  what do you use to determine that?
9      A.  That's a finding specifically out of
10  the DOJ report.
11      Q.  And --
12      A.  And that speaks to if the
13  investigator understands going in that if I leave
14  enough room, there can be an appeal and reversal,
15  they can overcome this and I've still on paper
16  done an investigation so that the claim of an
17  investigation can be done -- I mean, can be made.
18  That's what that refers to.  And a competent
19  investigation nails down all the aspects of what
20  occurred so that there is little or no room for an
21  appeal should -- should that occur and there would
22  be a just finding by the chain of command for
23  proper discipline.
24      Q.  And who makes the disciplinary

Page 179

1  decisions in the Chicago Police Department?
2      A.  The chain of command and I
3  understand -- it depends on the level of
4  punishment.  I'll use that term.  We can go up to
5  the chief of police.
6      Q.  And do they consider recommendations
7  made by the superintendent?
8      A.  Of course.
9      Q.  And they consider the existence of
10  an Independent Police Review Authority in this
11  process, too?
12      A.  I hope so.
13      Q.  You put this in the context of the
14  officers in this case saying "Because of the low
15  sustained rate and the reversal and the lowering
16  of it, that this caused them to believe they would
17  never be effectively investigated or meaningfully
18  disciplined for any misconduct towards Loury,"
19  what is the factual basis in your report for this
20  causation element?
21      A.  Well, we discussed that quite a bit
22  already in the deposition.  The propensity of
23  persons in every profession without accountability
24  to act with impunity and it's legendary.

Page 180

1      Q.  And so you can't really say what's
2  in an officer's head, do you?
3      A.  Well, I don't attempt to do that
4  other than another way of saying it is a jury
5  reviewing the facts would reasonably make this
6  conclusion.  They would determine the facts, but I
7  did not climb into either one of the officer's
8  heads.  I didn't try to.
9      Q.  So saying that it caused it would be
10  just speculation on your part?
11      A.  No.  There's, again, going back to
12  the intent of this report is the Monell.  This is
13  the ocean that these two officers swim in and
14  they're influenced by it, the currents, the tides,
15  everything that is going on, the turbulence and
16  this is what I'm trying to say.  I'm using this as
17  a metaphor.  I'm talking about the ocean, not the
18  officers in particular.
19      Q.  In Lane, this was 2009 to 2015, the
20  timeframe for this opinion.  For purposes of this
21  case from 2010 to 2016, have you changed this
22  opinion in any way?
23      A.  No.
24      Q.  Okay.  Opinion 14.  "Failures in the

45 (Pages 177 to 180)

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 181

1  process of disciplining officers who engage in
2  misconduct are the result of the deliberate and
3  conscious actions of Chicago and its policymakers
4  despite the clear consequences of allowing a
5  finding of police misconduct to be subject to the
6  fair, consistent and meaningful application of
7  discipline in order that wrongdoers were not left
8  with the belief that their bad behavior would
9  effectively go unpunished," is this essentially a
10 redundant opinion from the prior two opinions?
11     A.   Yes.
12     Q.   And you have the same factual basis
13 for it as you testified to in the prior two
14 opinions?
15     A.   Yes.
16     Q.   And what do you mean by the phrase
17 "meaningful application of discipline"?
18     A.   Well, we've talked about it for a
19 number of hours that there would be -- if the
20 officers or any employee understands they're
21 responsible for what they do, then it certainly --
22 and I think it's very logical would influence what
23 they do if they're responsible for it.  If they're
24 not responsible, if they can go out, and in

Page 182

1  particular an officer with a badge and a gun, and
2  the opportunity to operate with no accountability,
3  that's a very dangerous situation.
4          The -- the statement I find it
5  in most POST's, I don't know if it's in Illinois,
6  officers are given two unique powers.  This is the
7  police powers statement.  They have to -- in
8  Illinois, like all officers in the world -- in the
9  country, have to be certified.  The power of
10 arrest, the power to use lethal force.  The
11 authority does not come from an authoritarian
12 dictator, but from the will and the consent of the
13 people who require them to use these powers with
14 the utmost care and restraint.  That's the
15 professional standard.
16          Now, if there is no requirement
17 for the utmost care and restraint, then you fall
18 into this dark area of police misconduct,
19 unaccountability and the consequences.
20     Q.   As you stated earlier, the City of
21 Chicago policies and procedures are sufficiently
22 reasonable based on Illinois POST's, correct?
23     A.   The training and certainly that's
24 one of the statements by Williams.  The training

Page 183

1  given at the academy complies with the POST
2  standard and the POST standard in Illinois is the
3  national standard.
4      Q.   Opinion 14 -- well, in Lane, for the
5  opinion it was 2009 to 2015.  Is there anything in
6  this case from 2010 to 2016 that would change this
7  opinion 14?
8      A.   No.
9      Q.   Okay.  Opinion 15.  "At the time of
10 this incident, the City had failed to make any --
11 or to take any meaningful steps to curb or
12 otherwise correct these failures in the
13 disciplinary process," what is the basis of your
14 opinion that they have done nothing to correct or
15 perceive failures in the disciplinary process?
16     A.   It said at the time of the incident,
17 we can't forget that, and that's clearly
18 documented with the DOJ report which was the
19 beginning of 2017.  So that's their finding and
20 it's based on all the other documents as well.
21     Q.   The Police Accountability Task Force
22 Report was underway during -- prior to this
23 incident, was it not?
24     A.   It was.

Page 184

1      Q.   And so you do not consider that a
2  step in trying to improve the disciplinary
3  process?
4      A.   Well, if it's -- if it was done with
5  the intent to make the change, implement the
6  changes, I would agree, but clearly the admission
7  then is reflective of what was going on when Loury
8  was shot.
9      Q.   What do you consider a meaningful
10 step?
11     A.   Oh, goodness.  First, that there
12 would be a -- acceptable and professionally solid
13 investigative process for officer involved
14 shootings, that there would be the implementation
15 of -- this is not difficult by the way.  I mean,
16 this is well-established in the profession, that
17 there would be a meaningful system put in place
18 called EWS that would monitor all misconduct --
19 all conduct and all uses of force and put in --
20 and the system would notify supervisors and
21 commanders and the chain of command of any --
22 of -- flag any bumps in the road and identify
23 individuals that need special attention, which
24 would include retraining, discipline.

46  (Pages 181 to 184)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 185

1   reassignment, those things, the fixes.
2       Q.   Where --
3       A.   There would be a -- there would be a
4   vigorous system embedded in the department to turn
5   the ship into a better direction and that -- that
6   was part of my training in the Command College how
7   you move values, attitudes and beliefs.  This is
8   supposed to be -- and embed the department with
9   those values that would be reflective of what is
10  going on in the department and then see the
11  benefits to the community that would occur.
12      Q.   Where have they been implemented,
13  this EWS?
14      A.   Pardon me?
15      Q.   The procedures, EWS, where else have
16  they been implemented?  What other departments?
17      A.   Oh, you can buy them off the shelf.
18  You can buy these systems off the shelf now
19  they're so common and the literature is
20  voluminous, but -- and there are some departments
21  that have certain levels of -- that when, say,
22  I'll use an example a taser, when a taser is used
23  that it goes into the EWS on that officer and if
24  it is reflective to an overuse of the taser that

Page 186

1   that automatically comes out of the system and
2   goes to the supervisor.
3       Q.   Well, you're familiar with --
4       A.   And that the yearly fitness reports
5   always has the results of the EWS and that there
6   is a yearly fitness report and the yearly fitness
7   report comments on the various aspects of the
8   profession that are expected.  Okay.  I'll wait
9   for the question.
10      Q.   Are you familiar with IPRA's review
11  of other conduct of officers and their
12  disciplinary review?
13      A.   Not -- the only IPRA report I read
14  regarding this case cited is the shooting.  Are
15  you talking about another IPRA report?
16      Q.   So you're not familiar with what
17  IPRA does in reviewing people's past conduct or
18  officer's past conduct?
19      A.   I'm -- I'm aware that IPRA does
20  reviews, but I don't consider it -- I consider it
21  part of the problem, not part of the solution.
22      Q.   Are you familiar with the Chicago
23  Police Department's performance evaluations or
24  non-disciplinary intervention programs or any

Page 187

1   other programs they have in regard to the type of
2   conduct you just mentioned in the EWS?
3       A.   Only as it's reflected in the
4   reports that I cited in the -- and that's clearly
5   deficient as identified by the DOJ report.
6       Q.   So, again, you're relying just on
7   the DOJ report conclusions and its backup for it?
8       A.   Can we agree the DOJ, et al, the
9   other reports that support it, there is nothing
10  contrary in the other reports that are found in
11  the DOJ report?
12      Q.   All right.  And, again, the Lane was
13  2009 to 2015.  Anything to change your opinion for
14  2010 to 2016 in regard to opinion 15?
15      A.   No.
16      Q.   Okay.  Opinion 16.  "The failure of
17  Chicago to maintain an effective disciplinary
18  system which prevented police misconduct and
19  protected against a culture that gives officers
20  the belief that their bad behavior would
21  effectively go unpunished amounted to a de facto
22  policy of failing to supervise officers, including
23  the proper use of force when confronted with the
24  decision to discharge a firearm against a

Page 188

1   civilian."
2            Again, is this redundant
3   essentially of the last three opinions in regard
4   to failure to discipline?
5       A.   I would agree and it's also my
6   commentary such as it was just a minute ago also
7   reflects on this opinion.
8       Q.   Is there any distinctions in this
9   particular opinion as opposed to the other three,
10  the last three?
11      A.   The distinction is this is specific
12  to the failure to maintain the system, the
13  effective system.  It probably could be written in
14  the same paragraph of 15.
15      Q.   Again, Lane was 2009 to 2015, this
16  one is 2011 (sic) to 2016.  Anything to change
17  your opinion 16 between the two time periods?
18      A.   No.
19      Q.   Opinion 17.  "These de facto
20  policies of a failure to discipline and supervise
21  were the moving force behind each of Loury's
22  death -- or Loury's death."  Pardon me.
23           What's the factual basis for
24  this conclusion that this was the moving force

47 (Pages 185 to 188)

Electronically signed by Steven Brickey (501-307-281-8473)        954cbfef-baad-48a4-9690-8c9024c19f87

Page 189

1    behind his death?
2         A.   Nothing other than what I've said
3    and I would agree that it is -- it should be -- it
4    could be written better in terms of it appears to
5    be one of the moving forces, not the total moving
6    force.
7         Q.   And, again, this is all contingent
8    on the use of force in this particular case by
9    Officer Hitz actually being excessive in nature?
10        MR. ODIM:  Objection.  Misstates his
11   testimony and form.
12   BY THE WITNESS:
13        A.   So --
14   BY MR. GREEN:
15        Q.   Being a constitutional violation.
16        A.   Whether or not Loury was
17   unconstitutionally shot to death, I would agree,
18   but the report is based on the circumstances of
19   the department.
20        Q.   Again, 2009 to 2015 was the Lane
21   period.  For the purposes of opinion 17, is there
22   any changes for opinion 17 in -- for this time
23   period 2010 to 2016?
24        A.   No.

Page 190

1         Q.   Okay.  Opinion 18.  "Chicago had a
2    de facto policy or widespread custom of sustaining
3    and disciplining officers less often for
4    misconduct against African-American civilians."
5    Now, what is the factual basis in your report for
6    this claim?
7         A.   That's in the DOJ report as well as
8    there are other reports as well regarding the
9    racial bias that occurs.
10        Q.   And what are the actual statistics
11   for your opinion on this?
12        A.   I can't cite them as I sit here
13   other -- without going into the report, but there
14   is a clear disproportionate number vis-a-vi
15   African-Americans and use of force and arrests, et
16   cetera.
17        Q.   And what did you review to reach
18   this conclusion other than the DOJ's report's
19   general conclusions and the other materials cited?
20        A.   Nothing else.
21        Q.   And are you aware of any variables
22   that were taken into account in their analyses?
23        A.   Such as?  I don't know what you
24   mean.

Page 191

1         Q.   In doing their statistical analysis.
2         A.   You mean variables in terms of?
3         Q.   Of how it was done.
4         A.   I still don't know what you mean
5    other than this was -- their ethnic status, are we
6    talking about --
7         Q.   So you're not -- you're not familiar
8    with what their methodology was in how they came
9    up with their statistics?
10        A.   How they sorted it out in order to
11   justify or to explain the differences other than
12   by race, no, I'm not.  Only that it does exist and
13   that if you crunch the numbers by race it clearly
14   leans into the African-American population and
15   it's wrong.
16        Q.   And you don't know what safeguards
17   they used in their analyses to make sure it was
18   accurate?
19        A.   Safeguard?  You mean --
20        MR. ODIM:  Objection to form.
21   BY THE WITNESS:
22        A.   Looking at how they register their
23   race or I don't understand when you say --
24

Page 192

1    BY MR. GREEN:
2         Q.   In essence -- in essence, you just
3    don't know the methodology used by the
4    Department --
5         A.   No.
6         Q.   -- of Justice or any of the other
7    reports?
8         A.   No, but nationally there are far
9    more -- in proportion to the population, there are
10   far more African-Americans in terms of percentage
11   in jail and young men who get arrested and what
12   that means to the rest of their lives and the
13   charges placed against them.  I did a study one
14   time for -- in Valencia on the number of resisting
15   arrests against black youngsters vis-a-vi white
16   youngsters.  It's huge.  It's the propensity --
17   the issue is the propensity of the department to
18   lean heavily and, therefore, have a tremendous
19   impact on the lives of African-Americans versus
20   people of other races.
21        Q.   So what are the reports or analyses
22   that you personally did in Chicago?
23        A.   None.
24        Q.   Now, again, Lane was 2009 to 2015.

48 (Pages 189 to 192)

L.A. Court Reporters, L.L.C.
312-419-9292

Page 193

1  For opinion 18, do you have anything that would
2  change this opinion for the 2010 to 2016 time
3  period in this Hudson case?
4      A.    No.
5      Q.    Opinion 19.  "The City of Chicago
6  failed to take any steps to curb this
7  disproportionality," what basis do you have for
8  this opinion?
9      A.    The statistics themselves and the
10 facts as stated in the studies themselves and that
11 there has been no change.
12     Q.    What about the disciplinary system
13 that creates the disproportionality, what is it
14 that you state that causes this
15 disproportionality?
16         MR. ODIM:  Objection.  Form.
17 BY THE WITNESS:
18     A.    Can you read the question?  I want
19 to answer this correctly.  Can you read that back?
20 BY MR. GREEN:
21     Q.    You're saying they failed to take
22 any steps to curb the disproportionality that
23 because you say there is a widespread custom of
24 sustaining and disciplining officers less often

Page 194

1  for misconduct against African-American civilians.
2  So what is it in the disciplinary system itself
3  that creates the disproportionality?
4      A.    Okay.  The DOJ -- let me make --
5  start with this.  The DOJ report I think very
6  correctly and with great clarity identifies the
7  systematic problem in the Chicago Police
8  Department regarding their racial bias, in
9  particular African-American individuals.  And that
10 this is a Monell issue as I can identify it as a
11 Monell issue, but also the -- the impact of the
12 police services and the quality of life in the
13 city including their safety, the -- their
14 perception of a confidence in the police
15 department, their reliability on the police
16 themselves for their own protection and their
17 safety are all reflective of the -- this fact of
18 disproportionate bias.
19     Q.    All right.
20     A.    And, in conclusion, should have been
21 addressed long ago, needs to be addressed now and
22 was not addressed during the time of -- the timing
23 that we're talking about and I consider it to be
24 part of the Monell.

Page 195

1      Q.    All right.  In the -- talking about
2  the timing for opinion 19, in Lane 2009 to, excuse
3  me, 2015, is there anything to change your opinion
4  in 19 for this time period 2010 to 2016?
5      A.    No.
6      Q.    Okay.  Going on to your fourth,
7  failure to train general opinion, opinions 20 to
8  23A.
9          Opinion 20.  "Chicago had a de
10 facto policy or widespread custom or practice of
11 failing to train officers in the proper use of
12 force generally and with respect to the discharge
13 of firearms against civilians and fleeing suspects
14 in particular, and in failing to train officers in
15 the proper use of intervention in another
16 officer's use of force generally and with respect
17 to the discharge of firearms against civilians and
18 fleeing suspects in particular," what are the
19 factual bases for this claim of failure to train?
20     A.    Well, first of all, there is gross
21 failures in what the two officers did in their --
22 vis-a-vi their training which was don't separate
23 from your partner, don't flee solo, don't -- stay
24 in cover, stay in communication, don't put

Page 196

1  yourself deliberately in the way of harm's way
2  where you -- when there is an obvious, reasonable
3  alternative, all those things, and that this also
4  is a very significant part of the DOJ report, et
5  al.
6      Q.    Did you review the training
7  materials for these two officers?
8      A.    No, I did not see their training
9  documents as I recall.
10     Q.    So what did you review to reach this
11 conclusion?  Was it what you stated, the DOJ
12 report?
13     A.    The DOJ report and the fact that
14 they are POST certified police officers in the
15 State of Illinois.
16     Q.    So you're going on your general
17 knowledge of the POST requirements for the State
18 of Illinois?
19     A.    Yes, and the other things I
20 mentioned.
21     Q.    Meaning the DOJ report?
22     A.    Right.  The DOJ clearly sees this --
23     Q.    So you don't have any actual
24 statistics for this claim, this is just your --

49  (Pages 193 to 196)

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 197

1    what you just stated your basis was?
2         A.   Nothing in my report is based on
3    statistics.
4         Q.   You can't say whether the training
5    materials of these particular officers addressed
6    this issue or not, can you?
7         A.   Holy cow. Of course, I can. This
8    is -- this is 101. This is Police Tactics 101 and
9    anybody who does this gets pulled off the line and
10   when I was doing the training in -- as -- in the
11   patrol school I saw somebody that had that kind of
12   propensity they went back to the jail. They were
13   not allowed on the street. Not certified for
14   patrol.
15        Q.   But you personally can't say whether
16   the City of Chicago actually did train these
17   officers in the way they were supposed to act on
18   the street there?
19        A.   Let me say with confidence they were
20   trained and this was one of the issues clearly in
21   the -- in the DOJ report because they were --
22   they -- and, by the way, Williams, they tossed
23   that training into the toilet and -- when they hit
24   the streets because of the customs and practices

Page 198

1    of the department.
2         Q.   When you say they, you mean the
3    individual officers?
4         A.   And that the officers on the line as
5    a whole do that because it is the custom and
6    practice of the Chicago Police Department to
7    ignore it and not to -- not to reenforce it.
8         Q.   And the Lane case was 2009 to 2015.
9    For this opinion 20, do you have the same opinion
10   or no changes to it for the purpose of this case
11   from 2010 to 2016?
12        A.   No -- no changes.
13             MR. ODIM: I just want to insert the
14   reiteration of the --
15             MR. GREEN: You can have a standing
16   objection.
17             MR. ODIM: -- those objections to
18   make sure. Okay.
19   BY MR. GREEN:
20        Q.   Opinion 21. "Chicago failed to take
21   affirmative steps to ameliorate this custom or
22   practice of failing to train its officers in the
23   proper use of force generally with respect to the
24   discharge of firearms against civilians and

Page 199

1    fleeing suspects in particular."
2             Is this essentially a redundant
3    opinion as to opinion 20?
4         A.   Yes, except that opinion 20 is the
5    training and 21 is the affirmative steps, the
6    continuing reenforcement.
7         Q.   And what is the factual basis to say
8    that the City was not taking affirmative steps to
9    ameliorate any perceived custom or practice in
10   this regard?
11        A.   Because there is no evidence that it
12   was ever done, there was no commentary about it
13   and it is not in any of the reports including the
14   DOJ report.
15        Q.   And what about have you reviewed any
16   training materials that were in process of being
17   renovated or -- or redone in the City of Chicago
18   during this period?
19             MR. ODIM: Object to form.
20   BY THE WITNESS:
21        A.   Only the recommendations by the DOJ
22   and the City Commission.
23   BY MR. GREEN:
24        Q.   So you reviewed no other materials?

Page 200

1         A.   Correct.
2         Q.   So you can't say whether this issue
3    was addressed or not beyond what you saw in those
4    reports?
5         A.   Not beyond the timeframe as listed
6    in my report.
7         Q.   All right. Again, Lane was 2009 to
8    2015. Do you have any changes to this opinion 21
9    in regard to this case, the Hudson case, from 2010
10   to 2016?
11        A.   No.
12        Q.   Opinion 22. "The failure of Chicago
13   to maintain an effective training system which
14   prevented police misconduct and protected against
15   the culture that gives officers the belief that
16   their bad behavior would effectively go unpunished
17   amounted to a de facto policy of failing to train
18   officers including in the proper use of force when
19   confronted with the decision to discharge a
20   firearm against a civilian." Again, is this
21   essentially the same opinion as cited in 20 and
22   21?
23        A.   Yes.
24        Q.   And you have the same basis for this

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 201

1   opinion?
2       A.   Yes.
3       Q.   And you reviewed the same materials
4   or didn't review the same material as you
5   mentioned in 20 and 21?
6       A.   Correct.
7       Q.   Are you aware of any improvements or
8   changes implemented in the five years prior to the
9   year 2016?
10      A.   Prior to or since?
11      Q.   Prior to the shooting of 2016.
12      A.   No, nothing prior to that.
13      Q.   Are you aware of some after 2016?
14      A.   No, I've not been made aware of, but
15  I'm hopeful there have been or will be.
16      Q.   Again, for opinion 22, Lane was 2009
17  to 2015, do you have any change in this opinion 22
18  for the purposes of this case for the time period
19  2010 to 2016?
20      A.   No.
21      Q.   Okay.  Opinion 23A as we had talked
22  about earlier.  "City of Chicago and CPD's failure
23  to train officers in the proper use of force with
24  respect to the discharge of firearms against

Page 202

1   civilians and fleeing suspects in particular was
2   the moving force behind Loury's death."
3            Now, what factual basis do you
4   have in this report that this was -- the failure
5   to train was actually the moving force behind
6   Loury's death?
7       A.   The training what I had in mind when
8   that was written for the cases was we have a
9   process in the training it's called muscle memory
10  or conditioned response, which is designed to
11  eliminate the instinctive response officers or
12  humans have that get in the way of the proper
13  tactic.  An example is you have an officer intent
14  on making an apprehension that jumps out of the
15  car and runs headlong into chase after a suspect
16  leaving his partner behind, not knowing what kind
17  of problems his partner is facing or his partner
18  faces, too, et cetera.
19           That is sort of an instinctive
20  from a young officer wanting to make the arrest,
21  go after the guy, but the conditioned response
22  training is I'm not going to do that, I've got a
23  guy in the car, he is there, I've got to stay with
24  my partner, I'm going to let this guy go.  I'll

Page 203

1   find him.  I'll find out who he is when we take
2   that driver and give him a little bit of a
3   squeeze.  So that's the conditioned response,
4   muscle memory, and that's what I'm talking about
5   here.
6       Q.   And in addition to that, you're
7   basically basing the same review of materials for
8   this opinion 23A as the previous three opinions?
9       A.   Yes.
10      Q.   And in what way was anyone involved
11  in this specific case not sufficiently trained in
12  use of force, Officer Hitz, Riordan?
13      A.   Riordan and Hitz both demonstrate
14  improper training.  Because even though they were
15  taught -- I'm very confident they were taught how
16  to do this.  They both abandoned that reality and
17  went headlong into the utmost of stupidity.  I
18  don't know how else to say it.
19      Q.   So --
20      A.   Riordan leaves his radio car behind.
21  I mean, what a dilemma.  He hears shots fired.  I
22  understand he wants to get to his partner, but
23  it's a mess.
24      Q.   In -- Lane was 2009 to 2010 -- I'm

Page 204

1   sorry -- 2015.  In your opinion 23A, is it the
2   same, any changes in this opinion for this case
3   from 2010 to 2016?
4       A.   No.
5       Q.   Now, going to your final code of
6   silence opinion, opinions 23B, as we said, to 28.
7   Chicago -- 23B.  "Chicago had a de facto policy or
8   widespread custom or practice of ignoring, denying
9   or covering up the bad actions of a colleague or
10  colleagues, or, in other words, a code of
11  silence," what basics do you have in this report
12  for this claim?
13      A.   They come from three sources; the
14  report itself, the incident here and my -- my own
15  personal experience as an administrator, law
16  enforcement officer.
17      Q.   And that was in Los Angeles County?
18      A.   Right.
19      Q.   Other than Los Angeles County and
20  the reports you read here, was there any other
21  basis?
22      A.   No, I'm talking about all the 48
23  items.  That's my answer.
24      Q.   And where in the shootings between

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 205

1    2009 and the period -- well, sorry -- Strike that.
2              Is your perceived code of
3    silence unique to the Chicago Police Department?
4         MR. ODIM:  Objection.  Form.
5    BY THE WITNESS:
6         A.   No.
7    BY MR. GREEN:
8         Q.   So other departments you perceived
9    as you define the code of silence today have the
10   same issues?
11        A.   Yes, they -- it is an issue in the
12   profession, not only just in the police
13   profession, but we're talking about police.  It's
14   an issue everywhere and it has to be attended to
15   constantly by the line -- by the chain of command.
16        Q.   In fact, as you stated, it's common
17   to some extent in all professions, correct?
18        A.   Yes.  Even the lawyers, I think.
19        Q.   And even expert witnesses perhaps?
20        A.   Correct.
21        Q.   So in the Lane case from -- you
22   know, covered opinion 23 from 2009 to 2015, was
23   there anything to change your opinion in this case
24   for the time period 2010 to 2016 for this

Page 206

1    particular case?
2         A.   No.
3         Q.   Opinion 24.  "The failure to
4    ameliorate the code of silence despite being
5    placed on notice and acknowledging its existence
6    is the result of the deliberate and conscious
7    actions of Chicago and its policymakers."
8              What factual basis do you have
9    in this report for this claim that there was
10   deliberate and conscious actions of the Chicago --
11   Chicago and its policymakers not to ameliorate
12   this perceived code of silence?
13        A.   They come from two sources as I
14   understand your question.  One is the reports.
15   You keep referring back to them.  The other is --
16        Q.   That's the one you cited in your --
17        A.   Right.
18        Q.   -- report?
19        A.   Right.  But the -- and I'm going to
20   use this as an example.  The investigator,
21   including IPRA later on, the Chicago Police
22   accident investigator comes to the scene within
23   very short order of the shooting, takes a look,
24   sees the bullet hole, ignores it, does nothing

Page 207

1    further, now that is a classic code of silence
2    example.
3         Q.   This is the person from the
4    Independent Police Review Authority, not an acting
5    officer, correct?
6         A.   No, I'm talking about the first two
7    detectives that come out and then there is a
8    two-hour gap as you know I talk about it and then
9    they wind up going into the station, getting
10   interviewed, no recording, just --
11        Q.   Are you aware of the frequency of
12   shootings in that area at that time?
13        A.   I don't know exactly how many, but
14   the -- Chicago gets a lot of shootings, but --
15   okay.  I'll wait for the next question.  So that's
16   an example.  That's what I'm talking about here.
17        Q.   Do you identify each instance of
18   deliberate indifference that you cite here in
19   failure to ameliorate other than what's -- you
20   cited in these reports?
21        A.   Well, clearly, the DOJ says you guys
22   are not -- when I say you guys, the Chicago Police
23   Department, I'm getting a little tired, sorry, I
24   don't want to talk a little bit higher level.  The

Page 208

1    Chicago Police Department is doing -- is not
2    acknowledging the problem of the code of silence
3    to the degree that it will prevent it from
4    occurring wherever possible, see it for what it is
5    when it occurs and that's -- certainly is
6    demonstrated in the incident.
7         Q.   And what would you say the City
8    should have done differently over the years?
9         MR. ODIM:  Objection.  Foundation.
10   Objection.  Improper hypothetical.
11   BY THE WITNESS:
12        A.   I've given a lot of thought to that
13   kind of question and I know I said it repeatedly
14   values, attitudes and beliefs.  First and
15   foremost, the line has to embrace the importance
16   of embracing the truth of wherever it is and
17   whatever occurs and as painful as it may be in
18   terms of what it does to the brother officer
19   misconduct has to be addressed, has to be tended
20   to and reported because in the end it's not only
21   reflective of the officer's safety, but the safety
22   of those around that officer and the community and
23   that if the attitude of the line, which is
24   fostered and fed as a desire of the entire

52  (Pages 205 to 208)

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 209

```
 1    organization, that the police serve the community
 2    to make them safe and protect them from the bad
 3    and the evil, I'll use that term, then it fits
 4    with eliminating to the best extent possible the
 5    code of silence.
 6    BY MR. GREEN:
 7        Q.   Again, opinion 24, for Lane it was
 8    2009 to 2015.  Is your opinion 24 not changed for
 9    the purposes of this period of time 2010 to 2016?
10        A.   No.
11        Q.   Okay.  Opinion 25.  "Chicago created
12    an environment that nurtured a code of silence and
13    that made defendant officers believe they had
14    license to operate with impunity without fear of
15    punishment."
16             What is the factual basis for
17    this claim in regard to Officer Hitz and Officer
18    Riordan?
19        A.   The sequence of these five
20    overarching issues and the 29 specific opinions
21    are -- have a beginning and an end.  The code of
22    silence is the end.  And so it's the case of the
23    code of silence builds in the very beginning on
24    the department's failure to discipline, et cetera.
```

Page 210

```
 1    All of that cumulative opinion rests on these last
 2    opinions on the code of silence.  They create the
 3    soup for the code of silence to operate.
 4        Q.   Now, you said earlier you're aware
 5    of Rule 14, you reviewed that?
 6        A.   That's why I put specific to Rule
 7    14.
 8        Q.   Are you aware of the sustained
 9    amount of Rule 14's in the City of Chicago?
10        A.   You know, I don't remember if it was
11    even addressed in the material given to me, but --
12        Q.   How about --
13        A.   The answer is, no, I don't know.
14        Q.   And Rule's 21 to 22 regarding
15    criminal conduct or observance of misconduct?
16        A.   I'm aware that there are rules
17    regarding that.
18        Q.   And spars, summary punishment for
19    violations of administrative activities?
20        A.   The issue is how is it enforced and
21    when is it enforced?
22        Q.   And how about resignations under
23    investigation, are you aware of any of those
24    statistics?
```

Page 211

```
 1        A.   No.
 2        Q.   Again, in opinion 25, Lane was from
 3    2009 to 2015, are there any changes in this
 4    opinion 25 for the purposes of this case 2010 to
 5    2016?
 6        A.   No.
 7        Q.   Okay.  Opinion 26.  "Chicago's
 8    deliberate and conscious choice to nurture a code
 9    of silence and their failure to ameliorate it was
10    the moving force behind the death of Loury."
11             Again, what are the factual
12    bases to say that the code of silence caused the
13    death of Loury?
14        A.   This particular sentence falls in
15    the category of the other one I wanted to correct
16    that I'm not saying this is the singular issue,
17    it's cumulative and I think, better said, the jury
18    considering the facts of this case would -- would
19    reasonably conclude -- a jury or police
20    administrator would reasonably conclude than
21    continue on with that statement.
22        Q.   So you're saying the code of silence
23    wasn't the moving force in and of itself behind
24    the death of Loury?
```

Page 212

```
 1        A.   Correct.
 2        Q.   And which, if any, of the officers
 3    were involved in past conduct where the code of
 4    silence was present?
 5        A.   I'm not aware of any other than in
 6    this environment, then an officer can say things
 7    that the physical evidence belies.  Here is the
 8    thing about physical evidence.  Physical evidence
 9    is neutral.  It takes no side.  Physical evidence
10    doesn't lose its memory and physical evidence
11    tells the truth.
12        Q.   Again, Lane was from 2009 to 2015.
13    For purposes of opinion 26, have you made any
14    changes to this opinion 26 in this case for 2010
15    to 2016?
16        A.   No.
17        Q.   Opinion 27.  "In this case, the
18    inadequate CPD and IPRA investigations, the lack
19    of a finding of misconduct including for false and
20    misleading statements and the failure of defendant
21    officers to intervene and report the misconduct of
22    others and the failure to discipline the officers
23    involved are hallmarks of a code of silence."
24             What is the basis in this report
```

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 213

1   to say it's a hallmark of a code of silence?
2       A.   Well, a hallmark is the identifier.
3   That's why I used the word, not in this but the
4   other, and without it I think the true facts of
5   this shooting would have come to the surface.
6       Q.   And could you state which action
7   evidences code of silence in this particular case?
8       A.   Do you want me to give you some
9   particulars because I've given a number of them?
10      Q.   Other than what you've already
11  testified to.
12      A.   Well, I'm content.  I would
13  reference Scott's report I think is very excellent
14  in terming -- in documenting time, trajectory, et
15  cetera.
16      Q.   All right.  Lane was from 2009 to
17  2015.  For opinion 27, the same thing, 27 -- for
18  the purposes of this timeframe 2010 to 2016, is
19  there anything that would change your opinion for
20  this case?
21      A.   No.
22      Q.   Finally, opinion 28.  "Any
23  reasonable officer in the CPD during 2010 to 2016
24  would have been aware of the systemic flaws in

Page 214

1   Chicago's investigative process in the
2   disciplinary -- discipline system.  Those
3   officers, who like the defendants, chose to engage
4   in misconduct did so with the reasonable belief
5   that their actions would not subject them to any
6   thorough and meaningful investigation and would
7   not be subject to meaningful application of
8   discipline so that their bad behavior would
9   effectively go unpunished."
10          Is this a redundant opinion
11  basically of the prior three or four opinions
12  under code of silence?
13      A.   Yes.
14      Q.   And what is the basis in your
15  opinion for a systemic flaw regarding the code of
16  silence?
17      A.   Okay.  So systemic meaning pervasive
18  throughout the organization and without that you
19  don't have this condition of -- throughout the
20  agency officers operating with impunity and that's
21  what I see in this particular case.
22      Q.   Is the City required to have a
23  perfect system in this regard?
24      A.   No, it's not and that's not at all

Page 215

1   what I'm commenting on.  I don't consider -- I
2   don't hold the City as -- as expected to be
3   perfect.  That's -- that's not part of the human
4   condition, but certainly anybody that has reviewed
5   Chicago and its problems, including its death rate
6   by gunfire, would have to say something is
7   seriously going on here.
8       Q.   All right.  The Lane case was from
9   2009 to 2015, the same opinion 28, do you have any
10  changes in regard to this case of 2010 to 2016
11  time period?
12      A.   No.
13      Q.   Would you agree that all 29 opinions
14  are based upon your belief that an underlying
15  constitutional violation occurred here?
16      A.   Well, that's the purpose of the
17  report that the Monell condition is a
18  constitutional violation.  Yes.
19      Q.   So you're saying that the underlying
20  constitutional violation of the shooting of Pierre
21  Loury is what this Monell is based on?
22          MR. ODIM:  Objection.  That
23  misstates his evidence.
24

Page 216

1   BY THE WITNESS:
2       A.   No, that's not what I'm saying.  I'm
3   saying that what I took your question is the
4   underlying Monell -- I think I might have to have
5   the question read to me.
6           The underlying existence of the
7   Monell is the -- the existence of the Monell is
8   the underlying violation of the Constitution.
9   That's what I'm saying.
10  BY MR. GREEN:
11      Q.   So essentially the conduct --
12  perceived conduct of the City in and of itself
13  separate from what actually occurred that night
14  regarding Pierre Loury is the constitutional
15  violation that you're talking about?
16          MR. ODIM:  Objection to form.
17  Misstates his evidence.
18  BY THE WITNESS:
19      A.   I think I said it precisely,
20  correctly, what I was intending, that the
21  Monell -- the existing Monell as reflected in
22  my -- as I have documented in my report, stated in
23  my report, better said, stated in my report based
24  on the items that I listed and is -- and the

54  (Pages 213 to 216)

L.A. Court Reporters, L.L.C.
312-419-9292

Page 217

1    incident, the underlying incident which brings us
2    to that Monell commentary, is the -- let me back
3    up.
4            And the Monell is the
5    constitutional violation that I sought to address
6    and testify to here at this deposition, the
7    Monell. Of course, if the jury finds the facts of
8    the shooting are unconstitutional, that adds to
9    the opinion.
10   Q.    But if they find it was
11   constitutional and this, in fact, was a justified
12   shooting, then your opinions on Monell are
13   irrelevant, correct?
14           MR. MOWATT: Objection. Objection.
15   Foundation. Objection. Improper hypothetical.
16   BY THE WITNESS:
17   A.    So, thank you for that and the
18   answer is no. As I said previously for a number
19   of hours, regardless of how this shooting actually
20   did occur is not -- does not hinge on whether the
21   Monell exists or not. The Monell exists.
22   BY MR. GREEN:
23   Q.    I'm saying the constitutional
24   violation that's being alleged under the Monell

Page 218

1    rubric.
2    A.    Well, if you put it that way, the
3    shooting death of Loury is a constitutional
4    violation, but I never considered my report as
5    hinging solely on Loury's -- the circumstances of
6    how Loury was shot to death.
7    Q.    So it's more commentary on general
8    activities in Chicago?
9            MR. ODIM: Objection. Foundation.
10   That misstates his evidence.
11   BY THE WITNESS:
12   A.    No, I hope in 29 separate attempts
13   for me to be precise in -- first, as I said the
14   ocean, which is the Chicago Police Department, and
15   the two officers that swim in that ocean, and what
16   they did because of that is the best way I can say
17   it.
18           MR. GREEN: Let's take a break.
19           THE VIDEOGRAPHER: We are going off
20   the video record at 4:12 p.m. and this is the end
21   of video media four.
22           (Whereupon, a break was taken
23                after which the following
24                proceedings were had.)

Page 219

1            THE VIDEOGRAPHER: We are back on
2    the video record at 4:22 p.m. This is the
3    beginning of video media five. Go ahead.
4            MR. GREEN: This is Jonathan Green.
5    I have no further questions. The attorney for the
6    individual defendants --
7    C R O S S    E X A M I N A T I O N
8            BY MR. BARNETT
9    Q.    Sir, this is -- my name is Shawn
10   Barnett and I represent Defendant Sean Hitz and
11   Jeffery Riordan in this case and I have just a
12   couple of questions.
13           Now, you are not offering any
14   opinions regarding whether or not the shooting
15   itself was justified or unjustified, correct?
16   A.    Correct.
17   Q.    And on the second or third paragraph
18   of your report, you wrote that you are not going
19   to opine on the credibility of the witnesses
20   involved in the shooting incident itself, correct?
21   A.    Correct.
22   Q.    But you do say that the opinions you
23   offer are premised on the truthfulness of the
24   plaintiff's allegations and why do you do that?

Page 220

1    A.    Because there has to be a starting
2    point and so I -- there are allegations in the
3    complaint offered and I considered those. That's
4    why I put that sentence in there.
5    Q.    So your report is based on the
6    premise that the plaintiff's allegations are true?
7    A.    Well, the plaintiff's allegations
8    regarding the Monell are true. I'm taking -- they
9    have alleged that. They -- they have alleged that
10   the shooting did not occur as proffered by the
11   defendant officers certainly.
12   Q.    And you're taking that as true as
13   well?
14   A.    No, I'm taking it in consideration
15   not as true -- it needs to be said this way. I'm
16   not taking it as completely true. I'm taking
17   it -- I'm accepting that -- I'm accepting it for
18   certain purposes as true and as supported by the
19   physical evidence. That's the best way to say it.
20   There is significant physical evidence in that
21   regard.
22   Q.    And that was based on the report of
23   plaintiff's retained expert Ronald Scott?
24   A.    Partly, and I listed his report, but

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c924c19f87

Page 221

1    I could see it for myself as well. He was far
2    more precise in his evaluation.
3         Q.   Have you received any training in
4    crime scene reconstruction?
5         A.   Oh, as a detective and detective
6    bureau commander, I did often. We sorted -- as a
7    generalist detective. That would be the best way
8    to say it.
9         Q.   Did you receive any specialized
10   training in that?
11        A.   Just the generalist detective
12   training. That's all I received.
13        Q.   So no classes or college or like FBI
14   run or anything like that?
15        A.   Correct.
16        Q.   All right. And you've reviewed the
17   deposition of the plaintiff and the deposition of
18   Officer Hitz and then the IPRA statements of Hitz,
19   Riordan and then a bunch of individuals identified
20   as Rule 30(b)(6) witnesses, correct?
21        A.   Correct.
22        Q.   Did you review the deposition of any
23   of the independent witnesses?
24        A.   Only the depositions as listed. No

Page 222

1    others.
2         Q.   So no independent witnesses, medical
3    examiners or Illinois State Police forensic
4    personnel?
5         A.   You are correct.
6         Q.   Did you review the deposition of
7    Ronald Scott?
8         A.   No, I understand he was deposed, but
9    I have not seen it.
10        Q.   Did you review the report of the
11   other expert witness in this case, Lucien Hague?
12        A.   Yes, I've seen it.
13        Q.   That's not listed on your documents
14   that you reviewed, right?
15        A.   You know, you're correct. It just
16   recently was shown to me and I should have
17   indicated that I've seen it.
18        Q.   Okay. And I understand that you
19   recently went to visit the site of the shooting
20   incident?
21        A.   Yes.
22        Q.   When did you go do that?
23        A.   Right around 3:00 yesterday. 3:00
24   p.m.

Page 223

1         Q.   3:00 p.m. And this shooting
2    occurred in April of 2016, correct?
3         A.   Yes.
4         Q.   You didn't go to the scene any other
5    time than the one you did yesterday?
6         A.   That's correct.
7         Q.   And yesterday was December 26th,
8    2017?
9         A.   Correct.
10        Q.   Now, I'm looking at your report and
11   you wrote that you accepted as true that the
12   bullet struck the window, the second bullet fired
13   by Officer Hitz struck the window, correct?
14        A.   Yes.
15        Q.   And that's based on Ronald Scott's
16   report?
17        A.   Yes.
18        Q.   And it's based solely on Ronald
19   Scott's report, right, you did no independent
20   investigation into whether or not that was
21   actually Officer Hitz's second bullet?
22        A.   Only what was occurred during that
23   investigation and the photographs that were taken.
24   Other than that, nothing else other than Scott.

Page 224

1         Q.   And you wrote that -- you comment in
2    your report that it was problematic that you --
3    that Officer Hitz said that Pierre Loury was
4    quickly able to climb over the fence because you
5    reference Officer Riordan's statement that he
6    needed assistance to get over the fence, correct?
7         A.   Correct.
8         Q.   And you said that the fence was six
9    foot high?
10        A.   You know, it's not six feet high.
11   It's substantially lower than that. I took --
12   when I wrote this report, I accepted the
13   statements in the investigative file as six feet
14   and it's not and Riordan as you know says he
15   thought it was six feet.
16        Q.   Does the fact that it was
17   considerably lower than six foot affect your
18   opinion that it may have taken Loury additional
19   time to climb over the fence?
20        A.   Not in particular.
21        Q.   Okay. So, Loury -- did you review
22   the medical examiner's file?
23        A.   The autopsy and the photos, yes.
24        Q.   You were able to see that Mr. Loury

56 (Pages 221 to 224)

Electronically signed by Steven Brickey (501-307-281-8473)                954cbfef-baad-48a4-9690-8c9024c19f87

Page 225

1    was a slight individual with a trim or athletic
2    build?
3        A.    Yes.
4        Q.    You know that Officer Riordan was
5    6'5" and I believe he gave a description that he
6    was significantly larger, more heavyset?
7        A.    Yes.
8        Q.    Does the fact that he is more
9    heavyset than Mr. Loury, does that affect your --
10    did you take that -- the body type of the two
11    individuals into consideration when you were
12    stating that it was improbable that Loury was able
13    to climb the fence without assistance in such a
14    quick time?
15        A.    I don't think I said it was
16    improbable he could climb the fence.  The quick
17    time -- I accepted Scott's timing.  He says the
18    whole thing start to finish was 17 seconds.  I
19    think that's physically accurate and I noted that
20    Riordan had to be helped, I'll use that term, to
21    go over the fence and he was the first one over
22    the fence after Loury.
23        Q.    So -- so the time you just accepted
24    Mr. Scott's analysis on that point?

Page 226

1        A.    Oh, no.  There is -- there is a
2    clock.  There is a recording.  It's 17 seconds.
3        Q.    But the timing that -- Mr. Scott's
4    analysis of how quickly it took Mr. Loury to run
5    you accepted Mr. Scott's analysis on that point?
6        A.    Only -- only generally.  You know,
7    Scott talks about how fast he could run and how
8    much time there was.  Clearly this occurs very,
9    very quickly and the confrontation time I noted
10    that Scott puts it at I forget -- within seconds,
11    like less than three seconds.  I have it in the
12    record.  I think I might have it written down
13    here.  I don't.  But that was enough for me to
14    know that it happened very, very quickly and at
15    close range.  That was sufficient for my
16    evaluation.
17        Q.    All right.  Now, you started out
18    with the premise that you weren't making any
19    credibility assessments, but isn't it true that
20    numerous times throughout your deposition today
21    you have made the comment that the physical
22    evidence belies the officer's testimony, isn't
23    that opining on the credibility of officers?
24        MR. ODIM:  Objection.  Form.

Page 227

1    BY THE WITNESS:
2        A.    In that regard, it does certainly.
3    And I explained the importance of physical
4    evidence.
5    BY MR. BARNETT:
6        Q.    So, in a way, you are commenting in
7    that you believe the officer's testimony is not
8    credible?
9        MR. ODIM:  Object.  Misstates his
10    evidence and form.
11    BY THE WITNESS:
12        A.    Well, to that extent, I am in that
13    what the officer -- what the two officers said
14    occurred in terms of their account as they gave it
15    and what the physical evidence indicates there is
16    a clear discrepancy and so that is, I guess, in
17    that regard, a credibility issue and I do comment
18    in favor of the physical evidence.
19    BY MR. BARNETT:
20        Q.    And what exact physical evidence are
21    you referring to in that -- what specific physical
22    evidence do you -- are you relying upon to opine
23    that you do not find the officers trustworthy?
24        MR. ODIM:  Objection.  Misstates his

Page 228

1    evidence and form.
2    BY THE WITNESS:
3        A.    I comment in my report, but I'll
4    give you one example I think is a key example.
5    Hitz says that he shot Loury while he was down and
6    only then.  Two shots, quick succession, we have
7    them recorded and that would not line up with the
8    shot in the window.  That was obvious -- would be
9    obvious to any detective at the scene, any
10    investigator at the scene and would require a
11    workup on that issue, which didn't occur and
12    speaks, I think, volumes.
13        So knowing that one of the shots
14    did not go into Loury and we have Loury's body in
15    position we know and the allegation or the
16    statement "I shot both while he was down," then
17    somewhere in that general range is going to be the
18    slug from -- from Hitz's gun and there was no
19    effort to locate it or document it.
20    BY MR. BARNETT:
21        Q.    And so it is only Mr. Scott who
22    opined that Officer Hitz's second shot went into
23    the window?
24        A.    You know, you put your finger on it.

57 (Pages 225 to 228)

Electronically signed by Steven Brickey (501-307-281-8473)                                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 229

1   You're right. It took Scott to document that and
2   to put it in good context. I saw it obviously and
3   I saw it as a gross deficiency and deliberate. I
4   took it as deliberate. I don't know how it could
5   be seen any other way, looking the other way that
6   they ignored it deliberately because there is
7   commentary that in the IPRA statement that the
8   investigator officer at the scene simply took
9   Hitz's statement knowing that that would not line
10  up with the shot through the window, that would
11  not explain how that shot -- if the shot was from
12  Hitz's gun, that that was clearly belied Hitz
13  statement on how the shooting occurred and,
14  therefore, concluded on that basis it must be from
15  another gunshot from some other time.
16      Q.   So you have the shot in the window,
17  is there any other physical evidence that you
18  relied upon in your opinion that the officer's
19  testimony was untruthful?
20      A.   Yes, there is the time that Hitz and
21  Riordan say the sequence of what occurred
22  physically, how things could be done in the 16 or
23  17 seconds doesn't appear in my opinion to line up
24  and then it falls into the category of what is not

Page 230

1   documented. As I said before, it appears
2   deliberate. There are a number of those -- a
3   number of facts that fall into that category.
4       Q.   So the shot in the window, the
5   timing of everything that happened, any other
6   physical evidence?
7       A.   Well, it's the absence -- I said the
8   absence of things such as locating if there were
9   two shots fired and it's uncontested there were.
10  There are two shell casings. There are two
11  recorded gunshots. The timing of those two
12  gunshots is uncontested. We have a bullet in
13  Loury, it's not through and through and we have a
14  missing slug. The answer to that tune is bring
15  out the tent, bring out the trailer and we're not
16  leaving until we find that slug or account for it.
17      Q.   All right. So the shot in the
18  window, the timing and the absence of continued
19  searching for that second shell?
20      A.   Well, and there is more. There is
21  the failure to walk through it, the failure to --
22  even accepting Hitz's statement about that cannot
23  be one of my shots, failure to recover where that
24  slug went, to run the trajectory through --

Page 231

1   because we have two points, we have the blind and
2   we have the window itself and along that line is
3   going to be the muzzle of the gun that fired that
4   slug, the failure to workup the forensics on the
5   gun itself as I've discussed. Those issues come
6   to mind.
7       Q.   What do you mean by the forensics of
8   the gun?
9           MR. ODIM: Objection. Asked and
10  answered.
11  BY THE WITNESS:
12      A.   There is three DNA profiles and
13  they're different races. Now, isn't it a simple
14  thing of "Hey, Hitz, hey Riordan, let's have your
15  DNA. Let's take a look."
16  BY MR. BARNETT:
17      Q.   Have you reviewed any of the actual
18  DNA testing that was conducted on the firearm?
19      A.   Only what is in the reports done by
20  Illinois's crime lab. They did a profile.
21  They're three specific contributors, none of which
22  matched Loury precisely except for race.
23      Q.   You didn't see the most recent DNA
24  report that was released within the past several

Page 232

1   months?
2       A.   I don't know what you're talking
3   about.
4       Q.   Okay. I'll take that as a no.
5           MR. ODIM: Misstates his evidence.
6   BY MR. BARNETT:
7       Q.   You never -- you didn't do any
8   analysis into the trajectory of the bullet that
9   went through the window itself, correct?
10      A.   I did not.
11      Q.   You relied on Mr. Scott's analysis
12  of that?
13      A.   Correct.
14      Q.   And there was snow on the ground
15  when you went out there yesterday?
16      A.   There was. About two inches.
17      Q.   A lot different than California,
18  right?
19      A.   Yeah, barely. I left 80 degrees.
20          MR. BARNETT: All right. I have no
21  further questions on behalf of the individual
22  defendants. I'll give it back --
23          MR. ODIM: Plaintiff has no
24  questions.

Electronically signed by Steven Brickey (501-307-281-8473)          954cbfef-baad-48a4-9690-8c9024c19f87

Page 233

REDIRECT   EXAMINATION
BY MR. GREEN
Q.   I would just like to mention when
you first came in I asked if you brought anything
with you and in reference to the questions to
individual defendant attorney I see you're making
reference to notes, do you have notes on this case
that you brought with you?
A.   These are little prompts for -- to
anticipate questions for the depo to make it run
smoothly.
Q.   Let me just have a copy of that for
the record.
A.   You can have it.
MR. GREEN: I'll be right -- we'll
just take a quick break.
THE VIDEOGRAPHER: Okay. We are
going off the video record at 4:40 p.m.
(Whereupon, a break was taken
after which the following
proceedings were had.)
THE VIDEOGRAPHER: We are back on
video record at 4:43 p.m.
MR. GREEN: All right. Thank you.

Page 234

BY MR. GREEN:
Q.   Mr. Clark, you handed me your notes.
We made copies for everyone. I marked it as
Exhibit 5.
Would you take a quick look at
Exhibit 5 if you have your notes in front of you,
the original.
(Document marked as Clark
Exhibit No. 5 for
identification.)
BY THE WITNESS:
A.   I have it.
BY MR. GREEN:
Q.   At the top, you have September 2017
you have site visit, is that 3 -- is that 3:30
p.m. or 3:00?
A.   I think it's -- it is 3:30, right?
Q.   And these were notes from your visit
yesterday?
A.   No, just this morning when I wrote
out these limit prompts. That's -- it is 3:30
because my plane landed at 4:30 and -- I mean,
2:30. So, right.
Q.   And the second page you have a

Page 235

diagram, is that diagram from when you visited
there?
A.   I wrote it out this morning so I
know where north was and orient myself.
Q.   Okay. And you have a note there
about the McIntosh case and when that occurred?
A.   Correct.
Q.   August 24th, 2014. And just on the
front, you also have your opinions one through
five.
Are those the five general
opinions that we discussed earlier?
A.   Yes.
Q.   And that's how you would group them
yourself?
A.   Yes.
Q.   And then you have to the right DOJ,
is that -- that you base those upon the DOJ
report?
A.   Right, they're all taken out -- as
you know, DOJ lists seven. These are five out of
those seven.
Q.   And that's one would be six, two
would be five, three would be eight, four would be

Page 236

four and five would be six --
A.   Correct.
Q.   -- is that correct? And just up on
the left-hand top corner, what is that?
A.   Oh, that's my career. I just wanted
to -- in terms of years starting out with Central
Jail, patrol, detective bureau, communications --
then I became a sergeant, communications, patrol,
EOB, became a lieutenant, CJ, Central Jail, CVS,
Crescenta Valley Station, RFB, Reserve Forces
Bureau and the last NORSAT. Those are the basic
time periods in my career.
Q.   Okay. And the 7:40 p.m. up here is
it relates to when the shooting occurred --
A.   Correct.
Q.   -- in this underlying case?
MR. GREEN: Okay. No further
questions. Thank you.
MR. ODIM: Again, no further
questions for the plaintiff and we'll reserve
signature.
MR. GREEN: I was just going to ask
you. Thank you.
THE VIDEOGRAPHER: All right. Thank

59 (Pages 233 to 236)

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)                    954cbfef-baad-48a4-9690-8c9024c19f87

Page 237

```
1    you.  This concludes today's deposition.  The time
2    is now 4:46 p.m. and we are going off the video
3    record at the end of media unit five.
4         AND FURTHER DEPONENT SAITH NAUGHT...
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 238

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
     ESTATE OF PIERRE LOURY,        )
4    Deceased, by Tambrasha         )
     Hudson, Administrator.         )
5                                   )
             Plaintiff,   ) No. 16 C 04452
6                                   )
         vs                         )
7                                   )
     CITY OF CHICAGO, Chicago       )
8    Police Officers SEAN HITZ      )
     (Star No. 6272) and JEFF J.    )
9    RIORDAN (Star No. 7716),       )
                                    )
10           Defendants.  )
11        I hereby certify that I have read
     the foregoing transcript of my deposition given on
12   December 27, 2017, at the time and place
     aforesaid, consisting of Pages 1 through 237,
13   inclusive, and I do again subscribe and make an
     oath that the same is a true, correct and complete
14   transcript of my deposition so given as aforesaid.
15
          please check one:
16
             _____ I have submitted errata sheet(s)
17           _____ No corrections were noted
18           _____
                    ROGER CLARK
19
20   SUBSCRIBED AND SWORN TO
     before me this ____ day
21   of _____, A.D., 2018.
22   _____
         Notary Public
23
24
```

Page 239

```
1                WITNESS ERRATA SHEET
2
     I wish to make the following changes for the
3    following reasons:
4    Page Line
            _____ Change: _____
5           _____ Reason: _____
6           _____ Change: _____
            _____ Reason: _____
7
            _____ Change: _____
8           _____ Reason: _____
9           _____ Change: _____
            _____ Reason: _____
10
            _____ Change: _____
11          _____ Reason: _____
12          _____ Change: _____
            _____ Reason: _____
13
            _____ Change: _____
14          _____ Reason: _____
15          _____ Change: _____
            _____ Reason: _____
16
            _____ Change: _____
17          _____ Reason: _____
18          _____ Change: _____
            _____ Reason: _____
19
            _____ Change: _____
20          _____ Reason: _____
21          _____ Change: _____
            _____ Reason: _____
22
            _____ Change: _____
23          _____ Reason: _____
24   (Signed) _____
```

Page 240

```
1                WITNESS ERRATA SHEET
2
     I wish to make the following changes for the
3    following reasons:
4    Page Line
            _____ Change: _____
5           _____ Reason: _____
6           _____ Change: _____
            _____ Reason: _____
7
            _____ Change: _____
8           _____ Reason: _____
9           _____ Change: _____
            _____ Reason: _____
10
            _____ Change: _____
11          _____ Reason: _____
12          _____ Change: _____
            _____ Reason: _____
13
            _____ Change: _____
14          _____ Reason: _____
15          _____ Change: _____
            _____ Reason: _____
16
            _____ Change: _____
17          _____ Reason: _____
18          _____ Change: _____
            _____ Reason: _____
19
            _____ Change: _____
20          _____ Reason: _____
21          _____ Change: _____
            _____ Reason: _____
22
            _____ Change: _____
23          _____ Reason: _____
24   (Signed) _____
```

60  (Pages 237 to 240)

L.A. Court Reporters, L.L.C.
312-419-9292

Electronically signed by Steven Brickey (501-307-281-8473)        954cbfef-baad-48a4-9690-8c9024c19f87

Page 241

```
 1          WITNESS ERRATA SHEET
 2
        I wish to make the following changes for the
 3   following reasons:
 4   Page  Line
                        Change: _____
 5          Reason: _____
 6                  Change: _____
            Reason: _____
 7
                    Change: _____
 8          Reason: _____
 9                  Change: _____
            Reason: _____
10
                    Change: _____
11          Reason: _____
12                  Change: _____
            Reason: _____
13
                    Change: _____
14          Reason: _____
15                  Change: _____
            Reason: _____
16
                    Change: _____
17                  Change: _____
18          Reason: _____
                    Change: _____
19          Reason: _____
20                  Change: _____
21          Reason: _____
                    Change: _____
22          Reason: _____
                    Change: _____
23          Reason: _____
24   (Signed) _____
```

Page 243

```
 1          The undersigned is not interested in the
 2   within case, nor of kin or counsel to any of the
 3   parties.
 4          Witness my official signature in and for
 5   Cook County, Illinois, on this _____ day of
 6   _____, A.D., 2018.
 7
 8
 9
10
11
             860 Bit
             STEVEN BRICKEY, CSR
12           8 West Monroe Street
             Suite 2007
13           Chicago, Illinois 60603
             Phone: (312) 419-9292
14           CSR No. 084-004675
15
16
17
18
19
20
21
22
23
24
```

Page 242

```
 1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3
 4       I, Steven Brickey, Certified Shorthand
 5   Reporter, do hereby certify that on the 27th day
 6   of December, A.D., 2018, the deposition of the
 7   witness, ROGER CLARK, called by the Defendants,
 8   was taken before me, reported stenographically,
 9   and was thereafter reduced to typewriting under my
10   direction.
11       The said deposition was taken at 30 North
12   LaSalle Street, Chicago, Illinois, and there were
13   present counsel as previously set forth.
14       The said witness, ROGER CLARK, was first
15   duly sworn to tell the truth, the whole truth, and
16   nothing but the truth, and was then examined upon
17   oral interrogatories.
18       I further certify that the foregoing is a
19   true, accurate, and complete record of the
20   questions asked of and answers made by the said
21   witness, ROGER CLARK, at the time and place
22   hereinabove referred to.
23       The signature of the witness, ROGER CLARK,
24   was reserved by agreement.
```

61 (Pages 241 to 243)

L.A. Court Reporters, L.L.C.
312-419-9292